**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

FILED
**United States Court of Appeals**
**Tenth Circuit**

**February 28, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

| | |
|---|---|
| In re: SYNGENTA AG MIR 162 CORN LITIGATION (Toups/Coffman Plaintiffs' Counsel)* | Nos. 19-3008, 19-3022, 19-3079, 19-3176, 19-3280 |
| In re: SYNGENTA AG MIR 162 CORN LITIGATION (Kansas Common Benefit Firms)* | Nos. 19-3032, 20-3002 |
| In re: SYNGENTA AG MIR 162 CORN LITIGATION (Byrd/Shields Group)** | No. 19-3174 |
| In re: SYNGENTA AG MIR 162 CORN LITIGATION (Johnson Becker, PLLC) | No. 19-3175 |
| In re: Syngenta AG MIR162 (Hossley-Embry Group) | No. 19-3178 |
| In re: SYNGENTA AG MIR 162 CORN | |

---

    \*    The parties to the appeals filed by Toups/Coffman Plaintiffs' Counsel and the Kansas Common Benefits Firms can be found in the _Joint Response on Parties to these Appeals_ filed on March 15, 2019.

    \*\*    The parties to the appeals filed by the Byrd/Shields Group can be found in the _Response on Parties to Appeal No. 19-3174_ filed on September 18, 2019, the _Supplemental Response on Parties to Appeal No. 19-3174_ filed on October 9, 2019, and the court's order of November 25, 2019.

| | |
|---|---|
| LITIGATION (Law Office of Craig Eiland, P.C.) | No. 19-3279 |

_____

| | |
|---|---|
| In re: SYNGENTA AG MIR 162 CORN LITIGATION (Demerath Group) | No. 19-3284 |

_____

**Appeals from the United States District Court
for the District of Kansas
(D.C. No. 2:14-MD-02591-JWL-JPO)**

_____

Eric Alan Isaacson, Law Office of Eric Alan Isaacson, La Jolla, California (Mitchell A. Toups, Weller, Green Toups & Terrell, LLP, Beaumont, Texas; Richard L. Coffman, The Coffman Law Firm, Beaumont, Texas; D. Allen Hossley, Hossley-Embry, LLP, Dallas, Texas, with him on the briefs), the Toups/Coffman Plaintiffs' Counsel & Hossley-Embry for the Kansas Pool Appellants.

Christina J. Nielsen, Nielsen Law Firm, Woodbridge, Virginia, Jeffrey A. Lamken, Eric R. Nitz, and Caleb Hayes-Deats, MoloLamken LLP, Washington, D.C., William P. Ferranti, The Ferranti Firm LLC, Portland, Oregon, and Thomas J. Wiegand and Matthew J. Fisher, MoloLamken, Chicago, Illinois, for the Minnesota Appellants Watts Guerra, LLP, Paul Byrd Law Firm, PLLC, and Shields Law Group, LLC.

David Campbell, O'Hanlon, Demerath & Castillo, PC, Austin, Texas (Justin B. Demerath, O'Hanlon, Demerath & Castillo, PC, Austin, Texas; A. Craig Eiland, The Law Offices of A. Craig Eiland, PC, Austin, Texas, with him on the briefs), for the Illinois Appellants, and Clayton A. Clark and Scott A. Love, Clark Love Hutson, Houson, Texas, and Martin J. Phipps, Phipps Anderson Deacon LLP, San Antonio, Texas, and Peter J. Flowers, Meyers & Flowers, LLC, St. Charles, Illinois, joined in the supplemental brief for The Clark/Phipps Group.

Timothy J. Becker (Michael K. Johnson with him on the briefs) Johnson Becker, PLLC, Saint Paul, Minnesota, for Appellants.

Bradley T. Wilders, Stueve Siegel Hanson LLP, Kansas City, Missouri, and William Lewis Garrison, Jr., Heninger Garrison Davis, LLC, Birmingham, Alabama (Patrick J. Stueve and Rachel Schwartz, Stueve Siegel Hanson LLP, Kansas City, Missouri; Don M. Downing and Gretchen Garrison, Gray, Ritter & Graham, P.C., St. Louis, Missouri; William B. Chaney and Drew York, Gray Reed & McCraw, LLP, Dallas, Texas; Scott

Powell, Bruce McKee and Tempe Smith, Hare Wynn Newell & Newton, Birmingham, Alabama; the MDL Co-Lead Plaintiffs' Counsel on behalf of Kansas Common Benefit; and Daniel E. Gustafson, Gustafson Gluek PLLC, Minneapolis, Minnesota; Lewis A. Remele, Jr., Bassford Remele, A Professional Association, Minneapolis, Minnesota and William R. Sieben, Schwebel Goetz & Sieben PA, Minneapolis, Minnesota the Minnesota Co-Lead Counsel; and Christopher A. Seeger, Stephen A. Weiss, Diogenes P. Kekatos, Seeger Weiss LLP, Ridgefield Park, New Jersey, the Settlement Class Counsel; Christopher B. Hood, Heninger Garrison Davis, LLC, Birmingham, Alabama, the Illinois Mass Action Lead Counsel, with them on the briefs) for the Joint Appellees.

_____

Before **HOLMES**, Chief Judge, and **BACHARACH** and **McHUGH**, Circuit Judges.

_____

**HOLMES**, Chief Judge.

These appeals concern attorneys' fees awarded following a historic class action settlement. Numerous plaintiffs from multiple different states—but, mainly, Kansas, Minnesota, and Illinois—sued Syngenta AG ("Syngenta"), an agricultural company. The suits against Syngenta were organized into complex, federal multi-district litigation ("MDL") based in a court in the United States District Court for the District of Kansas ("Kansas district court"). Syngenta ultimately settled with the class action plaintiffs. The Kansas district court allocated approximately $503 million in attorneys' fees and expense awards stemming from the settlement to the myriad firms participating in the class action.

Appellants in this case—the various plaintiffs' lawyers and law firms that took part in the MDL against Syngenta—challenge numerous orders published by the Kansas district court concerning the apportionment and allocation of that $503 million fee pie. Having concluded it possessed significant authority to craft the allocation of attorneys' fees in the most reasonable manner, the Kansas district court had adopted a two-stage, "general approach" of an appointed special master to the allocation of the attorneys' fee

3

award—"by which the award is first allocated among the three common benefit pools

[i.e., for Kansas, Minnesota, and Illinois] and the IRPA pool [i.e., the pool for

individually retained private attorneys]," Joint App., Vol. 23, at 5357 (Kan. D. Ct. Mem.

and Order, filed Dec. 31, 2018) ("December 31, 2018, Fee Allocation Order"), and then,

second, disbursed to individual firms. Appellees—also lawyers and law firms from

Kansas, Minnesota, and Illinois, that acted as co-lead counsel ("CLCs" or "Leadership")

and by-and-large, spearheaded the litigation against Syngenta in the three main fora—

oppose Appellants' arguments, and they ask us to affirm the Kansas district court's fee-

allocation orders.[1]

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we fully **affirm** the Kansas

district court's post-judgment attorneys' fees orders challenged in these appeals.

---

[1] The three relevant groups of appellees in this action are the following: (a) the Kansas CLC, comprised of lawyers from Stueve Siegel Hanson LLP, Gray, Ritter, & Graham, P.C., Hare Wynn Newell & Newton, Gray Reed & McGraw, LLP, and all other firms and lawyers working at their direction; (b) the Minnesota CLC, comprised of lawyers from Gustafson Gluek, PLLC, Bassford Remele, A Professional Association, Schewebel Goetz & Sieben PA, and all other firms and lawyers working at their direction; and (c) Heninger Garrison Davis, LLC, the law firm appointed as lead counsel in the relevant action in the U.S. District Court for the Southern District of Illinois which was also appointed Coordinated Action Plaintiffs' Liaison Counsel in that district. Seeger Weiss LLP, which was the Settlement Class Counsel in this action, is also a party to the appeal as an appellee. These law firms and attorneys name themselves as the Joint Appellees in this action.

## I.     Background

### A.     Summary of the Litigation

The appeals at issue here stem from various lawsuits filed against Syngenta. Syngenta commercialized and released two genetically modified ("GMO") corn seeds under the brand names Agrisure Viptera and Agrisure Duracade before obtaining China's regulatory approval to import such genetically modified seeds. After discovering the Syngenta GMO corn seeds in its American imports, China closed its markets to American corn, depressing corn prices and thereby injuring producers. Beginning in 2014, corn farmers and others in the corn industry filed thousands of lawsuits against Syngenta in several federal and state jurisdictions; these suits took various forms, including class actions, mass tort actions, and individual actions.[2]

In December 2014, the Judicial Panel on Multidistrict Litigation consolidated hundreds of these suits into an MDL centered in the Kansas district court. A similar process occurred in Minnesota, where thousands of suits were consolidated in a state court ("Minnesota state court"). And finally, similar suits were litigated in a court in the United States District Court for the Southern District of Illinois ("Illinois district court").

---

[2]     Some corn producers who initially opted to file individual actions against Syngenta, as opposed to joining a class action lawsuit, had a change of heart and regretted their choice of pursuing individual claims. They separately sued the attorneys who allegedly inflated their legal fees by touting the benefits to them of pursuing individual lawsuits, while concealing the benefits of class litigation. That lawsuit was ultimately dismissed by the Kansas district court as part of the MDL at issue here, a dismissal that we affirmed in *Kellogg v. Watts Guerra LLP*, 41 F.4th 1246 (10th Cir. 2022).

In an order entered on January 22, 2015, the Kansas district court appointed several attorneys as "co-lead counsel" for the Kansas MDL. Joint App., Vol. 21, at 4749 (Kan. Special Master's R&R, filed Nov. 21, 2018) ("November 2018 Fee Allocation R&R") (quoting Joint App., Vol. 2, at 482 (Kan. D. Ct. Order Concerning Appointment of Counsel, filed Jan. 22, 2015)). "The order authorized Kansas MDL Leadership, in their role as co-lead counsel, to 'organize and supervise the efforts of plaintiffs' counsel in a manner to ensure that the pretrial and trial preparation for the plaintiffs is conducted effectively, efficiently, expeditiously, and economically' and 'to encourage full cooperation and efficiency among all plaintiffs' counsel.'" *Id.* (quoting Joint App., Vol. 2, at 482–83).

On the Minnesota front, firms like Watts Guerra LLP ("Watts Guerra"), along with several others, brought thousands of individual and class action lawsuits in Minnesota state court against Syngenta. The Minnesota state court also appointed certain counsel to a Minnesota Plaintiffs' Executive Committee to ensure "the efficient, coordinated litigation of the Minnesota cases." *Id.*, Vol. 21, at 4752. Attorneys from Watts Guerra and the Paul Byrd Law Firm, PLLC ("Byrd") were among the several appointees. Meanwhile, in Illinois, multiple suits percolated through state and federal court.

Substantive discovery occurred across the primary litigation sites (i.e., Kansas district court, Minnesota state court, and Illinois district court). In September 2016, after an evidentiary hearing, the Kansas district court certified eight state-wide classes to pursue state-law tort and statutory claims. Following a three-week jury trial of these

6

state-law claims in June 2017, one of the Kansas classes obtained a $217,700,000 verdict against Syngenta. This was the only completed class trial across the three jurisdictions, although one class trial was started, but not completed, in Minnesota.

Following the Kansas jury verdict, Syngenta expressed renewed interest in pursuing a global settlement of all claims. Settlement negotiations initially began in March 2016—before the state-wide class certifications—and the Kansas district court, along with its Minnesota and Illinois counterparts, appointed Ellen Reisman as the Special Master for Settlement in the Syngenta litigation ("the Kansas Special Master"). Two months after the June 2017 class action trial, the Kansas district court appointed a Plaintiffs' Settlement Negotiating Committee ("PNC") to work toward a settlement with Syngenta. The PNC included representatives of all the major plaintiffs' constituencies. Facing the risk of similar losses in Minnesota and other venues that could collectively total billions of dollars, Syngenta committed to settlement by late 2017.

On February 23, 2018, a class of farmers, certain grain handling facilities and ethanol production facilities, and various Syngenta entities reached a nationwide class action settlement ("the Settlement") that resolved the claims. Syngenta agreed to pay a total of $1.51 billion in exchange for the release of all claims relating to the sale and marketing of its GMO corn products. As well, the agreement was contingent on certification of a nationwide settlement class for claims arising under the Lanham Act. The Settlement provided that an award of attorneys' fees and expenses would be "separate from [the Kansas district court's] determination of whether to approve the [s]ettlement," which would nevertheless bind the parties even if the Kansas district court

"denie[d], in whole or in part," the attorneys' fees applications. *Id.* at 4744 (quoting Joint App., Vol. 5, at 1089–90 (Agrisure Viptera/Duracade Class Settlement Agreement, dated Feb. 23, 2018)). The Settlement contemplated the involvement of the judges of the Kansas district court, the Illinois district court, and the Minnesota state court in the allocation of the total attorneys' fees and expenses. Those judges, initially, were Judge John W. Lungstrum, Judge David R. Herndon, and Judge Laurie J. Miller, respectively. Judge Herndon of the Illinois district court retired in January 2019, and Judge Nancy J. Rosenstengel replaced him and presided over the proceedings.

On April 10, 2018, the Kansas district court granted preliminary approval of the Settlement. After a settlement hearing on November 15, 2018, the court further found the Settlement to be fair, reasonable, and adequate under the factors identified in *Tennille v. Western Union Co.*, 785 F.3d 422, 434 (10th Cir. 2015). The court then tasked the Kansas Special Master with issuing a report and recommendation (R&R) on allocation of the aggregate attorneys' fee award, which she issued on November 21, 2018.

On December 7, 2018, the Kansas district court entered its Aggregate Fee Order and Final Order and Judgment ("the Judgment") pursuant to Rule 58 of the Federal Rules of Civil Procedure. The Judgment memorialized the court's approval of the Settlement, including certification of a global settlement class. The Aggregate Fee Order awarded one-third of the gross settlement amount—i.e., $503,333,333.33 out of the $1.51 billion settlement fund—as attorneys' fees. The Aggregate Fee Order made clear that the *allocation* of this aggregate attorneys' fee award remained pending and incomplete. Then, in a Fee Allocation Order entered on December 31, 2018, following an objection

8

period and a hearing, the Kansas district court largely adopted the November 21, 2018, R&R on attorneys' fee award allocation issued by the Kansas Special Master.

### B.    Aggregation and Allocation of the Attorneys' Fee Award

Below we summarize the filings relevant to the Kansas district court's fee allocation process and, therefore, relevant to the instant appeals.

To give a big picture account of what happened: The allocation process implemented by the court turned on a four-pool fee allocation scheme, featuring three "common benefit pools" corresponding with the Kansas, Minnesota, and Illinois litigations and an "IRPA pool" for the work of individually retained private attorneys ("IRPAs").  Attorneys were assigned to one of the three common benefit pools based on where they performed the bulk of their work.  They could then petition for an attorneys' fee award from their designated pool for any common benefit work—i.e., work that benefitted the settlement class or the overall settlement negotiation process—irrespective of where that work was performed.

To the Kansas common benefit pool, the court allocated slightly under half of the aggregate attorneys' fee award; to the Minnesota pool, slightly less than a quarter; to the Illinois pool, just over 15%; and to the IRPA pool, 12%.  The IRPA pool was intended to compensate attorneys for *non*-common benefit work they performed on behalf of individual clients, and attorneys' recoveries would be dictated by their clients' claim recoveries from the Settlement.

### 1.    The Kansas District Court's Aggregate Fee Order & Final Order and Judgment

On December 7, 2018, the Kansas district court approved the class settlement agreement.  As stated, the court awarded one-third of the gross settlement amount—i.e., $503,333,333.33 out of the $1.51 billion settlement fund—as attorneys' fees.  To start, the court concluded it "ha[d] authority to award attorney fees and expenses from the settlement fund" pursuant to Rule 23(h) of the Federal Rules of Civil Procedure, which "provides that '[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law.'"[3]  Joint App., Vol. 22, at 5111 (Kan. D. Ct. Mem. and Order, filed Dec. 7, 2018) (second alteration in original) (quoting FED. R. CIV. P. 23(h)).  Furthermore, the settlement agreement "expressly contemplate[d]

---

[3]    In full, Rule 23(h) provides:

In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement.  The following procedures apply:

> (1) A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets.  Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

> (2) A class member, or a party from whom payment is sought, may object to the motion.

> (3) The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

> (4) The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

FED. R. CIV. P. 23(h)(1)–(4).

10

an award of attorney fees and expenses to counsel who performed work for the benefit of the settlement class members." *Id.* Attorneys' fees were "also authorized under the common fund doctrine." *Id.* "[P]ursuant to Rule 23(h) and the common-fund doctrine," then, the district court "award[ed] a percentage of the fund"—here, 33.33%—"sufficient to permit reasonable attorney fees for all work that contributed to the class settlement." *Id.* at 5112.

Next, the court set about justifying its percentage fee award. Guiding this analysis were the "so-called *Johnson* factors." *Id.* at 5112–13; *see Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989).[4] Additionally, "[i]n percentage-of-the-fund cases, courts often engage in a 'cross-check' of the fee award against the lodestar figure accounting for counsel's hours and hourly rates." Joint App., Vol. 22, at 5113 (alteration in original)

---

[4] As we have had occasion to recite them, these factors—by which a court assesses the reasonableness and propriety of an attorneys' fees award—are

(1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee—this is helpful but not determinative; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454–55 (10th Cir. 1988).

(quoting *In re: Urethane Antitrust Litig.*, No. 04-1616-JWL, 2016 WL 4060156, at *7 (D. Kan. July 29, 2016)).[5]

As to the *Johnson* factors, the court found that all but the eleventh factor "overwhelmingly support[ed]" a "substantial [fee] award." *Id.* Summarizing, the court found that the one-third fee was reasonable because: (1) "th[e] litigation required very extensive time and labor by plaintiffs' attorneys (*Johnson* factor 1)"; (2) the "good pace" of the litigation "required counsel to perform their work subject to significant time limitations (factor 7)"; (3) the litigation "involved very novel and difficult questions of law and fact (factor 2)"; (4) "[t]he complex and difficult nature of the litigation, which spanned across multiple jurisdictions and which involved multiple types of plaintiffs and claims, required a great deal of skill from plaintiffs' counsel (factor 3)"; (5) "the most prominent and productive plaintiffs' counsel in th[e] litigation were very experienced, had very good reputations, were excellent attorneys, and performed excellent work

---

[5] The well-established lodestar method may be briefly described in the following manner:

> Under this [lodestar] approach, in determining a reasonable fee award, a court must first multiply the hours reasonably spent by a normal hourly rate for noncontingent work to arrive at a lodestar figure. This lodestar should then be further considered for adjustments, known as 'multiples,' for contingency and quality factors, when appropriate, in arriving at a reasonable fee.

1 Alba Conte, ATTORNEY FEE AWARDS § 2:3 (3d ed.), Westlaw (database updated June 2022).

12

(factor 9)"; (6) "the demands of th[e] litigation, especially for lead counsel in the various courts, precluded other employment . . . (factor 4)"; (7) "a one-third fee is customary in contingent-fee cases (factor 5)"; and "many plaintiffs in th[e] case agreed to contingent-fee arrangements that allowed for fees of at least 40 percent of any recovery (factor 6)"; and (8) "the amount at stake," "the excellent results obtained for plaintiffs," the "difficulties faced by plaintiffs in succeeding on the[ir] claims," and "a consideration of awards in similar cases" (factors 8, 10, and 12) all justified a substantial aggregate fee award. *Id.* at 5114–18. The court also noted that, "unlike some other class actions, this case did not involve a government investigation or prosecution of the defendant, and thus plaintiffs' counsel were forced to undertake all of the necessary investigation and discovery"—which further supported a substantial fee award. *Id.* at 5115.

As well, the court reasoned that "a cross-check of the relevant lodestar amount" confirmed "the reasonableness of a one-third award." *Id.* at 5120. The court "consider[ed] all fee applications submitted by plaintiffs' attorneys" in constructing the applicable lodestar, "[b]ecause th[e] award [was] intended to account for all contingent fee recoveries from payments to class members from the settlement fund." *Id.* Further, the court found reasonable the counsels' average hourly rate, which was under $500, and "the number of hours expended," "considering the scope and complexity of th[e] litigation." *Id.* This information yielded a "total lodestar amount [of] approximately $357 million"; application of a 1.4 multiplier to the lodestar, then, generated the aggregate fee award of roughly $503 million. *Id.* "That multiplier," noted the court, "[was] extremely modest in light of the great risk undertaken in pursuing the[] claims on

a contingent-fee basis." *Id.* Thus, based on the *Johnson* factors and the lodestar cross-check, the court found a total fee award in the amount of one-third of the gross settlement fund to be justified in this case.

In the Judgment issued that same day, the court noted that it "retain[ed] . . . continuing and exclusive jurisdiction to interpret, implement, administer, and enforce the Settlement Agreement, to distribute, allocate, and decide any disputes among counsel related to attorneys' fees, costs and expenses, and to implement and complete the claims administration and distribution process." *Id.* at 5133 (Kan. D. Ct. Final Order and Judgment, filed Dec. 7, 2018).

### 2. The Kansas Special Master's November 2018 Fee Allocation R&R

On November 21, 2018, the Kansas Special Master filed her R&R on allocation of the aggregate attorneys' fee award. After briefly covering the ground the Kansas Special Master traversed in her R&R, we outline—in some detail—her discussions surrounding the Kansas district court's authority to implement a hybrid allocation scheme and modify (or abrogate) private agreements involving the attorneys. We also review her proposed allocations.

### a. General Overview

To frame the issues for the Kansas district court, the Kansas Special Master noted she needed to address the following "key issues" before proposing an allocation of the aggregate attorneys' fee award:

1. In this "hybrid" class action settlement context, what attorney time can fairly be considered work for the "common benefit";

2.     The enforceability of private contingent fee agreements entered into by certain Class Members prior to settlement, and the extent to which [the district court] . . . can invalidate or modify those agreements;

3.     What weight should be given to the Fee-Sharing Agreement . . . entered into by certain counsel immediately after execution of the Settlement Agreement on February 23, 2018;[6]

4.     The applicability of the Joint Prosecution Agreements (the "JPAs") entered into by certain counsel in 2015; and

5.     Application of allocation principles to the various fee applications and data submitted.

*Id.*, Vol. 21, at 4745–46 (footnote added).

Before explaining her answers to these issues in-depth, the Kansas Special Master summarized her findings and recommended, among other things, the following:

1.     The Courts should allocate the Attorneys' Fee Award so as to provide compensation both to those lawyers whose efforts produced common benefits to the entire Class and to [IRPAs] representing individual Class Members pursuant to contingent fee agreements. The Attorneys' Fee Award, plus expenses as approved by the Courts, should be the entire amount paid to any lawyers in connection with this litigation and settlement, notwithstanding any agreements (*e.g.*, JPAs or contingent fee agreements) to the contrary.

   A.     Specified percentages of the Attorneys' Fee Award . . . should be allocated to each of the three jurisdictions to which certain groups of counsel have been assigned. These amounts should be allocated . . . among those counsel for efforts that produced common benefits to the Class.

   B.     A set percentage of the Attorneys' Fee Award should be placed into a pool for allocation among IRPAs based on their clients' proportionate share of settlement payments, as finally determined by the Settlement Process. . . .

---

[6]     On February 23, 2018, "representatives of three different plaintiffs' groups" signed a Fee-Sharing Agreement proposing a division of the court-awarded attorneys' fees. Joint App., Vol. 21, 4798–99.

15

> C.    IRPA compensation in respect of individual clients should be limited to a share of the IRPA pool.  The IRPA pool will be allocated among IRPAs based upon their clients' proportionate share of settlement awards to Class Members represented by IRPAs.  Contingent fee agreements providing for higher percentages should not be enforceable beyond the amount of the IRPA pool share. . . .
>
> D.    Some law firms will be entitled to both common benefit fees and IRPA compensation.
>
> 2.    . . . . The Special Master recommends that the Court set aside the entire . . . $48,842,866.12 requested for reimbursement of expenses, with final determinations and allocations to be made after the Special Master has reviewed supporting materials and made more specific recommendations.

*Id.* at 4746–47.

The Kansas Special Master also recommended that $2,782,500 in service awards be granted to firms that requested them.

### b.    Authority to Award Fees and Modify Prior Agreements

In explaining these conclusions in greater detail, the Kansas Special Master addressed the district court's authority to (1) bifurcate the aggregate attorneys' fee award into common benefit pools and an IRPA fund and (2) modify, abrogate, or disregard private agreements, be they contingent-fee contracts between attorneys and their clients or agreements between attorneys.

### i.    The Authority to Devise a Four-Pool, Hybrid Allocation Scheme

The Kansas Special Master reasoned that bifurcating the aggregate fee award along IRPA and common benefit lines was necessary "because the claims resolved under [the nationwide class action settlement] include both class actions and individual actions

16

filed in multiple federal and state courts by individual plaintiffs who retained their own counsel." *Id.* at 4780.

Given this "hybrid character," the Kansas Special Master explained that the Kansas district court's "authority to award fees and expenses derives from several sources." *Id.* For starters, the court could award attorneys' fees pursuant to Rule 23(h) of the Federal Rules of Civil Procedure, which provides that, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." *Id.* at 4780–81 (alteration in original) (quoting FED. R. CIV. P. 23(h)). On a more general level, the Kansas Special Master noted that, "the authority of courts to award reasonable attorneys' fees and expenses pursuant to the common fund doctrine and the related common benefit doctrine has long been recognized." *Id.* at 4781. And third, the Kansas Special Master observed that the Settlement's express text likewise accorded with these stated principles, providing that "Settlement Class Counsel and other counsel representing Class Members who performed work for the benefit of Class Members shall make Fee and Expense Applications . . . ." *Id.* at 4781–82 (omission in original).

### ii. Authority to Modify, Abrogate, or Disregard Private Agreements

Turning to the second issue—whether the Kansas district court could "invalidate or modify" the "private contingent fee agreements entered into by certain Class Members prior to settlement"—the Kansas Special Master concluded that the district court's "legal and equitable authority" empowered it to either abrogate or modify the contingent-fee agreements as well as hours and fee calculations. *Id.* at 4745, 4786–88. Pointing

17

primarily to decisions from our sister circuits, the Kansas Special Master explained that the exercise of the court's legal and equitable power to abridge contingent-fee agreements was necessary to "meet the obligations imposed on [it] by Rule 23, supervise attorneys that appear before [it], protect the interests of class members, and preserve the integrity of the legal process." *Id.* at 4788.  In addition, the Kansas Special Master reasoned that "implementing a reasonable cap on attorneys' fees 'safeguard[s] the public's perception of the courts and legitimacy of the legal system's handling of massive MDLs and class actions' and 'promotes justice for all parties by allowing claimants to benefit (as their attorneys have) from the economies of scale and increased efficiency that an MDL provides.'" *Id.* at 4789 & nn.127–28 (alteration in original) (footnotes omitted) (first quoting *In re NFL*, No. 2:12-md-02323, 2018 WL 1658808, at *2 (E.D. Pa. Apr. 5, 2018); and then quoting *In re Vioxx Prods. Liab. Litig.*, 650 F. Supp. 2d 549, 558 (E.D. La. 2009)).  She continued:

> Moreover, in a class action, a court's inherent authority to assess the reasonableness of contingent fee agreements is underscored because of the court's performance of its fiduciary duty to protect class members' interests by approving class counsel, ensuring the terms of the settlement protect the interests of class members, and approving attorneys' fees.

*Id.* at 4789.  Thus, the Kansas Special Master concluded that "in both class actions and non-class MDLs"—characterizations relevant to this case—"federal district courts have routinely capped attorneys' fees, relying on their inherent authority over proceedings before them and their equitable authority." *Id.* at 4790 & n.130 (collecting cases).

Furthermore, the Kansas Special Master directed the parties and the court to the Settlement itself, which "recognize[d] that the enforceability of any attorneys' fee

contract affecting a Class Member [was] subject to judicial review." *Id.* at 4795. Indeed, as the Kansas Special Master noted, section 9.21.1 of the Settlement provided that "[t]he Court shall have exclusive jurisdiction to decide the enforceability of any lien." *Id.* (quoting Joint App., Vol. 5, at 1105). That section, among others, "contemplate[s] judicial review of all attorneys' fee contracts and liens." *Id.* Settlement negotiations anticipated modification and review of fee contracts, noted the Kansas Special Master— as "[i]t was important to all parties to the negotiations . . . that similarly situated plaintiffs . . . receive similar compensation under the Settlement Agreement, and that individually represented plaintiffs would not receive a lower net recovery due to attorneys' fee obligations." *Id.* at 4795–96.

The Kansas Special Master also considered what weight, if any, should be given to pre-existing fee-sharing agreements and joint prosecution agreements ("JPAs").[7] At the outset, the Kansas Special Master noted that a February 23, 2018, fee-sharing agreement (the "Fee-Sharing Agreement") signed on the heels of the Settlement was "not binding," as "[t]he decision regarding the total amount of fees to be awarded and how [those fees]

---

[7]    Not infrequently throughout this opinion, we refer to "JPAs" using the plural form. We do so to refer to one set of documents—with materially identical terms—that numerous lawyers or law firms representing plaintiffs entered into in this action. In other words, our use of the plural form does not signify that there are multiple sets of documents with materially different terms that constitute operative prosecution agreements in this case. The set of documents at issue consists of the June 2015 Joint Prosecution Agreement, as well as amendments and addenda thereto. Where a specific joint prosecution agreement is at issue, we refer to that specific agreement by name (e.g., the "June 2015 Joint Prosecution Agreement" or "First Addendum"). Moreover, when referring to the foundational June 2015 Joint Prosecution Agreement—which was subsequently built upon through amendments or addenda—we frequently employ a shorthand, referring to it simply in the singular form as "JPA."

should be allocated among the many plaintiffs' lawyers . . . is within the sole discretion of the Courts." *Id.* at 4799. Nevertheless, she recommended the Kansas district court "give significant weight to this Fee-Sharing Agreement" because its signatories "w[ere] critical to the achievement of a settlement in this litigation." *Id.* at 4799–4800. In other words, "without these individuals' willingness to overcome their personal and professional differences and work cooperatively for the benefit of . . . plaintiffs whom they all represented, this unique settlement could not have been achieved." *Id.* at 4801. Because of this, the Kansas Special Master found it "appropriate to give the Fee-Sharing Agreement substantial weight in making decisions about allocations of fees." *Id.* With that background, the Fee-Sharing Agreement recommended 50% of the allocation should go to the Kansas pool, 12.5% of the allocation should go to Minnesota Class Counsel, 17.5% should go to certain Illinois firms pressing mass action suits, and the remaining 20% should be left open for future allocation.

Several firms—but primarily Watts Guerra—maintained that the JPAs they entered with class counsel should govern the Settlement's allocation. Under one such agreement executed in June 2015 (the "June 2015 Joint Prosecution Agreement"), certain IRPA attorneys agreed to cooperate with class counsel and surrender a portion of their fees to compensate class counsel, via a "Common Benefit Assessment[]," for mutually beneficial efforts. *Id.*, Vol. 13, at 3138–39 (Amended and Restated Joint Prosecution Agreement, filed July 16, 2018). The agreement defined a "Common Benefit Assessment" as a "common benefit fee and expense assessment ordered by a state or federal MDL court in connection with a state or federal MDL." *Id.* at 3136. As well, it

20

stated that "the Parties agree that if and as such clients are entitled to any payment from Syngenta in connection with settlement of or judgment on such clients' Syngenta Claims, such clients will be subject to 100% of the then-applicable Benchmark Common Benefit Assessment." *Id.* at 3138. The agreement additionally defined the "Benchmark Common Benefit Assessment" as the "benchmark common benefit fee and expense assessment ordered by the Federal MDL Court in connection with the Federal MDL." *Id.* at 3136.

Regarding the JPAs, the Kansas Special Master rejected Watts Guerra's contention that "the JPAs executed by groups of plaintiffs' counsel should govern decisions as to the allocation of fees in th[e] class action context."[8] *Id.*, Vol. 21, at 4802. To start, the Kansas Special Master observed that the Settlement expressly abrogated the JPAs. Specifically, section 9.24.1 in the Settlement "contains express language that it 'supersedes all prior proposals, negotiations, agreements, and understandings relating to the subject matter of this Agreement,'" which includes issues concerning attorneys' fees. *Id.* (quoting Joint App., Vol. 5, at 1106). Moreover, the "JPAs [were] irrelevant to the award and allocation of fees in this nationwide class action settlement" because "they ha[d] . . . been 'overtaken by events,' namely a nationwide class action settlement that they did not contemplate." *Id.* at 4802–03. As well, "the context in which Watts Guerra . . . negotiated the JPA [was] further evidence of its inapplicability" to a class action settlement situation. *Id.* at 4806. That is, the Kansas Special Master explained that the JPA's premise reflected "an effort by Watts Guerra . . . to secure a process that would

---

[8]    Watts Guerra was one of the appellants in these proceedings up until it reached a settlement and was terminated as a party on January 7, 2021.

21

automatically exclude its clients from any class and correspondingly limit their common-benefit assessment on any individual recovery they secured." *Id.* "It is inconsistent with this premise," though, "that the same JPA was meant to address the opposite scenario, wherein [Watts Guerra's] clients [would] elect to participate in a federal settlement class and in which they [would] seek fees out of the common fund." *Id.*

Moreover, a July 2015 Common Benefit Order entered by the Kansas district court shortly after the June 2015 Joint Prosecution Agreement's execution made clear that the Joint Prosecution Agreement's language concerning individual assessments did not apply:

> In the event that there is a class settlement, recovery or judgment in favor of the class, no assessment pursuant to this Section will be made, either for attorneys' fees or for expenses, individually from any class member or his/her/its individual attorney as to the portion of any class recovery distributed to that individual class member if the class member remains in the class (i.e., does not opt-out of the class). Instead, all fees and expenses for that class member will come out of the overall class recovery funds provided by defendants, as approved by the Court, or as otherwise Ordered by the Court. The relationship between class counsel fees and costs obtained through any class settlement or judgment and the Common Benefit Fund will be addressed, if necessary, by later order of the court.

*Id.* at 4804 (quoting Joint App., Vol. 2, at 520 (Kan. D. Ct. Order Establishing Protocols for Common Benefit Work and Expenses and Establishing the Common Benefit Fee and Expense Funds, filed Mar. 6, 2015)).

The attorneys eventually amended the June 2015 Joint Prosecution Agreement in January 2016. But that First Addendum did not change much. Unlike the June 2015 Joint Prosecution Agreement, the First Addendum contemplated fee-sharing in the limited context of a Minnesota class. Under its terms, Minnesota counsel agreed to pay

22

"33 1/3 % of the attorneys' fees awarded in all [Minnesota] MDL Class Actions" to the co-lead counsel. *Id.*, Vol. 13, at 3164 (First Addendum to Am. and Restated Joint Prosecution Agreement, filed July 16, 2018). Even in that circumstance, the First Addendum did not grant "Minnesota MDL Class Actions" a national reach, defining it instead to mean "any action pursued in the Minnesota MDL Court." *Id.*, Vol. 21, at 4805 (quoting Joint App., Vol. 13, at 3162).

And if a court declined to certify the Minnesota class, the First Addendum expressly stated that only

> [t]o the extent that class certification of a [Minnesota MDL Class Action] is denied and/or Additional Minnesota Counsel have been, are engaged to or otherwise decide to pursue cases for Producers or Non-Producers in one or more individual actions, Additional Minnesota Counsel hereby join in the [JPA] and are subject to all of the same rights and obligations of the Remele/Sieben Group including, but not limited to, the *assessments on individual cases set forth therein*.

*Id.*, Vol. 13, at 3166 (emphasis added). In other words, the First Addendum (especially when read as a whole) contemplated a limited fee-sharing agreement between myriad Minnesota firms that would apply in "the limited context of a Minnesota class" and, barring that, set forth an assessment plan to be leveraged against individual recoveries if a party prosecuted an individual action against Syngenta. *Id.*, Vol. 21, at 4805.

In sum, satisfied that the Kansas district court had ample authority to award attorneys' fees it found reasonable out of the aggregate fee award—irrespective of pre-existing contingent-fee contracts, fee-sharing agreements, or JPAs—the Kansas Special Master recommended a four-pool allocation scheme for distributing the roughly $503 million in total attorneys' fees.

23

### c. The Four-Pool Allocation Scheme

The four-pool allocation scheme was predicated on the establishment of four sources of funds—one pool of funds for IRPAs and three common benefit pools to be assigned to the Kansas district court, the Minnesota state court, and the Illinois district court. That scheme was largely devised by the Kansas Special Master in consultation with the law firms spearheading the Syngenta litigation. To begin, the Kansas Special Master assigned all law firms to a particular regional pool. "[W]here a particular law firm should be placed" turned on "such factors as where the firm had filed lawsuits and appeared in court; where that firm had filed its fee petition; which leadership group, if any, 'claimed' that firm; whether the firm was identified as part of a group in the Fee-Sharing Agreement; and the [Kansas] Special Master's understanding of the alliances among the hundreds of law firms in this sprawling litigation." *Id.* at 4814–15.

After assigning each firm to one of the regional common benefit pools, the Kansas Special Master recommended particular percentage allocations from the aggregate attorneys' fee award to each pool. This recommendation "considered the contributions of the attorneys in each jurisdiction to the overall litigation and the settlement," "tak[ing] into account the history of the litigation, the available data regarding attorney hours incurred, and the experience of [the Kansas Special Master] and [the Illinois Special Master] in connection with settlement negotiations and implementation" as well as "the terms of the Fee-Sharing Agreement." *Id.* at 4815–16 (footnote omitted).

The Kansas Special Master identified "[s]everal points concerning this unique litigation and settlement" that influenced her "allocation considerations," including the

considerable experience of lead plaintiffs' counsel; the novel claims counsel raised and

the difficult issues of damages; Syngenta's aggressive, first-tier defense; the absence of

government involvement and its role in increasing lead plaintiffs' risk; lead plaintiffs'

counsel's coordinated, efficient litigation efforts; the "enormous amount of work"

demanded by this case and the "hard-fought settlement negotiations"; the

"unprecedented" court decisions obtained; and the "extraordinary" results of the

litigation. *Id.* at 4783–85.

### i.    The IRPA Pool

The Kansas Special Master recommended 10% of the aggregate attorneys' fee

award be allocated to the IRPA pool.  The Kansas Special Master thought the amount

was "appropriate given the limited work done by IRPAs and the fact that common benefit

awards would also be available to any IRPAs who had significant participation in the

litigation or settlement process for the benefit of the Class." *Id.* at 4809.  She

recommended the IRPA pool funds "be allocated among IRPAs based on their clients'

proportionate share of settlement recoveries by all claimants represented by IRPAs." *Id.*

### ii.    The Kansas Pool

The Kansas Special Master recommended that the Kansas common-benefit pool

receive 50% of the aggregate fee award.  The Kansas Special Master recommended such

a sizable allocation to the Kansas pool because of the following considerations:

> The Kansas group not only took on a leadership role in the federal MDL, it
> conducted and coordinated massive fact and expert discovery against both
> Syngenta and third parties spanning multiple countries and at substantial
> expense.  It also obtained significant rulings on complex legal issues,
> including removal issues that cleared the path for state court litigation and

25

responses to Syngenta's motions to dismiss and for summary judgment.  The Kansas group pursued and obtained certification of both a nationwide class and eight statewide classes, again surmounting complicated legal hurdles.  Perhaps most significantly, it tried the Kansas class litigation to a $217.7 million verdict.

*Id.* at 4818.  Furthermore, the Kansas Special Master observed that "participation of the Kansas MDL Leadership in a nationwide class settlement was critical to its success."[9]  *Id.*

### iii.    The Minnesota Pool

Turning to Minnesota, the Kansas Special Master recommended that the Minnesota common benefit pool receive 24% of the aggregate fee award.  In this regard, the Kansas Special Master recognized that, "[u]nquestionably, the Minnesota state court litigation both advanced the cause of pressuring Syngenta on multiple fronts, and, through coordination with Kansas counsel, assisted the nationwide class effort."  *Id.* at 4819.  The combination of "a class action and a significant number of individual suits" in Minnesota "resulted in the specter of multiple bellwether trials for Syngenta, with corresponding discovery burdens and the development of new experts to compliment those developed in the Kansas MDL litigation."  *Id.*  In effect, "Minnesota counsel forced Syngenta to divide its resources and fully work up" a bellwether case, ultimately resulting in Syngenta settling the claims brought during the uncompleted Minnesota class trial.  *Id.*

---

[9]    The Kansas Special Master specifically commended the work of Mr. Christopher Seeger of Seeger Weiss LLP, who was the Settlement Class Counsel and the leader of the PNC.  Indeed, the Kansas Special Master opined that "without [Mr. Seeger's] involvement, a settlement [was] unlikely to have been achieved—certainly not in the same timeframe or at the same amount."  Joint App., Vol. 21, at 4818.

Nonetheless, it was clear to the Kansas Special Master that Minnesota counsel's contributions to the settlement were decidedly second to those of Kansas counsel, in part because the "Minnesota lawyers did not have a unitary position in the settlement negotiations." *Id.*

### iv.    The Illinois Pool

Finally, the Kansas Special Master recommended that the Illinois common benefit pool receive 16% of the aggregate fee award. The Kansas Special Master acknowledged that the Illinois litigation "presented an important third pressure point on Syngenta to resolve the growing litigation against it." *Id.* at 4820. However, "[f]rom a settlement perspective, Illinois counsel initially presented a significant barrier to resolution," despite certain Illinois counsel later proving to be "critical to [the settlement's] success." *Id.* The Kansas Special Master specifically explained that one lawyer "in particular was fundamentally opposed to a class solution and pressed hard to proceed with individual litigation." *Id.* But another Illinois lawyer who agreed to participate and to convince the uncooperative lawyer and his group to participate in the settlement process, was crucial to the Settlement's success after "Syngenta made clear that piecemeal resolution was not an option."[10] *Id.*

---

[10]    Following the Kansas district court's lead, the Illinois district court appointed the Honorable Daniel Stack, "a retired judge who had served as a special master for settlement purposes," as a special master in the Illinois district court proceedings pursuant to Rule 53 of the Federal Rules of Civil Procedures "to make a recommendation concerning any allocation of attorney fees by that court." Joint App., Vol. 32, at 7438 (Kan. D. Ct. Mem. and Order, filed Nov. 19, 2019) ("November 2019 Illinois Pool Allocation Order").

### 3.    The District Court's December 31, 2018, Fee Allocation Order

In a December 31, 2018, Fee Allocation Order, the Kansas district court largely adopted the Kansas Special Master's November 2018 Fee Allocation R&R.  In relevant part, the district court agreed it possessed the requisite authority to modify, abrogate, or otherwise disregard the private agreements executed between attorneys and their clients, and amongst each other.  Moreover, it largely adopted the hybrid, four-pool scheme, though it allocated more funds to the IRPA pool than the Kansas Special Master recommended.

#### a.    The Kansas District Court Agrees It Has Authority to Set a Reasonable Fee Award

Pursuant to Rule 53 of the Federal Rules of Civil Procedure, the Kansas district court reviewed "de novo all objections to the [Kansas] [S]pecial [M]aster's factual findings and legal conclusions." *Id.*, Vol. 23, at 5352.  Agreeing with the Kansas Special Master, the court read our precedent to authorize "an award of fees from the settlement fund to both attorneys who performed common benefit work and attorneys who filed individual cases." *Id.* at 5352–53.  And, in any event, the court observed that "[n]o attorney . . . argued, either in applying for fees or in objecting to the [November 2018 Fee Allocation] R&R, that the Court may not adopt such an approach." *Id.* at 5353.

Nor did any attorney specifically object to the Kansas Special Master's conclusion regarding the court's authority to modify contingent-fee contracts, though Watts Guerra questioned in its briefing whether the court could exercise such power.  Nonetheless— and in view of its obligation to conduct a de novo review—the court concurred with the

28

Kansas Special Master's "thorough discussion" of the court's authority to "effectively modify individual contingent fee contracts relating to th[e] litigation [in order] to limit any contingent recovery by attorneys to the fees awarded and allocated by the Court." *Id.* And, on its own, the court concluded it "may exercise its inherent authority to supervise attorneys appearing before it, to act as a fiduciary for and protect the interests of the settlement class members, and to ensure that the integrity of the judicial process is not undermined by the recovery of unreasonable attorney fees." *Id.* at 5354.

In arriving at this conclusion, the district court "reject[ed] some objectors' arguments that any award to IRPAs should be governed by [the JPAs] executed among some plaintiffs' attorneys or Common Benefit Orders (CBOs) issued by the courts."[11] *Id.* at 5360. Watts Guerra and another firm, Bassford Remele, P.A. ("Bassford"), were the

---

[11]    Based on our reading of the Kansas Special Master's November 2018 Fee Allocation R&R, it appears that other courts involved in the expansive litigation against Syngenta entered common benefit orders. *See* Joint App., Vol. 21, at 4784, 4825. The Kansas district court seems to have had this understanding—in referring to CBOs (plural) entered by other courts. The Kansas district court's July 2015 Common Benefit Order, however, appears to be the only CBO in the Joint Appendix and is the only one that the parties address in their arguments on appeal. There appears to be a logic underlying this circumstance: specifically, it was in the July 2015 Common Benefit Order that the district court signaled its view that the private agreements between attorneys in this litigation regarding fees or expenses—whether reflected solely in JPAs or memorialized in CBOs entered by other courts—concerned individual assessments, *not* the recovery of fees or expenses after the resolution of a class action, by settlement or judgment. That is, the concern of such attorney agreements was *not* a class recovery. The court implemented this vision in rejecting the objectors' arguments—following the class action settlement here—that contended the JPAs or CBOs should govern any award to the IRPAs. Further, it was this vision that ultimately led the court (as discussed *infra*) to give "no weight to the percentages contained in the JPAs and CBOs" because they were "intended for and addressed different circumstances," that is, circumstances involving individual assessments, *not* class recoveries. *Id.*, Vol. 23, at 5360.

only two firms to meaningfully argue that the JPAs should govern the fee allocation scheme.

In its objections, Byrd requested "the opportunity to speak at the [attorney fee allocation] hearing on December 17, 2018," but devoted most of its written argument to the proposed modification of the contingent-fee agreements. *Id.*, Vol. 22, at 4951–57 (Byrd's Obj. to November 2018 Fee Allocation R&R, filed Dec. 5, 2018). To the extent Byrd discussed the JPAs, it urged the district court to consider the JPAs' policy virtues:

> Furthermore, individual lawyers will be hard pressed to come to an agreement to litigate together with the class lawyers while class certification is pending. In this case, the individual lawyers and the class lawyers had an agreement (the Joint Prosecution Agreement) in place to account for a commingled world should the Court certify a class, and that agreement was summarily discarded after the global settlement was reached. Lawyers like those in our group . . . will be extremely hesitant to expend the amount of effort and costs to create a similar coalition to fight the next biotech company when that company ignores the interconnected market and causes a trade disruption.

*Id.* at 4957.

Shields also objected to the November 2018 Fee Allocation R&R. Insofar as Shields could be said to have objected to the Kansas Special Master's recommendation regarding the JPAs, that objection is contained in the following paragraph:

> For sake of brevity, [Shields] joins in the legal argument and objections presented by our Minnesota Co-Lead Counsel, [Bassford] and [Watts Guerra] and incorporates *the same as set forth herein* along with supporting exhibits. We offer our objection as an additional support that the IRPA Fund has been undervalued by the Special Master and should be increased substantially.

*Id.* at 5085 (Shields's Obj. to November 2018 Fee Allocation R&R, filed Dec. 5, 2018)

(emphasis added). Yet, Shields omitted any reference to the JPAs and, instead, devoted

the bulk of its four-page brief to the IRPA allocation and the contingent-fee issue.

Agreeing with the analysis in the November 2018 Fee Allocation R&R "and the

briefs of the MDL [L]eadership," the district court concluded the JPAs and CBOs "do not

govern" because (1) "the Court is not bound by a private agreement among attorneys";

(2) "the JPAs address the issue of fees that might be recovered in multiple separate

litigations, and by their terms they do not apply to the present situation involving a

nationwide settlement class"; (3) "the [S]ettlement [A]greement . . . expressly supersedes

all other agreements"; and (4) "CBOs addressed the issue of assessments in the event of

*individual* recoveries, and they do not apply to this recovery by a settlement class." *Id.*,

Vol. 23, at 5360 (emphasis added). Thus, because the Kansas district court was not

bound by them, it gave "no weight to the percentages contained in the JPAs and CBOs,

which were intended for and addressed different circumstances." *Id.*

### b.     The Court Adopts the Four-Pool Approach but Modifies the Allocation Terms for the IRPA Pool

Having concluded it possessed significant authority to craft the allocation of

attorneys' fees in the most reasonable manner, the Kansas district court adopted the

Kansas Special Master's two-stage, "general approach" to the allocation of the attorneys'

fee award, "by which the award is first allocated among the three common benefit pools

and the IRPA pool."[12]  *Id.* at 5357.  The court detailed its reasons below:

> The Court agrees with the [Kansas Special] [M]aster that this is the most reasonable and appropriate way to allocate the fee award, for the reasons set forth in the [November 2018 Fee Allocation] R&R, particularly given the hybrid nature of this litigation, which involved both class and individual claims.  Creation of the IRPA pool allows the Court to recognize the contribution to the ultimate recovery made by the very existence of the huge number of individual claims, while at the same time limiting fees for those attorneys to a reasonable amount.  Creation of the three common benefit pools allows for a reasonable allocation of the remainder of the fee award based on the attorneys' relative contributions to the recovery, including the actual litigation of the claims against Syngenta and the negotiation and defense of the settlement.  Although there was overlap among jurisdictions, particularly because of the great amount of coordination among plaintiffs' counsel, the fact that the litigation took place primarily on the three discrete jurisdictional fronts allows the remainder to be divided reasonably into the three pools based on a comparison of the relative contributions to the recovery by the attorneys placed in those pools.  This framework further allows the court most familiar with the work on a particular front to allocate fees to particular attorneys and firms within that court's common benefit pool.  Although the task of allocation is necessarily a difficult one, the framework recommended by the [Kansas] [S]pecial [M]aster most ably facilitates a reasonable allocation.
>
> Accordingly, the Court rejects Watts Guerra's argument in favor of a direct award to it of a fixed percentage of the attorney fee award. Similarly, the Court rejects the argument by [Weller, Green, Toups & Terrell, LLP, and The Coffman Law Firm ("Toups/Coffman")] in favor of a single-stage approach undertaken after the claimants' recoveries are determined.  No other attorney has objected to the recommended two-stage approach, and the Court is persuaded that the attorney fee award may be allocated reasonably and appropriately among the pools at this time.

*Id.* at 5357–59.

---

[12]    Recall that the Kansas Special Master recommended the following two-stage approach: at the first stage, funds are allocated to the specific pools, and then at the second stage, the funds are disbursed to individual lawyers and law firms.

Moreover, the Kansas district court "agree[d] . . . that it [was] appropriate to include an allocation to an IRPA pool from the total award of fees," because the number of individual suits incentivized Syngenta to settle. *Id.* at 5359. The court thus "adopt[ed] the factual findings in the [November 2018 Fee Allocation] R&R concerning the relative weight of the contributions by IRPAs and by attorneys performing common benefit work." *Id.* at 5360.

Additionally, the Kansas district court rejected objections "argu[ing] that IRPAs did enough work to justify a larger IRPA pool allocation than that recommended in the [November 2018 Fee Allocation] R&R." *Id.* at 5361. The court "agree[d] with the [Kansas] [S]pecial [M]aster . . . that the *relative* contribution to the ultimate recovery, based on the mere existence of individual claims (the basis for any common fund allocation to the IRPA pool), is small when compared to the pools allocated to attorneys who performed work that benefited the entire settlement class." *Id.* (emphasis added). Moreover, the court concurred that the "time and expense incurred by IRPAs in recruiting clients d[id] not contribute to the ultimate recovery." *Id.* As the court put it, "[t]he key . . . [was] that the IRPAs were relieved of having to do any work to advance their clients' lawsuits or to add value to their claims." *Id.* at 5362. However, to the extent an IRPA attorney "did engage in such work that could be said to benefit the overall litigation and recovery," the court's allocation scheme enabled that attorney to also "seek . . . fees from the common benefit pools." *Id.*

Notwithstanding its rejection of the objectors' efforts to procure a larger share of the aggregate fee award, the Kansas district court was sensitive to the time IRPA firms

33

devoted to their cases and their contingent-fee contracts. After all, it agreed with the IRPAs that "represented claimants w[ould] [likely] recover more than 50 percent of the total recovery by all claimants." *Id.* at 5366–67. With their labor and client agreements in mind, the Kansas district court found an "effective 10 percent contingent fee" reasonable. *Id.* at 5366. To achieve that "effective" 10% cap, the court augmented the recommended IRPA allocation from 10% to 12%. The court concluded that the entire IRPA pool would "be distributed to IRPAs on a *pro rata* basis tied to the recovery by IRPA clients." *Id.* at 5367. Thus, the "effective contingent fees for IRPAs [would] not [be] capped at any particular percentage, but rather [would be] limited only by the size of the IRPA pool." *Id.*

By way of the common benefit and IRPA pools, the Kansas district court "intend[ed] that its fee award from the settlement fund cover all fees recovered by attorneys on contingent fee contracts relating to claims included in this settlement." *Id.* That is, "any attorney representing a client on a contingent fee basis relating to claims covered in th[e] settlement [could] recover attorney fees only from the pools created by [the December 31, 2018, Fee Allocation] [O]rder, allocated from the Court's total one-third fee award." *Id.* at 5367–68. Such attorneys, under the court's scheme, "may *not* recover any additional fees from the client's recovery based on any contingent-fee contract." *Id.* at 5368. Alluding to its obligations to ensure that fee awards remain reasonable, the Kansas district court justified this restriction by reference to its inherent authority, as well as that vested in it by the Federal Rules of Civil Procedure and the Settlement.

34

Having resolved these issues, the court "adopt[ed] the following procedure for distribution from the IRPA pool":

> Once the amount of each claimant's recovery from the settlement fund has been determined, the claims administrator, with oversight by the [Kansas] [S]pecial [M]aster, shall calculate the *pro rata* IRPA award to be made from the IRPA pool to each attorney who has applied for a fee award, and the amount of an attorney's proposed IRPA fee award shall be communicated to that attorney, *who shall have the opportunity to object to the calculation by the administrator.* After the administrator has attempted to resolve any objection, the [Kansas Special] [M]aster shall file a report and recommendation concerning the proposed distribution of the IRPA pool to particular attorneys or law firms, in which [she] shall note any outstanding objections and her recommendations concerning those objections. *Objections to that report and recommendation may be filed within 14 days, and the Court will then resolve any such renewed objections.*

*Id.* at 5371–72 (emphases added).

### c. The Court Largely Adopts the Common Benefit Pool Allocations

Then, turning to the common benefit pools, the Kansas district court adopted the Kansas Special Master's recommendation concerning the assignment of attorneys, law firms, and attorney groups to the three pools; no firm objected to its own placement within one of those three pools. However, the court clarified, in response to a question from Johnson Becker, PLLC ("Johnson Becker"), one of the appellants in this case, that "each applicant will eventually receive an award of fees based on its common benefit work *anywhere*, performed with respect to cases in any jurisdiction, *regardless* of the particular pool into which the applicant is placed." *Id.* at 5373 (emphases added).

The court also largely agreed with the Kansas Special Master's rationale for relative allocations among the common benefit pools, concluding that her allocations

35

were "reasonable for all of the reasons [she] stated . . ., including a consideration of the applicable *Johnson* factors." *Id.* at 5374.

First, as to Illinois, the court particularly "agree[d] that the cases [there] provided a valuable third front in the overall litigation against Syngenta, which created additional pressure on Syngenta to resolve the litigation," and that the "contributions of the Illinois firms were not trivial or insignificant." *Id.* "At the same time, however, . . . those contributions were outstripped to a considerable degree by the contributions made by" counsel in the Kansas and Minnesota pools. *Id.* at 5374–75. Unlike their Kansas and Minnesota counterparts, "the Illinois attorneys did not try (or begin the trial of) any of their cases against Syngenta." *Id.* at 5375. And the rulings that they did garner "for the most part . . . followed similar rulings after litigation of the same issues in [the Kansas] and the Minnesota court[s], which allowed the Illinois attorneys to rely to a great extent on work that had already been performed by other attorneys." *Id.*

As the Kansas district court explained, the Kansas MDL and the "massive consolidated action in Minnesota" drove the "successful resolution" of the litigation against Syngenta, leaving the Illinois litigation "third in the pecking order." *Id.* Moreover, much of the work of certain Illinois firms—Clark, Love & Hutson, PLLC; Meyer & Flowers, LLC; and Phipps Anderson Deacon, LLP (collectively, "Clark/Phipps")—"ultimately proved unsuccessful, which . . . bolstered Syngenta's position and thus did not contribute to achievement of the settlement." *Id.* "These factors support[ed] an allocation to the Illinois pool . . . much lower than the allocations to the other two pools," and, therefore, the Kansas Special Master "str[uck] a reasonable

36

balance in her allocation to the Illinois pool relative to the allocations to the other pools."

*Id.*

Second, as to the two other fora, the Kansas district court found that the Minnesota attorneys significantly contributed to the ultimate settlement class but that their contribution "did not approach that made by the attorneys in the Kansas pool, especially in litigating the MDL."[13]  *Id.* at 5376.  While "two trials were started" in Minnesota, "only in the Kansas MDL did plaintiffs obtain a verdict against Syngenta."  *Id.*  Indeed, "[t]he [Kansas] MDL drove the entire litigation against Syngenta"—by achieving the first major rulings on dispositive motions, leading investigations and discovery, retaining expert witnesses, and obtaining eight statewide class certifications—"and for the most part the MDL proceeded on an earlier track than the Minnesota consolidated litigation."  *Id.*  Further, "Syngenta's greatest exposure came from the [Kansas] MDL, in which it had already suffered one adverse class action verdict, trials for the other seven certified classes had been scheduled (in which Syngenta would again face the possibility of punitive damage awards), and certification of at least 12 other statewide classes loomed."  *Id.*  Considering these facts, the Kansas district court concluded the relative allocations to the Minnesota and Kansas pools were reasonable.

---

[13]    As the Kansas district court noted, Minnesota leadership did not object to the Kansas Special Master's allocations to the three common benefit pools.  The district court overruled the sole objection to the Minnesota pool—made by Watts Guerra—and found that the Kansas Special Master's allocation was "reasonable."  Joint App., Vol. 23, at 5376.

However, given the 2% increase in the allotment to the IRPA pool, the district

court reached a slightly different division of the total fee award amongst the common

benefit pools.  After determining that 12% of the total fee award should be allocated to

the IRPA pool, the Kansas district court allocated 49% to the Kansas common benefit

pool, 23.5% to the Minnesota common benefit pool, and 15.5% to the Illinois common

benefit pool.

Concluding the December 31, 2018, Fee Allocation Order, the Kansas district

court adopted the Kansas Special Master's recommendation to award a total of

$48,842,866.12 in expenses in addition to, and separate from, the one-third award of

attorneys' fees.[14]  The court also approved service awards in the amount of $2,782,500.

### 4.      Distribution of the Attorneys' Fee Award

Following issuance of the December 31, 2018, Fee Allocation Order, the Kansas

district court consulted with the judges overseeing the litigation in Minnesota and Illinois,

and all three judges "expressly" approved of the allocation framework—and initial

allocation of fees—described in the order.  *Id.*, Vol. 25, at 5860–61 (Kan. D. Ct. Mem.

and Order, filed Mar. 20, 2019) ("March 2019 Kansas Pool Allocation Order").  The

judges likewise agreed that the funds in the three common benefit pools would be

allocated to the attorneys in each pool based on work performed that benefitted the

settlement class, irrespective of whether they performed such work pursuant to a court-

issued common benefit order.  All three judges filed orders allocating and distributing the

---

[14]      No attorney objected to the Kansas Special Master's various
recommendations concerning expenses.

attorneys' fees among the law firms within the common benefit pools.  What follows is a largely chronological description of those orders and any pertinent objections raised by the parties, as brought to the corresponding courts.

### a.    The March 2019 Kansas Pool Allocation Order

The Kansas pool fund consisted of $246,633,333.33.  In a separate order also issued on December 31, 2018, the Kansas district court granted the request of the Kansas CLC that they be designated to divide the Kansas pool's allocation.[15]  The court then ordered the Kansas CLC to file an R&R concerning their proposed division of the allocation, which the Kansas CLC filed on February 1, 2019.  Over the objections of two firms—Toups/Coffman and Hossley-Embry, LLP ("Hossley-Embry"), both appellants in this case—the Kansas district court adopted the R&R in full on March 20, 2019.

The CLC's R&R divided the firms into six tiers:

(1)    Tier One consisted of the four Kansas CLC members and the Settlement Class Counsel, to be awarded $214,895,659.86;

(2)    Tier Two consisted of six firms involved since the beginning of the litigation, "whose work focused on litigation of the class and bellwether cases" and who "participated in legal briefing, expert discovery, and the Kansas trial, although to a lesser extent than the Tier 1 firms[,]" to be awarded $21,026,771.70;

(3)    Tier Three "consist[ed] of five firms that performed substantive legal work on class and bellwether plaintiff claims," to be awarded $5,939,040.00;

---

[15]    As the Kansas district court later explained, it asked the Kansas CLC for an allocation proposal "because those attorneys took the lead and performed the great majority of the substantive work on behalf of plaintiffs in this litigation."  Joint App., Vol. 25, at 5865.  Accordingly, the Kansas CLC was "in the best position to judge the relative contributions by the petitioning attorneys to the settlement and the benefit of the settlement class."  *Id.*

(4)     Tier Four consisted of thirty-two firms who either represented individual bellwether plaintiffs, filed class-action lawsuits to protect against the running of the statute of limitations, or represented "non-producer class representatives or bellwether plaintiffs," to be awarded $2,546,876.50;

(5)     Tier Five "consist[ed] of nine firms that filed individual cases for plaintiffs who were not part of the MDL bellwether discovery pool"—with the "common benefit work" performed by these firms limited to "drafting complaints" and preparing "plaintiff fact sheet[s] ["PFSs"]" that were "actually filed or submitted to Syngenta"—to be awarded $1,821,136.50; and

(6)     Tier Six consisted of three firms that served as settlement counsel for certain subclasses, to be awarded $403,848.75.

*Id.* at 5862–65.

The Kansas CLC also recommended that two firms in Tier Two and three firms in Tier Four should be allowed to seek fees from the Minnesota common benefit pool.

We note that the court "appreciate[d] that an inherent conflict exist[ed]" in tasking the Kansas CLC with generating a specific allocation proposal for each firm, "in that any undercompensation of non-lead counsel would increase [the] [Kansas] CLC's own share of the fee pool." *Id.* at 5865–66.  Considering this risk, the court "emphasize[d] that it . . . exercised its independent judgment" in adopting the Kansas CLC's proposal "to ensure a fair allocation of common benefit fees from th[e] pool." *Id.* at 5866.

In that vein, the court concluded that the recommended allocation was "fair, reasonable, and appropriate," *id.* at 5865, and it commended the Kansas CLC for "an excellent job in making its recommendations," *id.* at 5866.  Noting that "[n]o firm . . . objected to the tier or tiers into which it was placed," the court agreed with the Kansas

40

CLC's treatment of each specific tier. *Id.* It gave particular attention to the Tier Five

recommendations:

> [T]he Court agrees with [the Kansas] CLC's recommendations concerning the allocation to firms in Tier 5. These firms did not perform any particular substantive work to advance the litigation on behalf of plaintiffs other than filing and maintaining individual lawsuits against Syngenta. The mere fact that such individual suits had been filed (with the threat of opt-outs) did contribute to the overall benefit of the settlement class, and that contribution justified an award of fees to IRPAs. *Thus, an attorney's contribution in having an individual client and filing an individual lawsuit will be compensated by an award from the IRPA pool.* As the Court stated in its [December 31, 2018,] [Fee] [A]llocation [O]rder, work completing a significant number of PFSs that were actually served on Syngenta and work drafting complaints for multiple plaintiffs could benefit the entire settlement class and thus could reasonably be compensated from the common benefit pools. For that reason, the Court agrees with [the Kansas] CLC's recommendation that Tier 5 attorneys who did not perform particular legal work that benefitted the entire settlement class should receive an allocation from the Kansas common benefit pool only for such work preparing served PFSs and drafting complaints. Although the Court noted that such work would not be weighed as equal to other common benefit work, [the Kansas] CLC has been fairly generous i[n] recommending that Tier 5 attorneys receive their entire requested lodestar amounts for work drafting complaints, and the Court agrees that such allocations are appropriate. The Court also noted that PFS work could reasonably have been performed at a lower attorney rate or even at a paralegal or staff rate, and it agrees with [the Kansas] CLC that a flat rate of $600 per PFS is appropriate for this work that was mostly clerical in nature.

*Id.* at 5868 (emphasis added) (citations omitted).

### i.    Toups/Coffman's Objections

The Kansas CLC recommended that Toups/Coffman "receive a total of

$236,571.88 in fees (using a 1.25 multiplier) for Tier 4 work" and "receive $909,050.00

under Tier 5, consisting of $387,050 for drafting individual complaints and $522,000 for

preparing 870 PFSs that were served on Syngenta"—all for "a total award . . . of

41

$1,145,621.88 (which d[id] not include amounts that [Toups/Coffman] w[ould] receive from the IRPA pool)." *Id.* at 5869.

Toups/Coffman only objected to the Kansas CLC's Tier Five allocation recommendation.[16]  Its objections, however, merely "revive[d] . . . old arguments" that the Kansas district court previously rejected.  *Id.*  Those arguments included (1) that the court should not prohibit Toups/Coffman's collection of fees under its contingent-fee contracts with clients or through its lodestar; (2) that the court should not use the four-pool framework but should instead base fee awards solely on the number of bushels produced by claimant clients; and (3) that a one-third fee award is too high for a mega-fund settlement.

The court explained that, in renewing those arguments, Toups/Coffman neglected "to explain how the Court erred in previously rejecting them or even to address the Court's reasoning on those points."  *Id.*  Thus, the Kansas district court "summarily denied" these recycled objections, resting on its previously stated rationale in the Aggregate Fee Order and December 31, 2018, Fee Allocation Order, "including its conclusions that attorney fees should be allocated first and foremost by reference to the work that most contributed to the outcome and that a fee award at the top of the range of awards in similar cases is appropriate in this case."  *Id.* at 5869–70.

---

[16]    The court noted that the firms declined to object to the Kansas CLC's Tier Four recommendations, as they "[were] not worth quibbling over at this juncture."  Joint App., Vol. 25, at 5869.

The court also rejected Toups/Coffman's contention that "it should receive its entire lodestar of $25.17 million . . . incurred representing its individual clients (which is exclusive of the common benefit work for which it received compensation in Tier 4)." *Id.* at 5870. Toups/Coffman argued that the Kansas CLC's allocation effectively precluded it from recovering on the "thousands of hours" it spent communicating with clients, obtaining forms and documents, monitoring the litigation, and submitting claims. *Id.* But, at bottom, Toups/Coffman did not explain to the court's satisfaction how this work contributed to the settlement "and thus inured to the benefit of the entire settlement class." *Id.* In any case, the court observed that the allocation compensated Toups/Coffman for drafting complaints and preparing PFSs. So, the court declined to award Toups/Coffman its entire lodestar. However, it nevertheless pointed out that Toups/Coffman would receive some compensation for this work from the IRPA pool, in addition to the "properly limited" compensation from the Kansas common benefit pool for "work preparing a significant number of served PFSs and a significant number of complaints." *Id.* at 5870–71.

## ii.    Hossley-Embry's Objections

Turning next to Hossley-Embry's objections, the Kansas district court noted that the Kansas CLC's R&R recommended the firm "receive a total of $95,250 in fees (using a 1.25 multiplier) for Tier 4 work" plus "$578,450 under Tier 5, consisting of $189,050 for drafting individual complaints and $389,400 for preparing 649 PFSs." *Id.* at 5871–72. Thus, under the Kansas CLC's distribution scheme, Hossley-Embry would receive a total of $673,700 from the Kansas common benefit pool. This amount did not bear on

any fee award Hossley-Embry could receive from the IRPA pool. Hossley-Embry "object[ed] to the recommended rate of $600 for each PFS prepared and submitted to Syngenta," which was "based . . . on a maximum of two attorney hours (at a $300 hourly rate) per PFS." *Id.* at 5872. Hossley-Embry argued "that two hours per PFS [was] too low, and that it should instead be compensated its lodestar amount for the approximately seven hours it spent on each PFS." *Id.*

The Kansas district court rejected this argument for three reasons. First, in the court's view, Hossley-Embry's lodestar estimates were suspect because a declaration from its associated counsel was internally inconsistent. Second, "much of the work described by Hossley[-][Embry] consist[ed] of communicating with the client and obtaining and organizing documents"—work "more appropriately compensated by an award from the IRPA pool." *Id.* at 5873. As to "PFS preparation time," such time, according to the court, was "reasonably compensated at a lower attorney rate or even at a paralegal or staff rate, which means that a $600 award might translate to three or four or five hours per PFS." *Id.* "Again," reiterated the court, "the preparation of PFSs contributed to the favorable outcome to a *relatively small extent*, and a rate of $600 per PFS—a rate that reasonably approximates the lodestar for that task—is reasonable and appropriate for the allocation of fees to Tier 5 firms." *Id.* (emphasis added).

Hossley-Embry also objected to its Tier Four allocation, arguing that it should have received a higher lodestar rate than what its own records supported and a multiplier as high as certain Tier Two firms. The Kansas district court was unpersuaded. With respect to Hossley-Embry's first argument, the court reiterated that "the work performed

44

by the Tier 2 firms contributed more to the common benefit of the settlement class than the Tier 4 work performed by Hossley[-][Embry]." *Id.* at 5874. The court found Hossley-Embry's next objection similarly unavailing. Hossley-Embry sought a higher lodestar figure based on an hourly rate higher than the one it provided—$345 for its Tier Four work—because a different firm received an award based on a rate of $810 per hour. But, because Hossley-Embry received the rate that it, itself, used in compensating its own Tier Four work, the firm could not "be heard to argue that its attorneys' time was actually more valuable than previously stated." *Id.*

### b. The Kansas District Court's April 2019 Clarification Order

On April 2, 2019, the Kansas district court entered an order clarifying that it would issue all final fee award orders, including those described in the allocation orders to be issued by the Minnesota state court and the Illinois district court.[17]

This order addressed certain plaintiffs' counsel, who sought clarification as to "how any appeals from the three courts' fee award allocations w[ould] be taken" and requested the Kansas district court mandate "that the allocation orders by the Minnesota and Illinois courts be filed [in the Kansas district court] for inclusion in a final judgment by [that court], from which judgment all appeals could be taken." *Id.*, Vol. 26, at 5922 (Kan. D. Ct. Mem. and Order, filed Apr. 2, 2019) ("April 2019 Clarification Order").

---

[17]    The court issued the order soon after it issued the March 2019 Kansas Pool Allocation Order, while the allocations of the other common benefit pools were ongoing.

Noting that such an approach "seem[ed] to run counter to the previous understanding of the three courts and counsel," the court nonetheless "agree[d] with [m]ovants that the settlement agreement require[d] that final allocation awards be issued by [the Kansas district court]." *Id.* at 5923. After all, the Settlement provided that "any Fee and Expense Award . . . shall be issued by [the Kansas district court] (in consultation with and approved by the other two courts), and that [the Kansas district court] retain[ed] exclusive jurisdiction over a Fee and Expense Award." *Id.* The Settlement also gave the Kansas district court "exclusive jurisdiction over the settlement fund, and thus any disbursements from that fund for attorney fees must be authorized ultimately by [the Kansas district court]."[18] *Id.* at 5924. Accordingly, the court granted counsels' motion and ordered that, "[a]t the conclusion of the allocation procedures in Minnesota and Illinois," those courts' "allocation rulings . . . [be] filed in" the Kansas district court, which would "subsequently issue final allocation orders and authorize that funds be disbursed to attorneys." *Id.*

The Kansas district court also clarified two additional matters. First, the court rejected the petitioners' suggestion that it could issue a final allocation order for the three common benefit pools before deciding the IRPA pool's final allocation. Agreeing with Toups/Coffman, the court reasoned that, "despite the IRPA formula having been set," no firm knew "how much it w[ould] receive from that pool," a consideration that could

---

[18]     Relatedly, the Kansas district court explained that its Final Order and Judgment of December 7, 2018, relevant to the Aggregate Fee Order, also established that it had "exclusive jurisdiction over the settlement fund and the allocation and distribution of attorney fees." Joint App., Vol. 26, at 5924.

factor in "that firm's argument on appeal." *Id.* at 5925.  At the same time, the court

opined that "the issue of when orders are final for purposes of appeal and the issue of

when appeals are best considered by the appellate court are for the parties to consider and

litigate to the Tenth Circuit." *Id.*  The Kansas district court explained that it would

continue to issue final allocation orders for each common benefit pool one by one, "as

completed," given that "[t]here is no requirement that [its] final allocation rulings be

contained in a single order." *Id.*  It would "then be up to interested parties to prosecute

appeals when and how they [saw] fit." *Id.*

Second, because it would issue the final allocation orders, the Kansas district court

would "not . . . merely . . . sign off on the allocations [issued] by the Minnesota and

Illinois courts without any consideration whatsoever." *Id.* at 5926.  To that end, the court

explained that it would "not foreclose entirely the opportunity for attorneys to litigate

whether [it] should adopt the other courts' allocations without alteration." *Id.*  That said,

the court made plain that it would "defer to the reasoning of the other courts in making

their allocations of the Minnesota and Illinois pools," as those courts were "best

position[ed] to understand the relative contributions of the attorneys assigned to those

pools to the ultimate outcome of the litigation against Syngenta." *Id.* at 5926–27.

Accordingly, the Kansas district court outlined the parameters for permissible

objections: specifically, "objections to specific allocations based on the judgment of those

courts" would not be entertained, whereas objections to "structural and procedural issues"

would be. *Id.* at 5927.  By way of example, the Kansas district court noted "an attorney

could object . . . on the basis of a fraud in the proceedings in the other court," which

requires "at least . . . a mechanism by which [such objection] could be raised." *Id.* at

5927 n.4.  But the court "would not entertain an objection based on the argument that the

objector's contribution to the settlement class should have been given more value." *Id.*

### c.    The May 2019 Minnesota Pool Allocation Order

On May 29, 2019, the Minnesota state court adopted in part and slightly modified

an R&R prepared by the Minnesota CLC (the "Minnesota CLC's R&R") regarding the

division of the $118,283,333.33 in attorneys' fees allocated to the Minnesota common

benefit pool.

First, the court adopted the Minnesota CLC's "proposed methodology of awarding

each firm that submitted a claim for common benefit time its approved audited lodestar

amount for its common benefit work, as increased by an appropriate multiplier." *Id.*,

Vol. 29, at 6711 (Minn. State Ct. Order on Allocation of Minn. Common Benefit Fees,

filed May 30, 2019) ("May 2019 Minnesota Pool Allocation Order").  Second, it

embraced the Minnesota CLC's "proposed methodology . . . of compensating each firm's

PFS-related work on the basis of a flat fee for each PFS that was completed and

submitted to Syngenta." *Id.*  And, third, the court adopted the "assignment of individual

firms to separate tiers, numbered Tiers One through Five." *Id.* at 6712.

The court fielded numerous objections to the recommended allocation, including

those raised by Johnson Becker and another appellant in this matter, Shields Law Group

("Shields").  These objections largely fell into two buckets: (1) complaints that the "flat

fee of $250 per PFS . . . would not adequately compensate . . . for the amount of time . . .

spent preparing PFSs"; and (2) complaints that the Minnesota CLC "unfairly and

48

artificially constrained" firms' compensable lodestar amounts by applying multipliers to increase the lodestar amounts in Tiers One through Four, but not Tier Five. *Id.* at 6727–28, 6734.

With respect to the first set of objections, the court determined that a flat fee rate of $301.63 per PFS was fair. Regarding the second set, the court "adjusted the multipliers to be applied to the five tiers of attorneys" so that the final multipliers would be 2.66 for Tier One, 2.3 for Tier Two, 1.65 for Tier Three, 1.45 for Tier Four, and 1.2 for Tier Five. *Id.* at 6712, 6741–42.

Johnson Becker raised one additional objection outside these two categories. The Kansas district court's December 31, 2018, Fee Allocation Order assigned Johnson Becker to the Minnesota pool, notwithstanding the fact that it worked in both Minnesota and Illinois. So, Johnson Becker asked the court to apply a methodology proposed in the Illinois district court when calculating its award for work done in that jurisdiction. Indeed, Johnson Becker believed that the proposed Illinois methodology would generate a larger fee award than it would receive under the Minnesota methodology.

The Minnesota state court was "not persuaded . . . that a different methodology should apply to [Johnson Becker's] work performed in Illinois." *Id.* at 6739. In that regard, the court seemed to zero in on the response to Johnson Becker's request for clarification before the Kansas Special Master and the Kansas district court during a December 17, 2018, hearing. At the hearing, Johnson Becker declined to object to the Kansas district court's assignment of it to the Minnesota pool. Instead, Johnson Becker asked the Kansas district court and the Kansas Special Master to clarify that it would be

compensated for its Illinois work by the Minnesota state court. The Kansas Special Master confirmed that each court overseeing a common benefit pool would compensate firms for their work in multiple jurisdictions, at which point Johnson Becker concluded that it "came . . . to get . . . clarification" and "received it." *Id.*, Vol. 23, at 5315–16.

Returning to the May 2019 Minnesota Pool Allocation Order, the Minnesota state court advised that even if Johnson Becker were reassigned to the Illinois pool, the court was not convinced it stood to recover more under any methodology deployed by the Illinois district court. Thus, the court declined to award Johnson Becker "additional compensation beyond that which ha[d] been calculated under the allocation adopted in [the Minnesota state court's] order." *Id.*, Vol. 29, at 6739.

### d.     The August 2019 Illinois Pool Allocation Order

In December 2018, the Illinois district court appointed a Special Master to issue an R&R on the division of attorneys' fees from the Illinois pool. The Illinois Special Master issued his R&R (the "Illinois Special Master's R&R") in March 2019. The Illinois district court largely rejected the Illinois Special Master's R&R due to legal and methodological flaws it saw in the report. On August 19, 2019, the court issued its own recommended allocations for the attorneys' fee award provided to the Illinois common benefit pool.

The court "review[ed] the hours the applicants submitted and ensure[d] they comport[ed] with the [December 31, 2018,] Fee Allocation Order, common benefit principles, *Johnson* factors, and posture of th[e] litigation." *Id.*, Vol. 29, at 6940 (S.D. Ill. D. Ct. Mem. and Order, filed Aug. 19, 2019). Relevant to this appeal, the court

recommended that O'Hanlon, Demerath & Castillo and Demerath Law Office (collectively "Demerath") be awarded $780,166.67 in fees, or 1% of the Illinois pool—half of the 2% allocation recommended by the Illinois Special Master. Though Demerath "claim[ed] 9,505.5 hours of common benefit work, consisting of 6,060 attorney hours and 3,445.5 non-attorney hours," the Illinois district court "afford[ed] significantly less weight to the non-attorney hours and little weight to hours recorded as pre-settlement communication with clients and assisting clients in perfecting claims," reductions warranted (in its view) by Demerath's limited contribution to the class overall or the Settlement. *Id.* at 6944.

Similarly, the court recommended that the Law Offices of Craig Eiland ("Eiland") receive a $2,340,500 attorneys' fee award, or 3% of the Illinois pool—a reduction of one percentage point from the Illinois Special Master's recommended allocation. As with Demerath's award, the Illinois district court "afford[ed] significantly less weight to the non-attorney hours and little weight to the hours recorded as pre-settlement communication with clients (over half of Eiland's estimated attorney hours) and PFS work-related hours." *Id.* at 6945. Because "the majority of Eiland's hours consist[ed] of PFS work, communication with clients, assisting clients with claims, and administrative work," the Illinois district court found that a reduction in fees from the Illinois Special Master's recommendation was justified. *Id.*

    **e.**       **The Kansas District Court Adopts the Minnesota and Illinois Pool Allocation Orders**

In accordance with its April 2019 Clarification Order, the Kansas district court reviewed and adopted the Minnesota state court's May 2019 Minnesota Pool Allocation Order in July 2019. Later, in November 2019, the Kansas district court reviewed and adopted the Illinois district court's August 2019 Illinois Pool Allocation Order.

           **i.**       **The July 2019 Minnesota Pool Allocation Order**

First, on July 16, 2019, the Kansas district court adopted the May 2019 Minnesota Pool Allocation Order over the objections of Shields and Johnson Becker. Abiding by the self-imposed discretion guidelines explained in its April 2019 Clarification Order, the Kansas district court deferred to the Minnesota state court's allocation decisions and considered whether any of the objections raised claims of structural or procedural error.

Relevant to these appeals, Shields filed an "objection" but conceded that "it d[id] not challenge the judgment of the Minnesota court in making [its] allocation" and that its objection was "more akin to a motion for reconsideration." *Id.* at 6870–71 (Kan. D. Ct. Mem. and Order, filed July 16, 2019) ("July 2019 Minnesota Pool Allocation Order"). Specifically, Shields asked the court to reconsider its December 31, 2018, Fee Allocation Order adopting the four-pool allocation structure. Shields maintained that the four-pool structure "led to inequitable results (which had to occur before it knew to object . . .)." *Id.* at 6871. Drawing from the Illinois Special Master's R&R—which, at that time, the Illinois district court had not largely rejected—Shields claimed that "certain firms in the Illinois . . . common benefit pool w[ould] be better compensated . . . based on a

comparison of the number of corn producers represented by the firms and the number of common benefit hours claimed." *Id.*

The Kansas district court rejected this argument. It noted that Shields's motion for reconsideration came "far too late."[19] *Id.* (citing D. KAN. R. 7.3(b), which imposed a fourteen-day deadline for filing a motion to reconsider a non-dispositive ruling). The court acknowledged that Shields did object to the Kansas Special Master's November 2018 Fee Allocation R&R, upon which the court's December 31, 2018, Fee Allocation Order was based. However, Shields merely "argued that the IRPA pool allocation was insufficient and that PFS work should be adequately compensated across all jurisdictions." *Id.* at 6871 n.2. Notably absent from that objection was its current contention—that "the four-pool structure itself would lead to inequitable results." *Id.* Put differently, when Shields could have objected to the four-pool structure, it opted to focus on how best to fill the pools.

Because the allocation process for each pool was "well underway," the court found Shields's "lack of timeliness in making [its] argument . . . prejudicial." *Id.* at 6871. Indeed, as the court observed, the allocation process for the Kansas pool "ha[d] been completed." *Id.* Nor could Shields claim it needed to "'play the game and see the result' before it could offer its 'critique,'" or "liken[] the end results of the allocations to new

---

19    In full, Rule 7.3(b) provides: "Parties seeking reconsideration of non-dispositive orders must file a motion within 14 days after the order is filed unless the court extends the time. A motion to reconsider must be based on: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice." D. KAN. R. 7.3(b).

evidence that could justify reconsideration." *Id.* Simply put, the court concluded that Shields "was not permitted to have it both ways"—i.e., "go[ing] along with the Court's approach and roll[ing] the dice hoping for a good result, and then complain[ing] about the approach if ultimately dissatisfied with the outcome." *Id.* at 6871–72.

And, in any event, Shields failed in persuading the court that it should not have adopted the four-pool structure. Shields complained "solely" about the scheme's outcome but "ha[d] not explained why the use of the four-pool structure was legally deficient." *Id.* at 6872. Nor had Shields described how the four-pool structure's use was inferior to some other method of allocation or why the court's "reasons . . . for adopting that method of allocation" were somehow questionable. *Id.* Accordingly, Shields fell far short of convincing the court that "it must start all over with a different allocation methodology." *Id.*

Johnson Becker's objections—which ranged from valuation and pool-assignment concerns to constitutional due process challenges—were similarly unavailing. Johnson Becker initially "complain[ed] about the Minnesota court's valuation of its common benefit work performed on cases filed in Illinois." *Id.* at 6872–73. As with Shields's objection, Johnson Becker relied on the (ultimately rejected) analysis advanced in the Illinois Special Master's R&R. Based on that analysis, Johnson Becker argued "that it would receive a much greater fee award for its Illinois common benefit work if [either] it had been placed in the Illinois pool for purposes of that work or . . . the Minnesota court had employed the Illinois [S]pecial [M]aster's methodology in evaluating the Illinois work." *Id.* at 6873. The court overruled this objection "to the extent that Johnson Becker

54

argue[d] that the Minnesota court should have applied the Illinois [Special] [M]aster's methodology to [its] Illinois work," instead deferring to the Minnesota court's judgment regarding Johnson Becker's common benefit work.[20]  *Id.*

Additionally, the Kansas district court rejected what amounted to a belated motion for reconsideration by Johnson Becker—i.e., its "argu[ment] that it should have been placed in both the Minnesota and Illinois pools, with each court allocating fees for work performed on cases in its jurisdiction."  *Id.*  Not only was this reconsideration request untimely under Kansas's Local Rule 7.3(b), but Johnson Becker "effectively abandoned" it earlier in the post-judgment fee allocation proceedings by not seeking "reconsideration of the Court's [prior] decision to assign it only to the Minnesota pool."  *Id.* at 6875–76. Abandonment aside, the court also made plain that Johnson Becker, like Shields, failed to explain "*why* the Court's decision to place it in only the Minnesota pool was erroneous, other than by reference to the [presumed] end result."  *Id.* at 6876 (emphasis added).

Turning to Johnson Becker's third objection, which it also advances in this appeal, the Kansas district court rejected Johnson Becker's assertion that its assignment to the Minnesota pool violated its due process rights.  For one, Johnson Becker failed to establish a protected property interest in its fee award of any specific amount or in the application of a particular methodology.  *See id.* at 6876–77.  More than that, Johnson

---

[20]     As the Kansas district court noted, Johnson Becker conceded in its objection that the Minnesota state court's ruling as to the allocation methodology made sense based on that court's unfamiliarity with the Illinois litigation.

Becker failed to demonstrate that it was the victim of arbitrary decision-making, in large part because it received adequate process. As the district court explained:

> Johnson Becker had multiple opportunities to request placement also in the Illinois pool, but it abandoned any such request. Johnson Becker was also afforded ample process with respect to the Minnesota allocation, as it made multiple submissions to [the] Minnesota CLC prior to its recommendation and submitted multiple briefs to the Minnesota court before it issued its allocation order.

*Id.* at 6877.

In sum, the court observed that Johnson Becker "was . . . afforded ample process with respect to the Minnesota allocation," and it also "had multiple opportunities to request placement . . . in the Illinois pool"—opportunities that it "abandoned." *Id.* Thus, the court rejected Johnson Becker's objection.[21]

### ii.    The November 2019 Illinois Pool Allocation Order

Next, on November 19, 2019, the Kansas district court adopted the August 2019 Illinois Pool Allocation Order over the objections of Demerath and Eiland. Pertinent here is the district court's consideration of Demerath's and Eiland's objections. Demerath and Eiland argued that, "despite its previous [April 2019 Clarification] [O]rder," the Kansas district court "should not limit the scope of its review of the [August 2019] Illinois [Pool Allocation] Order to structural and procedural issues, but should instead exercise its own

---

[21]    The court also rejected an objection filed by Toups/Coffman, both because it was untimely, and because Toups/Coffman had "no standing to object to" the Kansas district court's adoption of the Minnesota state court's allocation of the Minnesota pool, as it "was assigned to the Kansas MDL common benefit pool, and the Minnesota court therefore did not consider Toups/Coffman's entitlement to fees." Joint App., Vol. 29, at 6878.

judgment."[22] *Id.*, Vol. 32, at 7441 (Kan. D. Ct. Mem. and Order, filed Nov. 19, 2019)

("November 2019 Illinois Pool Allocation Order").  Given the retirement of Judge

Herndon, who had presided over the Illinois litigation, Demerath and Eiland argued that a

more searching review of the August 2019 Illinois Pool Allocation Order made sense

because the basis of the Kansas district court's deference—principally, the other court's

greater familiarity with the litigation in Illinois—was absent.  In Demerath's and Eiland's

view, that rationale could not be furthered because "Judge Rosenstengel[,] [who replaced

Judge Herndon,] did not preside over the Illinois cases until after the settlement was

complete."  *Id.*

> The Kansas district court rejected this argument, explaining that:
>
> The reassignment to a new judge does not represent a new issue or a changed
> circumstance.  At the time of this Court's allocation order on December 31,
> 2018, Judge Herndon's retirement was imminent and expected; and at the
> time of this Court's order of April 2, 2019, in which the Court limited
> objections to structural and procedural issues, Judge Rosenstengel had
> already been presiding over the Illinois cases for nearly three months (and
> [the Illinois Special Master] had already issued his R&R).  Thus, the
> governing framework that includes deference to the Illinois court was
> adopted with the understanding that a new Illinois judge would be
> determining the allocation from the Illinois pool.

*Id.* at 7441–42.

In any event, the court declined to alter the "procedure and . . . scope" of its

review of the Illinois district court's allocation order after the fact.  *Id.* at 7442.  The court

recalled that it had adopted a posture of deference not only because the Minnesota state

---

[22]    Demerath and Eiland timely joined the objections that another party, Clark,
Love & Hutson, made.

and Illinois district courts "were better placed to make the allocations," but also because

such an approach reflected the parties' understanding as memorialized in the Settlement.

*Id.* at 7442–43.  As the Kansas district court reasoned, Demerath and Eiland "ha[d] not

argued that the procedure and scope of review adopted by the Court violate[d] the law,"

fell "outside of the Court's discretion in awarding fees," or was "not a reasonable way to

perform the allocation."  *Id.* at 7443.  Thus, the Kansas district court reviewed only for

procedural and structural errors and declined to consider objections questioning the

Illinois district court's judgment on each firm's relative contribution to the settlement

class.

Demerath and Eiland also broadly urged the Kansas district court to reject the

August 2019 Illinois Pool Allocation Order and instead adopt the Illinois Special

Master's R&R under which they both stood to receive larger fee allocations.  However,

the Kansas district court pointed out that neither Demerath nor Eiland "addressed the

Illinois court's specific reasoning concerning [their] contributions, and thus [had] not

explained how [their] allocation[s] d[id] not fall within the proper judgment of [the

Illinois district] court."  *Id.* at 7448.  The Illinois district court "properly considered the

type of work for which [they] claimed common benefit fees, and [then] applied [the

Kansas district court's] guidance in affording less weight to non-attorney hours, claims

work, and client communications."  *Id.*  Thus, neither firm "identified a basis to disturb

the judgment of the Illinois [district] court," and the Kansas district court, accordingly, overruled their objections.[23]  *Id.*

### 5.     The Kansas District Court's July 2019 Expense Order

In addition to the orders above, the Kansas district court adopted the Kansas Special Master's R&R concerning expense awards.  The court did so over the objection of Byrd and Shields.

### a.     The Kansas Special Master's R&R on Expenses

Before the Kansas district court tasked her with recommending an expense allocation scheme, the Kansas Special Master anticipated that certain expense guidelines the district court had previously entered were underinclusive.  As such, in her November 2018 Fee Allocation R&R she effectively recommended that the Kansas district court enlarge the definition of "common benefit expenses"—essentially, the costs of litigation done in furtherance of the ultimate class recovery—to account for the expenditures that meaningfully contributed to the Settlement.  *Id.*, Vol. 21, at 4823–26.  No attorney objected to that portion of her R&R, which the Kansas district court adopted.

Later, in her R&R on expenses, the Kansas Special Master explained that, in the December 31, 2018, Fee Allocation Order, the Kansas district court "agreed that the definition of 'common benefit' hours and expenses eligible for payment from the

---

[23]     As with the July 2019 Minnesota Pool Allocation Order, Toups/Coffman also filed an objection/motion for reconsideration pertaining to the November 2019 Illinois Pool Allocation Order, which the Kansas district court dismissed for largely the same reasons outlined in its July 2019 Minnesota Pool Allocation Order.

common fund . . . should extend beyond the definitions provided under the applicable Kansas and Minnesota common benefit orders." *Id.*, Vol. 26, at 6003. So expanded, "common benefit" expenses would "include items beyond those approved in advance by leadership under those orders." *Id.* Thus, so long as a firm's work provided a benefit to the settlement class or contributed to the overall settlement, that work would come under the umbrella of "common benefit" work and expenses. *Id.* That said, the Kansas Special Master clarified that client recruitment efforts or firm overhead costs, such as advertising expenses, would not be considered common benefit work.

The Kansas Special Master also considered the specific category of expert and consulting fees. "As a general rule," she "recommended approval of expenses for 'experts' retained by law firm groups who were described as assisting [to get] information from existing clients . . . to complete PFSs, respond to discovery, fill out opt out forms from the certified litigation class, or apply for settlement benefits." *Id.* at 6016–17. The Kansas Special Master also "generally recommended acceptance of charges for contract employees, including contract attorneys, who were described as doing similar work (*e.g.*, assisting with client PFSs or discovery or responding to telephone inquiries) or were involved in assisting at meetings reported to be with existing clients." *Id.* at 6017. Likewise, the Kansas Special Master generally recommended acceptance of expenses for "legal and damages experts and experts regarding the agricultural industry." *Id.* However, she "did not . . . recommend acceptance of requests for reimbursement of hourly rates or salaries for law firm employees who performed such tasks," as she "believ[ed] that those costs [were] subsumed in attorneys' fee awards, and

60

should not be reimbursed as expenses." *Id.*  With these proposed rules in mind, the

Kansas Special Master recommended a total expenses award of $31,297,117.70.

### i.    Byrd's Objections

As mentioned, the Kansas district court adopted the Kansas Special Master's R&R

on expenses over several objections.  Among them were certain objections of Byrd,

which bear on the resolution of this appeal.  First, Byrd claimed $539,603.02 in expenses,

including $381,903.84 for "Expert/Consulting Fees Not Included in Common Benefit,"

but "the [Kansas] [S]pecial [M]aster . . . recommended a total award to [Byrd] of

$328,305.16, including $194,414.69 for expert/consultant expenses." *Id.*, Vol. 29, at

6895 (Kan. D. Ct. Mem. and Order, filed July 19, 2019) ("July 2019 Expense Order").

Byrd "object[ed] . . . to the recommended denial of expert/consultant expenses for paying

29 workers a total of $187,037.11." *Id.* at 6895–96.  To be sure, Byrd "state[d] that it

d[id] not object to the [Kansas] [S]pecial [M]aster's methodology, in which she drew [a]

distinction between 'contract employees' and 'law firm employees.'" *Id.* at 6896.

Rather, Byrd "object[ed] to the characterization of [its] 29 workers as firm employees,"

arguing that "its payments to these workers [were] not properly considered overhead of

the firm." *Id.*  Specifically, Byrd claimed "that these workers were hired only for the

duration of th[e] [*Syngenta*] litigation, worked on no other firm matters . . ., had their own

workspace, and were paid an hourly wage without benefits." *Id.*  Additionally, Byrd

maintained these employees were "not part of the firm's regular overhead" because "four

other associated firms shared in the cost of paying" them. *Id.* at 6896–97.  However, as

Byrd conceded, "it issued W-2s for these workers (instead of 1099s used for independent

contractors), based on the level of control the firm exerted over the workers," arguing that "such treatment for tax purposes d[id] not mean that these costs [wer]e properly considered overhead." *Id.* at 6897.

Rejecting this argument, the Kansas district court first found the Kansas Special Master's "distinction between contract workers and firm employees" to be reasonable and "proper"—and, in any event, Byrd "d[id] not object to the special master's methodology," which included this distinction. *Id.* As the Kansas Special Master explained, she made this distinction because "work by firm employees [was] more properly considered in the context of an application for reasonable attorney fees." *Id.* Consequently, the "primary consideration" as to the work for which Byrd sought compensation was "whether [it was] more properly considered as attorney fee work or [as] an expense." *Id.*

Put differently, the distinguishing factor was "whether the firm did the work in-house, with its own employees, or whether the firm shopped the work out to an outside party or parties." *Id.* Under this framework, "it d[id] not matter whether the workers were paid hourly or given a salary, or whether they were hired on a temporary or permanent basis." *Id.* In Byrd's case, the firm "chose to hire . . . workers and pay them directly as employees, exerting a level of control sufficient to demand treatment as employees for tax purposes." *Id.* As a result, such workers were "reasonably treated as firm employees and not as contract workers in this context, and any reimbursement for th[eir] time should have come through the attorney fee award process." *Id.* at 6897–98.

Formal categorization aside, the court observed that Byrd, itself, "described these workers as having performed specific and other tasks necessary to complete PFSs," for which Byrd "ha[d] been awarded *attorney fees* in the amount of $707,925.61 . . . ." *Id.* at 6898 n.4 (emphasis added). That PFS-specific attorneys' fee amount, which was the sum of thousands of flat-fee-per-PFS awards, "was intended to compensate the firm for all work performed on those PFSs by firm employees (whether temporary or permanent)." *Id.* In short, Byrd had already been compensated for the work of these twenty-nine employees by way of the PFS-specific percentage of its total attorneys' fee award. Accordingly, the court rejected Byrd's objection to the Kansas Special Master's recommendations as to the expense award.[24]

Separately, Byrd claimed that it did not realize it could seek expenses until after it reviewed the Kansas Special Master's R&R on expenses, in which she discussed allocations for expert fees. For that reason, Byrd sought to amend its application to account for an additional $31,549.75 in expenses incurred. Exercising its discretionary powers, the Kansas district court declined to reopen the allocation process for Byrd. According to the court, "[a]ll applicants" enjoyed "sufficient opportunity" to make expense requests. *Id.* at 6898. Byrd, however, failed to explain how it was "misled in any way" or why it believed it could not seek reimbursement for such costs. *Id.* Like the

---

[24]    The Kansas district court further explained that the majority share of the new expenses for which Byrd sought compensation comprised payments to temporary workers whom it described in the same general terms as the twenty-nine workers who assisted with the PFSs. Byrd did not claim to have paid an external entity for these workers, and the court classified them as law firm employees—not contract workers. So, the court compensated their work through the attorney fee award process.

other firms, Byrd "could have requested any expenses that it desired," especially since neither the court nor the Kansas Special Master made any pronouncement that expressly excluded expenses related to the settlement process. *Id.* But Byrd "chose not to submit these expenses." *Id.* Thus, the court concluded that it "would be unfair to the integrity of the process to allow [Byrd] to make a [belated] new claim." *Id.* at 6898–99.

### ii.    Shields's Objection

Also relevant to this appeal are Shields's objection and motion to amend; they fared no better than Byrd's objections. Shields sought "a claim for $40,053.51 for telephone charges incurred communicating with clients regarding PFSs and the settlement claims process," plus a new "claim for $59,092.08 for payment to certain contract workers []who worked on PFSs and settlement claims." *Id.* at 6899. Shields "originally included such expenses in its filed application, but it later abandoned and withdrew [them] in submitting its detailed spreadsheet based on a [purported] 'mistaken belief' that they constituted impermissible 'overhead' expenses." *Id.*

With respect to the telephone charges, Shields did not explain in its objection why it initially determined that the charges were properly classified as overhead expenses—or why that determination was erroneous. As such, the district court declined to reopen the application process.

Regarding contract worker expenses, Shields explained in its reply brief that it initially withdrew this expense claim to avoid double-dipping, as it intended to include the work in its attorney fee application. But, after the Kansas Special Master issued her R&R on Expenses, Shields "realized that it could have been awarded expenses for its

64

contract workers," without double-dipping, because the Minnesota state court "declined to award firms their lodestar amount in attorney fees for work on PFSs." *Id.* at 6900.

Disallowing this new claim, the Kansas district court noted that Shields "voluntarily chose to submit this incurred cost in its fee application instead of in its expense application" despite having "no reason" to believe that an expense award would preclude charges for contract workers. *Id.* Put differently, the court explained that Shields could "not try the other route simply because it [was] unhappy with the result of the route that it did choose." *Id.* And, contrary to Shields's suggestion, the "specter of double-dipping remain[ed]" because the court intended that Shields's fee award for PFS work—$643,980.05 for 2,135 PFSs—"provide reasonable compensation to [Shields] for the PFS work that [Shields] submitted in its fee application." *Id.* Given Shields's voluntary conduct and its attorneys' fee award, the court "in its discretion decline[d] to reopen the [expense] process to allow [Shields] to submit [its] new claim." *Id.*

### 6.    The Watts Guerra Settlement Agreement

We previously mentioned that Watts Guerra—a party to the instant appeal—exited this matter after settling its claims against the Appellees (the "Watts Guerra Settlement"). In December 2020, Watts Guerra and the Appellees moved in Kansas district court for an indicative ruling pursuant to Rule 62.1 of the Federal Rules of Civil Procedure. Under the Watts Guerra Settlement, Watts Guerra would receive an additional sum, to be paid from the fee awards of the other parties to the agreement. By design, the Watts Guerra Settlement would *not* affect the fee awards of firms that were not party to the agreement.

65

### 7.     The June 2021 IRPA Pool Allocation Order

Rounding out the relevant procedural background for these appeals, most recently, on June 4, 2021, the Kansas district court adopted the Kansas Special Master's recommendation concerning attorneys' fee awards allocated to the IRPA pool and entered an order to this effect—again, over objections from Shields and Toups/Coffman. *See* Joint Supp. App., Vol. 13, at 3561 (Kan. D. Ct. Mem. and Order, filed June 4, 2021) ("June 2021 IRPA Pool Allocation Order ").[25]  The Kansas district court entered its June 2021 IRPA Pool Allocation Order after the appeals were brought before the Tenth Circuit, and just after oral argument was held on March 10, 2021.  We permitted the Appellants to file limited supplemental briefing in response to this order.[26]  We now move on to describe what the Appellants in this case specifically challenge before us.

### C.     The Current Appeals

The Kansas district court and the parties themselves have largely grouped Appellant law firms and attorneys and their respective contentions into five pools.  They are:

- "Kansas Appellants"—i.e., Toups/Coffman and Hossley-Embry;

---

[25]     In an exercise of our discretion, we take judicial notice of the Kansas district court's subsequent proceedings and orders related to the appeals at hand.  *See, e.g.*, *United States v. Smalls*, 605 F.3d 765, 768 n.2 (10th Cir. 2010).

[26]     The Panel's order prohibited the parties from "rais[ing] any challenge to the district court's allocation of the IRPA pool itself" and limited the supplemental briefing "to arguments regarding whether, and to what extent, the [June 2021 IRPA Pool Allocation Order] . . . affect[ed] the fee allocation issues already briefed by the parties." *In re Syngenta AG MIR 162 Corn Litig.*, Nos. 19-3008, *et al.*, Order (entered July 12, 2021) (the "Supplemental Briefing Order").

- "Minnesota Appellants"—i.e., Byrd and Shields;[27]

- "Illinois Appellants"—i.e., Eiland and Demerath;

- Byrd and Shields;[28] and

- Johnson Becker.

Appellants in this action have specifically challenged various facets of the Kansas district court's orders as to the fee allocation process.  At bottom, the following orders are at issue here: (1) the December 31, 2018, Fee Allocation Order; (2) the March 2019 Kansas Pool Allocation Order; (3) the July 2019 Minnesota Pool Allocation Order; (4) the November 2019 Illinois Pool Allocation Order; and (5) the July 2019 Expense Order.

More specifically, Kansas Appellants, Minnesota Appellants, and Johnson Becker challenge the Kansas district court's December 31, 2018, Fee Allocation Order.[29]  Kansas

---

[27]     Byrd and Shields together with Watts Guerra previously functioned as the "Minnesota Appellants."  But, as we have explained above, on January 7, 2021, Watts Guerra reached a settlement and the Tenth Circuit's Clerk of Court filed an order terminating it as an appellant in this case.

[28]     While also functioning as "Minnesota Appellants" in these appeals, Byrd and Shields additionally pursue a separate action, bringing a stand-alone appeal related to expenses and the IRPA pool allocation.

[29]     Toups/Coffman has filed a notice for virtually every order entered in the post-judgment proceedings.  Toups/Coffman filed its first notice of appeal on January 7, 2019, purportedly challenging the Kansas district court's Aggregate Fee Order and corresponding Final Order and Judgment both entered on December 7, 2018.  But Toups/Coffman clarifies that it appeals from those orders "*only* with respect to their provisions pertaining to, delineating, and/or affecting the process, procedures, and criteria for, and the administration of, the allocation and distribution of the attorneys' fees and expenses awarded by the Court in this action.  Toups/Coffman Plaintiffs' Counsel and Toups/Coffman Plaintiffs specifically do not appeal the fairness and/or overall amount of

Appellants also target the March 2019 Kansas Pool Allocation Order. Proceeding merely as Byrd and Shields, and not as Minnesota Appellants, Byrd and Shields target the July 2019 Minnesota Pool Allocation Order, which Johnson Becker also appeals.

For their part, Illinois Appellants bring a narrow challenge to the Kansas district court's November 2019 Illinois Pool Allocation Order. And, finally, proceeding not as Minnesota Appellants but as "Byrd and Shields," Byrd and Shields appeal the Kansas district court's July 2019 Expense Order.[30]

## II.     Discussion

We begin by assessing our appellate jurisdiction. Once assured of it, we discuss our scope of review. As the factual background illustrates, many of the appellants failed to lodge appropriate objections before the Kansas district court. Furthermore, several of the appellants failed to raise or adequately present arguments in their opening briefs. Consequently, our waiver and forfeiture doctrines have some bearing on the resolution of these appeals, and we thus offer a general overview of these preservation doctrines. With our standard of review and preservation doctrines in mind, we then turn to each party's specific appellate issues. Ultimately, we uphold the Kansas district court's rulings.

---

the settlement of this action." Joint App., Vol. 23, at 5394–95 (Notice of Appeal, filed Jan. 7, 2019).

[30]     Summing these up, we have *numerous* notices of appeal filed prior to the publication of the June 2021 IRPA Fee Allocation Order, and three notices from the Kansas and Minnesota Appellants filed after that allocation.

### A.     Jurisdiction

### 1.     Finality

Because "[f]ederal courts are 'courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute,'" we must ensure we have jurisdiction before delving into the parties' arguments. *Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1201 (10th Cir. 2012) (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005)); *accord McClendon v. City of Albuquerque*, 630 F.3d 1288, 1292 (10th Cir. 2011) ("The courts of appeals are creations of Congress and the boundaries of their jurisdiction are staked by statute."). Due to these limitations, we "presume[] that a cause lies outside [our] . . . jurisdiction" unless "the party asserting jurisdiction" carries its "burden of establishing the contrary." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *accord Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1016 (10th Cir. 2013) ("[B]ecause the jurisdiction of federal courts is limited, there is a presumption against our jurisdiction, and the party invoking federal jurisdiction bears the burden of proof." (quoting *Marcus v. Kan. Dep't of Revenue*, 170 F.3d 1305, 1309 (10th Cir. 1999))). Thus, we must examine our jurisdiction even when no party raises it. *McGeorge v. Cont'l Airlines, Inc.*, 871 F.2d 952, 953 (10th Cir. 1989); *see 1mage Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) ("Federal courts 'have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party,' and thus a court may *sua sponte* raise the question of whether there is

subject matter jurisdiction 'at any stage in the litigation.'" (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506, 514 (2006))).

Congress authorized the courts of appeals to hear "appeals from all *final decisions* of the district courts of the United States." 28 U.S.C. § 1291 (emphasis added). But, as we have narrated, the parties first filed their notices of appeals while the Kansas district court was still allocating the $503,333,333.33 aggregate attorneys' fee award granted in the Aggregate Fee Order and Final Order and Judgment filed on December 7, 2018. Indeed, the Kansas district court did not complete allocation of the attorneys' fee award among the law firms within the four common benefit pools until June 4, 2021, when it entered the June 2021 IRPA Pool Allocation Order—that is, a few months after we heard oral argument in this case. So, at this juncture, the question is whether we have jurisdiction to review appeals from the parties that were filed *before* the June 2021 IRPA Pool Allocation Order. Put differently, we ask whether any of the pre-June 2021 appeals challenge orders that have the requisite *finality* to be appealable.

To answer this question, we must review what makes a "final decision" final. Though acknowledging that finality determinations cannot be reduced to "a formula," *Gillespie v. U.S. Steel Corp.*, 379 U.S. 148, 152 (1964), the Supreme Court has explained "a [district] court's decision ordinarily becomes 'final,' for purposes of appeal, only upon completion of the entire case," *Ritzen Grp., Inc. v. Jackson Masonry*, --- U.S. ----, 140 S. Ct. 582, 586 (2020). Determining finality, then, is a functional inquiry: when a district court has no more to do but "execute the judgment," we know that the decision it has entered is final for the purposes of conferring jurisdiction under § 1291. *Van*

70

*Cauwenberghe v. Biard*, 486 U.S. 517, 521–22 (1988) (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)); *accord Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 408–09 (2015) (explaining that a final decision is one "by which a district court disassociates itself from a case" (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995))).

Our own discussions of finality track with these general contours. In *McClendon*, we explained that finality, "for purposes of § 1291[,] . . . signal[s] [that] the litigation is over." 630 F.3d at 1295. And in *D&H Marketers, Inc. v. Freedom Oil & Gas*, *Inc.*, 744 F.2d 1443 (10th Cir. 1984), we explained that § 1291 "require[s] the termination of all matters as to all parties and causes of action before an appeal may be taken." *Id.* at 1444. In short, Congress's finality requirement "precludes consideration of decisions that are subject to revision." *Roska ex rel. Roska v. Sneddon*, 437 F.3d 964, 969–70 (10th Cir. 2006) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996)).

That an attorneys' fee award tends to arise in the context of post-judgment proceedings is not cause to depart from these well-settled rules. Indeed, courts tend to treat post-judgment proceedings as standalone litigation units subject to the same finality rules that apply to prejudgment merits proceedings. *See, e.g.*, *Caribbean Mgmt. Grp., Inc. v. Erikon LLC*, 966 F.3d 35, 40 (1st Cir. 2020) (collecting cases) ("When evaluating the finality of an order entered after judgment, courts generally treat the post-judgment proceeding as if it were a lawsuit distinct from the suit that generated the underlying judgment."); *In re Joint E. & S. Dists. Asbestos Litig.*, 22 F.3d 755, 760 (7th Cir. 1994) ("[A] postjudgment proceeding, for purposes of appeal, must be viewed as a separate lawsuit from the action which produced the underlying judgment."); *see generally* 15B

71

Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 3916 (2d ed.), Westlaw (database updated April 2022) ("Appeal ordinarily should not be available as to any particular post-judgment proceeding before the trial court has reached its final disposition. Once the district court has completely disposed of the matter, its decision should be found final."). As the Eleventh Circuit helpfully explained,

> [I]n postjudgment proceedings, such as attorney fee disputes, the meaning of a final decision is less clear because the proceedings necessarily follow a final judgment. Even so, we treat the postjudgment proceeding as a free-standing litigation, in effect treating the final judgment as the first rather than the last order in the case. Thus, an order is deemed final if it disposes of all the issues raised in the motion that initially sparked the postjudgment proceedings. . . . Only if a postjudgment order is apparently the last order to be entered in the action is it final and appealable.

*Mayer v. Wall St. Equity Grp., Inc.*, 672 F.3d 1222, 1224 (11th Cir. 2012) (per curiam) (alterations, citations, and quotations omitted). While noting that this bright-line rule cohered with the Supreme Court's "practical construction of 28 U.S.C. § 1291," the Eleventh Circuit also recognized that it promoted the salutary goal of efficient litigation: "For us to hold otherwise invites litigants to appeal every attorney's fee order, *even if other requests remain outstanding*, resulting in a proliferation of piecemeal or repetitious appeals." *Id.* (emphasis added).

The Sixth Circuit employed a similar rationale in *JPMorgan Chase Bank, N.A. v. Winget*, 920 F.3d 1103 (6th Cir. 2019), where it dismissed an appeal of an interim award of attorneys' fees made post-judgment because the post-judgment fee proceedings were ongoing. *Id.* at 1104. The *Winget* litigation began with Chase Bank suing Mr. Winget for millions he owed to it under a credit agreement. *See id.* After numerous appeals

72

dealing with both the merits and issues pertaining to attorneys' fees, the district court

entered a final amended judgment against Mr. Winget, and the case moved into "post-

judgment proceedings" concerning, *inter alia*, "what assets Chase can collect, how Chase

can collect those assets, and what those assets are worth." *Id.* at 1105. As these

proceedings "dragg[ed] on, Chase periodically ask[ed] the district court for more

attorneys' fees." *Id.* The court granted one of Chase's motions, and in doing so

highlighted the "interim nature of the award." *Id.* Nonetheless, Mr. Winget appealed this

interim award of attorneys' fees. *Id.* at 1104.

Observing that district courts "typically resolve[] all attorneys' fees in a single,

final order" over which an appellate court can exercise jurisdiction, the Sixth Circuit

dismissed Mr. Winget's appeal because it pertained to "an interim award of attorneys'

fees *post*-judgment, where the post-judgment proceedings [were] *ongoing*." 920 F.3d at

1106–07. In other words, "this award of attorneys' fees did not end the post-judgment

litigation"; instead, "applying the post-judgment completeness rule" would reveal the

appeal "not [to be] from a final, appealable order." *Id.* at 1107. This characterization of

an interim fee award "ma[de] sense" because allowing for such appeals would encourage

the very kind of uneven, inefficient litigation that the finality rule aims to avoid. *Id.* at

1107–08.[31]

---

[31]    Both the Eleventh Circuit's reasoning in *Mayer* and the Sixth Circuit's
reasoning in *Winget*—both discussed *supra*—find some support in caselaw from other
circuit courts. *See Autotech Techs. LP v. Integral Rsch. & Dev. Corp.*, 499 F.3d 737, 745
(7th Cir. 2007) ("[W]e 'treat the post-judgment proceeding as if it were a free-standing
lawsuit and . . . identify the final decision in the post-judgment proceeding and confine
any further appeal under section 1291 to that decision.' 'A postfinal order will be treated

In practical terms, none of the Appellants challenge the Settlement or the aggregate fee award of $503 million *per se*; rather, their appeals all center on the *allocation* of that fee award.  Indeed, the parties filed most, if not virtually all, of their notices of appeal with respect to fee allocation orders that were entered during post-judgment proceedings *after* the Kansas district court's December 7, 2018, Final Order and Judgment and *before* the June 2021 IRPA Pool Allocation Order, which completed the fee-award allocation process.

Akin to the appellants in *Mayer* and *Winget*, Appellants in this action prolifically (and in piecemeal fashion) appealed from various fee awards that appeared "final"—in the sense that they disposed of a particular, discrete issue that the district court was unlikely to revisit—even though these awards did not, alone or in combination, resolve the overall fee allocation proceedings writ large.  Critically, we conclude that all proceedings after the Kansas district court's Aggregate Fee Order and corresponding Final Order and Judgment constitute one, post-judgment litigation that only concluded with the filing of the June 2021 IRPA Pool Allocation Order.

---

as "final" for purposes of section 1291 if it "dispose[s] of all issues raised in the post-judgment motion."'" (citations omitted) (first quoting *Bogard v. Wright*, 159 F.3d 1060, 1062 (7th Cir. 1998); and then quoting *JMS Dev. Co. v. Bulk Petroleum Corp.*, 337 F.3d 822, 825 (7th Cir. 2003))); *Jensen Elec. Co. v. Moore, Caldwell, Rowland & Dodd, Inc.*, 873 F.2d 1327, 1329 (9th Cir. 1989) ("An order awarding attorney's fees which does not fully dispose of the issue of attorney's fees is not a final, appealable order."); *cf. Wickersham v. City of Columbia*, 221 F. App'x 488, 489 (8th Cir. 2007) (unpublished) (dismissing appeal for lack of jurisdiction where district court "ha[d] not yet resolved the apportionment of fees" and this apportionment was more than a mechanical exercise).

Keeping in mind the persuasive dispositions of our sister circuits in *Mayer* and *Winget*, our jurisdictional inquiry in this case centers on whether there is an order or judgment that has resolved all outstanding fee issues, which would render the post-judgment litigation final and appealable. Such an order did not exist before June 2021. Prior to that, we had orders that only had the effect of continually moving the Kansas district court toward a final resolution of all outstanding fee issues. That final resolution did arrive, however, with the IRPA Pool Allocation Order.

Applying our well-established standards and the caselaw discussed *supra*, we must necessarily conclude that all appeals challenging the Kansas district court's various allocation orders *after* the Aggregate Fee Order and Final Order and Judgment and *before* the June 2021 IRPA Pool Allocation Order were not appeals from final orders as required for our jurisdictional purposes. In other words, Appellants' notices of appeal were filed prematurely, such that at the time when they were filed, we did not have jurisdiction to review them. But, fortunately for Appellants, that is not the end of the story.

## 2.    Ripening

Notwithstanding this determination, both our caselaw and Rule 4(a)(2) of the Federal Rules of Appellate Procedure posit that a premature notice of appeal may "ripen[]" upon the conclusion of the district court proceedings if we have not yet dismissed the premature appeals. *See, e.g., Lewis v. B.F. Goodrich Co.*, 850 F.2d 641, 645 (10th Cir. 1988) (en banc) ("[W]hen a district court has adjudicated all remaining outstanding claims before this appellate court acts to dismiss the appeal, we will consider the appeal on its merits rather than dismiss for lack of jurisdiction . . . ."); *see* FED. R.

APP. P. 4(a)(2) ("A notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry."); *see also Harbert v. Healthcare Servs. Grp., Inc.*, 391 F.3d 1140, 1146 (10th Cir. 2004) (noting that, in *Lewis*, "we held that an otherwise nonfinal decision becomes final and appealable if the district court adjudicates all remaining claims against all remaining parties before the appellate court acts to dismiss the appeal on the merits for lack of jurisdiction"). As all parties have represented, allocation of the IRPA pool was the only outstanding fee-related action left for the district court to accomplish, and with its completion, we believe the post-judgment fee proceedings concluded. So, we must ask whether the June 2021 IRPA Pool Allocation Order ripened the Appellants' otherwise premature notices of appeal. And, more specifically, whether the June 2021 IRPA Pool Allocation Order ripened the notices of appeal pertaining to the orders that the Appellants seek to challenge in this matter. For the reasons explicated below, we answer that inquiry in the affirmative.

The Supreme Court's decision in *FirsTier Mortgage Co. v. Investors Mortgage Insurance Co.*, 498 U.S. 269 (1991), begins our treatment of this question. There, the appellant filed its notice of appeal after the district judge orally announced that he would grant a motion for summary judgment on all claims but before he entered written findings of fact and conclusions of law. *Id.* at 271–72. In addressing whether the appellant's notice of appeal was "fatally premature," the Court construed Rule 4(a)(2) to recognize that the "technical defect of prematurity. . . should not be allowed to extinguish an otherwise proper appeal" when there is a lack of prejudice. *Id.* at 273. Consequently, the

Court held that "Rule 4(a)(2) permits a notice of appeal filed from *certain* nonfinal decisions to serve as an *effective* notice from a subsequently entered final judgment." *Id.* at 274 (emphases added). But just as appeals from "certain" nonfinal decisions fall within the ambit of Rule 4(a)(2), certain others do not. As the Court put it, "Rule 4(a)(2) [does not] permit[] a notice of appeal from a clearly interlocutory decision—such as a discovery ruling or a sanction order under Rule 11 of the Federal Rules of Civil Procedure—to serve as a notice of appeal from the final judgment." *Id.* at 276. With this limitation in mind, a premature notice of appeal ripens after entry of the final judgment only when the district court's decision "*would be* appealable if immediately followed by the entry of judgment" because "[i]n these instances, a litigant's confusion" about the finality of the decision is "understandable." *Id.*

As we have recognized, *FirsTier*'s "discussion about the limits of Rule 4(a)(2) is open to many different understandings." *In re Woolsey*, 696 F.3d 1266, 1271 (10th Cir. 2012). And some of our sister circuits have reached a similar assessment of the case. *See, e.g.*, *Outlaw v. Airtech Air Conditioning & Heating, Inc.*, 412 F.3d 156, 161 (D.C. Cir. 2005) (noting that *FirsTier*'s discussion reflects "a rather imprecise guide for a jurisdictional rule"). Fortunately, our caselaw issued after *FirsTier*—and in some instances expressly interpreting it—has clarified when Rule 4(a)(2) might ripen a premature notice of appeal.

In reviewing that caselaw, we have noted that ripening occurs so long as the prematurely appealed order bears "some indicia of finality and is likely to remain unchanged during subsequent court proceedings." *Elm Ridge Expl. Co., LLC v. Engle*,

77

721 F.3d 1199, 1209 n.5 (10th Cir. 2013) (quoting *Fields v. Okla. State Penitentiary*, 511 F.3d 1109, 1111 (10th Cir. 2007) (non-precedential order and judgment) (construing *FirsTier*)).  Our "indicia of finality" standard traces its roots most prominently to *Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993), where we explained that "to require the filing of a new notice of appeal" when the appealed-from order lacks "technical formal finality" but "is likely to *remain unchanged* in both its form and its content" would "amount to little more than 'empty paper shuffling.'"  *Id.* at 778 (emphasis added) (quoting *Lewis*, 850 F.2d at 644).

To be sure, *Hinton* did not expressly mention *FirsTier*—even though it was issued after *FirsTier*.  *See Hinton*, 997 F.2d at 778.  Nevertheless, *Hinton*'s interpretation of ripening principles appears to be congruent with *FirsTier*'s.  And, as we explained in *In re Woolsey*, *Hinton*'s interpretation is binding on us.  *See In re Woolsey*, 696 F.3d at 1271.  Applying *Hinton*'s standard—that "a premature notice of appeal retains its validity only when the order appealed from is likely to remain unchanged in both its form and its content"—to the double-layered interlocutory bankruptcy appeal at issue in *In re Woolsey*, we concluded that a prematurely appealed district court order was "amenable to appellate review" where "the bankruptcy court could not undo [it] later" and "it resolve[d] the only appealed issue to arise out of the [since] concluded bankruptcy proceedings and so could not be changed in any event."  *Id.* (quoting *Hinton*, 997 F.2d at 778).

Our decision in *B. Willis, C.P.A., Inc. v. BNSF Railway Corp.*, 531 F.3d 1282 (10th Cir. 2008) also offers instructive guidance.  In *Willis*, the district court dismissed

most of the plaintiff-appellant's claims, and, approximately six months later, it granted two of three defendants summary judgment on the remaining claim. *See id.* at 1295. A third defendant did not move for summary judgment, so the plaintiff-appellant retained one claim. *See id.* Following the district court's summary judgment order—but before the district court entered a final, appealable order (as the plaintiff-appellant's remaining claim against the third defendant was still pending)—the plaintiff-appellant filed its notice of appeal. *See id.* This third defendant subsequently moved for summary judgment, which the district court granted. *See id.* On that same day, the district court also entered a judgment "terminating th[e] matter." *Id.*

Denying the defendant-appellees' motion to dismiss the premature appeal for lack of jurisdiction, we concluded that the district court's "final decision . . . *ripened* [the plaintiff-appellant's] prematurely filed notice of appeal." *Id.* (emphasis added). Specifically, we found that we have jurisdiction to "consider an appeal from the district court's [initial summary judgment] order, which was the decision named in the prematurely filed notice of appeal." *Id.* As well, because the plaintiff-appellant's notice also referred to the district court's "prior orders," we were satisfied that we also had jurisdiction to review those earlier decisions. *Id.* at 1295–96. Though *Willis* did not expressly employ the "indicia of finality" standard that we embrace here, its treatment of the notice of appeal there accords with that standard—where the initial summary judgment order from which appeal was prematurely taken in *Willis* was unlikely to change in both its "form and . . . content," *Hinton*, 997 F.2d at 778. *See Willis*, 531 F.3d at 1295–96.

79

Under *Hinton*'s "indicia of finality" principle, the premature notices at issue here have ripened, because all the nonfinal orders the parties appealed from either were recognized as final by the district court or otherwise bore sufficient indicia of finality. More specifically, the "indicia of finality" was evidenced through the district court's adoption of certain reports and recommendations over objections, the court's express language awarding certain fees, and the court's post-award clarification orders and other orders declining reconsideration. *See, e.g.*, Joint App., Vol. 22, at 5111–21 (the December 2018 Fee Allocation Order) (awarding fees in the amount of one-third of the settlement fund after considerable briefing); *id.*, Vol. 25, at 5874–75 (March 2019 Kansas Pool Allocation Order) (adopting the Kansas CLC's proposed allocations over objections and ordering that "fees are hereby awarded to particular attorneys"); *id.*, Vol. 26, at 5925 (April 2019 Clarification Order) ("There is no requirement that the Court's final allocation rulings be contained in a single order. The Court has already issued its *final* allocation order for the Kansas MDL common benefit pool. The court will issue its other allocation orders—for the Minnesota common benefit pool, the Illinois common benefit pool, the IRPA pool, and expenses—. . . *as completed*. It will then be up to interested parties to prosecute appeals when and how they see fit." (emphases added)); *id.*, Vol. 29, at 6864–79 (July 2019 Minnesota Pool Allocation Order) (adopting the Minnesota state court's allocation order over objections and ordering that "the Minnesota state court common benefit pool of attorney fees shall be allocated and fees are hereby awarded"); *id.*, at 6898 (July 2019 Expense Order) (declining to "reopen the expense application process to allow a new claim"); *id.*, Vol. 32, at 7449–51 (the November 2019 Illinois

80

Pool Allocation Order) (expressly declining to reconsider prior fee allocation orders in the district court's order allocating the Illinois common benefit pool); *cf.* Case No. 2:14-md-02591-JWL-JPO, Doc. 4499, at 3–12 (Kan. D. Ct. Mem. and Order, filed Dec. 2, 2020) (finding the district court lacked jurisdiction to rule on a motion to reconsider prior fee allocation rulings, but concluding, in the alternative, that "[t]here [was] no basis for . . . reconsideration" of prior fee orders).

These actions by the district court and the surrounding circumstances make clear that it would be reasonable for the litigants to believe that the decisions were final. *See FirsTier*, 498 U.S. at 276. Or, put differently, the text and context of the "order[s] appealed from" underscore that they were "likely to remain unchanged in both [their] form and [their] content" at the time they were appealed. *Hinton*, 997 F.2d at 778. The June 2021 IRPA Pool Allocation Order simply brought the fee allocation process to a completion; it did not disturb the myriad common benefit pool allocation orders at issue here. *Cf. In re Woolsey*, 696 F.3d at 1271 (finding *Hinton*'s test satisfied "where, as here, the appealed order from the district court . . . resolves the only outstanding issue in what has, by the time it reaches us, become an otherwise completed bankruptcy proceeding"). Pursuant to ripening, then, we have jurisdiction over all challenges brought by Appellants, *except* any challenges the parties may raise to the IRPA pool allocation order itself. Such challenges to the IRPA pool allocation order would post-date the premature (ripened) notices of appeal. *See Willis*, 531 F.3d at 1295–96.[32]##

---

[32]    In *Willis*, we concluded that the plaintiff-appellant's premature notice was insufficient for us to exercise appellate jurisdiction over the district court's final

Thus, in light of the foregoing, the notices of appeal filed by Appellants before the

June 2021 IRPA Pool Allocation Order are sufficient to confer jurisdiction over

Appellants' challenges here to orders published and articulated between December 7,

2018—the day the Kansas district court entered its Aggregate Fee Award and

corresponding Final Order and Judgment—and June 4, 2021, when it issued its June 2021

IRPA Fee Allocation Order.

## B.    Standard of Review

"We review a district court's attorneys' fees award for abuse of discretion,"

though "[i]n doing so, we review the district court's application of legal principles de

novo, and we review the district court's findings of fact for clear error." *Schell v. OXY*

*USA Inc.*, 814 F.3d 1107, 1126 (10th Cir. 2016) (quoting *ClearOne Commc'ns, Inc. v.*

---

judgment. *See* 531 F.3d at 1296 ("[Plaintiff's] prematurely filed notice of appeal,
however, was not sufficient to give this court jurisdiction to consider an appeal from the
district court's final judgment."). To review this final judgment, which postdated the
premature notice of appeal, the plaintiff-appellant needed to timely file a second notice of
appeal. *See id.* Though the plaintiff-appellant failed to do so, we treated its "amended
docketing statement, filed . . . on February 9, 2006, after the district court's final decision,
as the 'functional equivalent' of a second notice of appeal" and concluded we had
jurisdiction to review an appeal of this final decision as well. *Id.* (quoting *Smith v. Barry*,
502 U.S. 244, 245, 248–49 (1992)). Applying *Willis*'s framework to this case, to appeal
the district court's June 2021 IRPA Pool Allocation Order, Appellants needed to have
filed additional notices of appeal as to that order—as their *prior* notices would not bring
this later-filed order within the ambit of our jurisdiction. *See id.*; *see also Nolan v. U.S.*
*Dep't of Just.*, 973 F.2d 843, 846 (10th Cir. 1992) ("We have never held . . . that the
filing of a final order serves to ripen not only the previous premature appeal but also any
subsequent appeals arising out of the same case."). The Kansas and Minnesota
Appellants filed notices of appeal challenging the June 2021 IRPA Pool Allocation
Order. However, the merits issues in the appeals now before us focus exclusively on the
Kansas district court's orders *before* June 2021, and we have abated the appeals filed
with respect to the court's June 2021 IRPA Pool Allocation Order pending our resolution
of these appeals.

*Biamp Sys.*, 653 F.3d 1163, 1184 (10th Cir. 2011)); *see also First Am. Title Ins. Co. v. Nw. Title Ins. Agency*, 906 F.3d 884, 900 (10th Cir. 2018) ("'Generally speaking, we review the decision to award attorney fees, and the amount awarded, for abuse of discretion,' though any legal analysis underlying the award is reviewed de novo." (quoting *Xlear, Inc. v. Focus Nutrition, LLC*, 893 F.3d 1227, 1233 (10th Cir. 2018))); *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1249 (10th Cir. 1998) ("[A]n attorneys' fee award by the district court will be upset on appeal only if it represents an abuse of discretion." (alteration in original) (quoting *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1201 (10th Cir. 1986))); *see also Law v. Nat'l Collegiate Athletic Ass'n*, 4 F. App'x 749, 751 (10th Cir. 2001) (unpublished) ("In class actions, the district court has broad authority over awards of attorneys' fees; therefore, our review is for an abuse of discretion." (quoting *In re FPI/Agretech Sec. Litig.*, 105 F.3d 469, 472 (9th Cir. 1997))). The watchword of our abuse-of-discretion review is *deference. See O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 903 (10th Cir. 1992) ("We give deference to a district court's decision regarding attorneys' fees. . . . [and] only overturn these decisions where the district court abuses its discretion.").

It has been said on countless occasions that this deference stems from a recognition of the district (i.e., trial) court's "superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *see also Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1207 (10th Cir. 2015) ("Because the district court 'is in a better position than an appellate court to determine the amount of effort expended and the

value of the attorney's services,' we review an attorney's fee award for abuse of discretion." (quoting *Flitton v. Primary Residential Mortg., Inc.*, 614 F.3d 1173, 1176 (10th Cir. 2010))); *Anchondo v. Anderson, Crenshaw & Assocs., L.L.C.*, 616 F.3d 1098, 1104 (10th Cir. 2010) (noting that we "owe[] much deference" to a district court's "uniquely informed on-the-spot" attorneys' fee decisions); *McInnis v. Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1148 (10th Cir. 2006) ("[U]ltimately 'an appellate court plays [only] a "limited role" in reviewing a district court's award of attorneys' fees and costs, and deference is given to a district court's judgment on the matter, since the court is in a better position to assess the course of litigation and quality of work.'" (second alteration in original) (quoting *Gamble, Simmons & Co. v. Kerr-McGee Corp.*, 175 F.3d 762, 773–74 (10th Cir. 1999))); *Case*, 157 F.3d at 1249 ("'We customarily defer to the District Court's judgment because an appellate court is not well suited to assess the course of litigation and the quality of counsel.' The district court 'saw "the attorneys' work first hand,"' and '"has far better means of knowing what is just and reasonable than an appellate court."'" (first quoting *Mares*, 801 F.2d at 1200–01; and then quoting *Poolaw v. City of Anadarko*, 738 F.2d 364, 368 (10th Cir. 1984); and then quoting *Mares*, 801 F.2d at 1201)); *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 453 (10th Cir. 1988) ("An award of attorneys' fees is a matter uniquely within the discretion of the trial judge who 'has intimate knowledge of the efforts expended and the value of the services rendered.' . . . [The district court's] experience with and knowledge about the course of the litigation compels appellate court deference to [its] determination in the absence of an abuse of

84

discretion." (quoting *United States v. Anglin & Stevenson*, 145 F.2d 622, 630 (10th Cir. 1944))).

In deferring to the district court's decision-making, we recognize that they "need not, and indeed should not, become green-eyeshade accountants." *Fox v. Vice*, 563 U.S. 826, 838 (2011). Rather than "achieve auditing perfection," a trial court need only "do rough justice" in determining a fee award. *Id.* Thus, "[w]e can hardly think of a sphere of judicial decisionmaking in which appellate micromanagement has less to recommend it." *Id.* Accordingly, "we have long understood [our abuse-of-discretion standard] to mean that we will reverse a district court's determination only if the court exceeded the bounds of the rationally available choices given the facts and the applicable law in the case at hand." *Big Sky Network Can., Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1186 (10th Cir. 2008); *see also Latham v. First Marine Ins. Co.*, 16 F. App'x 834, 837 (10th Cir. 2001) (unpublished) ("Under the abuse of discretion standard, our task is not to independently assess the merits of each attorney's performance and fine-tune individual fee awards. Instead, our job is to determine whether the district court 'made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" (quoting *Cummins v. Campbell*, 44 F.3d 847, 854 (10th Cir. 1994))). "That is to say, we recognize that in many cases there will not necessarily be a single right answer, but a range of possible outcomes the facts and law at issue can fairly support." *Big Sky Network*, 533 F.3d at 1186. So, "rather than pick and choose among them ourselves, we will defer to the district court's judgment so long as it falls within the realm of these rationally available choices." *Id.*

In the attorneys' fee context, this generally means "we consider whether the district court's determination appears reasonable in light of the complexity of the case, the number of strategies pursued, and the responses necessitated by the other party's maneuvering," but we "do not require the district court to identify and justify every hour allowed or disallowed." *Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n,* 886 F.3d 863, 873 (10th Cir. 2018).

Even if we find a legal error, we will only reverse and remand if the error prejudiced the party's substantial rights.[33] *See Polys v. Trans-Colo. Airlines, Inc.*, 941 F.2d 1404, 1407 (10th Cir. 1991) (applying the harmless error measurement to the abuse of discretion standard where district court excluded evidence from trial); *United States v. Wright*, 826 F.2d 938, 943 (10th Cir. 1987) ("An abuse of discretion[] does not require reversal if that abuse amounted to harmless error."); *see also McInnis*, 458 F.3d at 1142 ("Even assuming the district court abused its discretion in excluding evidence, we must also determine whether the exclusion was harmless error because 'we will not set aside a jury verdict unless the error prejudicially affects a substantial right of a party.'" (quoting *Praseuth v. Rubbermaid, Inc.*, 406 F.3d 1245, 1253 (10th Cir. 2005))); *McCombs v. Meijer*, Inc., 395 F.3d 346, 358–60 (6th Cir. 2005) (explaining that "[w]e review an award of attorneys' fees *under the same standard as evidentiary determinations* and will

---

[33]    "An error affecting a substantial right of a party is an error which had a 'substantial influence' or which leaves one in 'grave doubt' as to whether it had such an effect on the outcome." *McInnis*, 458 F.3d at 1142 (quoting *United States v. Sarracino*, 340 F.3d 1148, 1171 (10th Cir. 2003)).

therefore 'usually sustain a district court's award and division of attorneys' fees absent an abuse of discretion'" and stating, in a separate section, that we "should only reverse when 'such abuse of discretion has caused more than harmless error'" (emphasis added) (first quoting *Dean v. Holiday Inns, Inc.*, 860 F.2d 670, 672 (6th Cir. 1988); and then quoting *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994))).

That is, courts only reverse and remand in circumstances where they cannot conclude that the error was harmless. *See Pinkham v. Camex, Inc.*, 84 F.3d 292, 294–95 (8th Cir. 1996) (noting that the district court's incorrect inclusion of certain expenses in the overall attorneys' fees award under 28 U.S.C. § 1920(4) was harmless error because those expenses could nevertheless have been included and awarded as reasonable attorneys' fees); *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1253–54 (11th Cir. 2020) (concurring with *Keil v. Lopez*, 862 F.3d 685 (8th Cir. 2017), and applying harmless error doctrine to a district court's Rule 23(h) error initially deemed to be an abuse of discretion); *Keil*, 862 F.3d at 705 (as to a Rule 23(h) violation, concluding that "the error is harmless because there is no reasonable probability that it affected the outcome of the proceeding"); *see also United States v. Resendiz-Patino*, 420 F.3d 1177, 1181 (10th Cir. 2005) ("A harmless error is one that does not have a substantial influence on the outcome of the trial; nor does it leave one in grave doubt as to whether it had such effect." (quoting *United States v. Jones*, 44 F.3d 860, 873 (10th Cir. 1995))).

## C.    Waiver and Forfeiture Framework

In this case, several of the appellants repeatedly missed opportunities to object or, in some instances, unambiguously declined to object. Elsewhere, several of the

appellants failed to raise or adequately present arguments in their opening briefs.

Whether achieved by neglect or design, these issues implicate our preservation doctrines.

From a ten-thousand-foot view, there are two species of preservation issues that arise from a litigant's conduct in the trial court: forfeiture and waiver. Typically, the former is thought of as the product of inadvertence or ignorance of a legal issue. *See, e.g.*, *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011) (explaining that "if the theory simply wasn't raised before the district court, we usually hold it forfeited"); *United States v. Zubia-Torres*, 550 F.3d 1202, 1205 (10th Cir. 2008) ("[F]orfeiture comes about through neglect." (quoting *United States v. Carrasco-Salazar*, 494 F.3d 1270, 1272 (10th Cir. 2007))); *Carrasco-Salazar*, 494 F.3d at 1272 (noting that "forfeiture is the failure to make the timely assertion of a right" (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993))).

Meanwhile, the latter (i.e., waiver) is viewed as the product of intentional conduct—with the party charged with knowledge or awareness of the legal issue later raised on appeal. *See, e.g.*, *United States v. McGehee*, 672 F.3d 860, 873 (10th Cir. 2012) ("We typically find waiver [as opposed to forfeiture] in cases where a party has invited the error that it now seeks to challenge, or where a party attempts to reassert an argument that it *previously raised and abandoned below*." (alteration and emphasis in original) (quoting *Zubia-Torres*, 550 F.3d at 1205)); *Carrasco-Salazar*, 494 F.3d at 1273 ("There can be no clearer 'intentional relinquishment or abandonment of a known right' than when the court brings the defendant's prior objection to his attention, asks whether it has

88

been resolved, and the defendant affirmatively indicates that it has." (citation omitted) (quoting *Olano*, 507 U.S. at 733)).

Ordinarily, a litigant who has forfeited an issue before the district court may only secure review under "our rigorous plain-error test." *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019); *see, e.g.*, *United States v. Ibarra-Diaz*, 805 F.3d 908, 916 (10th Cir. 2015) ("We generally review an asserted ground for reversal that a party fails to present in the district court under the 'rigorous plain-error standard.'" (quoting *United States v. Cooper*, 654 F.3d 1104, 1117 (10th Cir. 2011))); *United States v. Kimler*, 335 F.3d 1132, 1141 (10th Cir. 2003) ("Under this standard, [the litigant] 'must show: (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights. If he satisfies these criteria, this Court may exercise discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" (quoting *United States v. Scull,* 321 F.3d 1270, 1277 (10th Cir. 2003))). But the consequences of waiver are typically even more severe: when a litigant has "waived a right," the litigant is "not entitled to appellate relief." *United States v. Teague*, 443 F.3d 1310, 1314 (10th Cir. 2006) (emphasis omitted); *see also United States v. Egli*, 13 F.4th 1139, 1144 (10th Cir. 2021) ("[W]aiver is a harsher doctrine: a party that has waived an issue is precluded entirely from appellate relief.").

Notably, our precedent establishes that where a litigant forfeited a legal issue in the trial court and, at no point on appeal, invokes and advocates for the issue under our plain error rubric, the litigant "effectively waive[s]" the issue. *Fish v. Kobach*, 840 F.3d 710, 729–30 (10th Cir. 2016). That is, the litigant must face the more severe

89

consequences of an outright waiver—they lose their right to any review at all. S*ee Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 56 F.4th 913, 926 (10th Cir. 2022) (declining to consider an issue where litigant "waived it by not arguing for plain-error review after forfeiting it"); *Richison*, 634 F.3d at 1131 ("[T]he failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court.").

While our discussion of our preservation doctrine has thus far centered on a litigant's conduct in district court, one also may waive appellate review of an issue by not arguing it—or arguing it in an inadequate manner—in one's opening brief. *See Sawyers v. Norton*, 962 F.3d 1270, 1286 (10th Cir. 2020) (concluding that appellants "waived an argument" "[d]ue to their inadequate briefing"); *Bishop v. Smith*, 760 F.3d 1070, 1095 (10th Cir. 2014) ("Waiver through appellate-briefing omission . . . [is an] admittedly distinct failure[] of preservation."); *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1266 (10th Cir. 2004) ("Issues not raised in the opening brief are deemed abandoned or waived." (quoting *Coleman v. B-G Maint. Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1205 (10th Cir. 1997))); *United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) ("This briefing-waiver rule applies equally to arguments that are 'inadequately presented' in an opening brief[,]" including those presented "in a perfunctory manner." (first quoting *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007); and then quoting *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004))); *Leffler*, 942 F.3d at 1197

90

(noting that we typically "do not consider arguments made for the first time on appeal in an appellant's reply brief and deem those arguments waived").[34]

Our preservation rules thus operate as "part of the 'winnowing process' of litigation that permits a court to 'narrow what remains to be decided.'" *Walker*, 918 F.3d at 1151 (quoting *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 n.6 (2008)). In that vein—and because the Court of Appeals is not a "'second-shot' forum . . . where secondary, back-up theories may be mounted for the first time"—they promote fairness in the administration of justice. *Tele-Commc'ns., Inc. v. Comm'r*, 104 F.3d 1229, 1233 (10th Cir. 1997); *see also* 9B Charles Alan Wright & Arthur R. Miller, FEDERAL

---

[34] To be sure, we have sometimes invoked the language of forfeiture to describe the loss of the right to appellate review resulting from inadequate briefing of an argument. *See, e.g.*, *Kitchen v. Herbert*, 755 F.3d 1193, 1208 (10th Cir. 2014) (noting that the "omission of an issue in an opening brief generally forfeits appellate consideration of that issue" (quoting *Bronson*, 500 F.3d at 1104)); *Bronson*, 500 F.3d at 1104 (same). However, as we have recognized before, our use of the terms "waiver" and "forfeiture" and linguistic variants thereof have sometimes suffered from a lack of precision. *See Richison*, 634 F.3d at 1128 ("[A]s we've noted previously, this court's cases haven't always been so precise in distinguishing between waiver and forfeiture."); *see also Zubia-Torres*, 550 F.3d at 1205 (noting that "there is some uncertainty in our cases regarding the difference between waiver and forfeiture"). However, we have consistently applied the *consequences* associated with waiver—i.e., the loss of the right to any review at all—in instances where appellants have either omitted arguments or presented them inadequately in their opening briefs. *See Strain v. Regalado*, 977 F.3d 984, 995 (10th Cir. 2020) (declining to consider an appellant's "conclusory" argument and deeming it "waived"); *Sawyers*, 962 F.3d at 1286 ("Due to their inadequate briefing, the [appellants] have waived an argument that the district court erred."); *Walker*, 918 F.3d at 1151 (concluding that the government "waived its challenge . . . through inadequate briefing" and declining to exercise review over its argument). This specific, briefing-waiver rule—like all of our preservation rules—"protects us from issuing 'an improvident or ill-advised opinion' because we did not have the benefit of the adversarial process." *Leffler*, 942 F.3d at 1197–98 (quoting *Hill v. Kemp*, 478 F.3d 1236, 1251 (10th Cir. 2007)).

PRACTICE & PROCEDURE § 2472 (3d ed.), Westlaw (database updated April 2022) (noting

that preservation doctrines ensure "the orderly administration of civil justice").

These virtues notwithstanding, our preservation doctrines function *not* as absolute

constraints on our power to review but, rather, more like prudential norms.  That is,

"whether issues should be deemed waived is a matter of discretion."  *Walker*, 918 F.3d

at 1153; *see Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013) ("[T]he decision

regarding what issues are appropriate to entertain on appeal in instances of lack of

preservation is discretionary.").  We are especially disinclined, however, to exercise our

discretion in favor of review with respect to waived issues of a constitutional stature, as

"[i]t is a well-established principle governing the prudent exercise of th[e] [c]ourt's

jurisdiction that normally the [c]ourt will not decide a constitutional question if there is

some other ground upon which to dispose of the case."  *Nw. Austin Mun. Util. Dist. No.

One v. Holder*, 557 U.S. 193, 205 (2009) (first alteration in original) (quoting *Escambia

Cnty. v. McMillan*, 466 U.S. 48, 51 (1984)).

### D.     Kansas Appellants

Kansas Appellants target the Kansas district court's December 31, 2018, Fee

Allocation Order and March 2019 Kansas Pool Allocation Order.  They assert three

issues on appeal:

> (1)     "Did the [Kansas] district court err by abrogating [Kansas
> Appellants'] contingent-fee contracts without ensuring that they will
> receive equivalent compensation—or at least their lodestars—from
> the $503.33 million fee award?"  Kan. Aplts.' Opening Br. at 3–4.

> (2)     "Did the [Kansas] district court err by arbitrarily awarding certain
> counsel lodestar multipliers of three or more in this megafund case, at

the expense of individually retained counsel—including [Kansas Appellants]—who received but a fraction of their lodestars?" *Id.* at 5.

(3)    "Did the [Kansas] district court abuse its discretion by implementing a[] . . . three-court four-pool scheme of allocating attorneys' fees that has resulted in an inequitable fee allocation with insufficient funds allocated to the IRPA Pool?" *Id.* at 4.

We address each stated issue below.

## 1.    Effective Waiver

As a preliminary matter, certain of Kansas Appellants' arguments are likely effectively waived by Kansas Appellants' forfeiture at the trial-court level and subsequent failure to argue plain error before us. *See Richison*, 634 F.3d at 1131 ("[T]he failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court."). Specifically, Kansas Appellants likely effectively waived their argument that the district court erred by abrogating their contingent-fee contracts. Moreover, insofar as Toups/Coffman argues that the IRPA pool, itself, was underfunded, those arguments are also likely effectively waived.

First, recall that the Kansas district court issued the following pronouncements when largely adopting the Kansas Special Master's November 2018 Fee Allocation R&R:

> The Court agrees that an award of fees from the settlement fund to both attorneys who performed common benefit work and attorneys who filed individual cases is permitted under Tenth Circuit law. *No attorney* has argued, either in applying for fees or in objecting to the [November 2018 Fee Allocation] R&R, that the Court may not adopt such an approach.

93

> The [Kansas] [S]pecial [M]aster also recommends that the Court effectively modify individual contingent fee contracts relating to this litigation to limit any contingent recovery by attorneys to the fees awarded and allocated by the Court in this order.  After a thorough discussion of the law, the [Kansas Special] [M]aster concludes that the Court has the authority to impose such a limitation.  Significantly, although Watts Guerra and a few other attorney applicants questioned whether the Court has such authority in their briefs in support of their fee applications, *no attorney has objected to this conclusion* in the [November 2018 Fee Allocation] R&R.

Joint App., Vol. 23, at 5352–53 (emphases added) (footnote omitted) (citation omitted);

*see also id.* at 5353 n.3 (noting that <u>Watts Guerra</u>, in a single footnote, took issue with the Kansas Special Master's "conclusion that federal law governs whether the Court may exercise its inherent authority to modify contingent fee contracts" but that it did not "directly argue in the objection . . . that th[e] Court lack[ed] the necessary authority").

As the above-quoted portion of the Kansas district court's December 31, 2019, Fee Allocation Order reflects, neither of the Kansas Appellants took direct issue with the Kansas Special Master's conclusion that the district court possessed the authority to modify the contingent fee contracts.  For its part, Hossley-Embry explicitly conceded that courts "have given themselves the authority to change the terms of contingency fee agreements" and argued only that they "should not do so lightly, or on an arbitrary basis." *Id.*, Vol. 21, at 4877.  And Toups/Coffman limited its objections to the district court's decision to disburse fee awards using a two-stage approach, wherein funds are allocated to the specific pools and then disbursed to individual lawyers and law firms, as opposed to the "single-stage approach" endorsed by Toups/Coffman that would allocate funds to pools only "after the claimants' recoveries are determined." *Id.*, Vol. 23, at 5358.

94

Regarding the Kansas district court's overall allocation to the IRPA pool,

Toups/Coffman "d[id] not take issue with any other recommendation" in the November

2018 Fee Allocation R&R, apparently because it "c[ould] [not] know whether it objects

to its ultimate award of fees until that award has been determined." *Id.* at 5359 n.7.

Later, Toups/Coffman explicitly disclaimed any objection regarding "the amount of

money that [the Kansas Special Master] put in all three of the jurisdictions"—even

though the allocations to specific pools conceivably could bear on the amount of money

Toups/Coffman could recover from the IRPA pool—and even commended her for

"d[oing] a very good job." *Id.* at 5283:16–19 (Tr. of Att'y Fee Allocation Hr'g, dated

Dec. 17, 2018).

It seems likely that Kansas Appellants did not fully appreciate their objection

opportunities.[35]  And, because neglect more appropriately implicates our forfeiture

doctrine, we look to see whether they argued for plain error. *See Richison*, 634 F.3d

at 1131.  They did not. *See generally* Kan. Aplts.' Opening Br.; Kan. Aplts.' Reply Br.

Generally, that would be "the end of the road" and we would decline to review their

---

[35]    That said, it is not lost on us that Kansas Appellants could have
intentionally decided not to press certain arguments before the district court—especially
as they relate to the court's authority to modify contingent-fee agreements, employ
common fund doctrine principles, and allocate nearly 90% of funds to the common
benefit pools—because they were either content to have other firms do the work or hoped
the allocation process would result in a more favorable recovery. *See Egli*, 13 F.4th
at 1144 (noting that waiver-through-abandonment "occurs when a party deliberately
considers an issue and makes an intentional decision to forgo it" (quoting *United States v.
Malone*, 937 F.3d 1325, 1327 (10th Cir. 2019))); *see also Freytag v. Comm'r*, 501 U.S.
868, 895 (1991) (Scalia, J., concurring) (discussing the "strategic" reasons a party might
"pursue a certain course" and later claim error).

arguments. *See Richison*, 634 F.3d at 1131.  Nevertheless, in an exercise of our

discretion, we elect not to rest our decision as to these arguments exclusively on this

preservation ground.  *See Walker*, 918 F.3d at 1153 (noting that "whether issues should

be deemed waived is a matter of discretion").

## 2.    The Contingent-Fee Contracts

On the merits, then, Kansas Appellants first contend that the Kansas district court

erred in abrogating their "valid and enforceable attorney-client contingent-fee contracts

without first inquiring into whether their specific terms were unreasonable . . . or

ensuring that individual plaintiffs' counsel received equivalent compensation, or at least

their lodestars."  Kan. Aplts.' Opening Br. at 36; *see also* Toups/Coffman Suppl. Br. at 2

(arguing that the district court "improperly abrogat[ed] Toups/Coffman's contingent-fee

client contracts").[36]

We conclude, however, that the district court's inherent power to review

contingent-fee contracts—together with both Rule 23(h) of the Federal Rules of Civil

Procedure and the Settlement—vested the court with ample authority to modify the

contingent-fee contracts at issue here.  Because the district court exercised that authority

reasonably, we affirm.

### a.    The Nature and Scope of the District Court's Authority to Modify Contingent-Fee Contracts in the Class Action Context

---

[36]    In its supplemental briefing, Hossley-Embry "adopt[ed] and incorporate[d] by reference" Toups/Coffman's supplemental brief.  Hossley-Embry Suppl. Br. at 2.

96

We begin our analysis with whether the district court had inherent authority to modify the contingent-fee contracts at issue here. Our caselaw regarding the court's authority to review and modify contingent-fee agreements has developed piecemeal, but it nevertheless confirms the district court's approach. *See Garrick v. Weaver*, 888 F.2d 687, 690 (10th Cir. 1989); *Cooper v. Singer*, 719 F.2d 1496, 1505 (10th Cir. 1983), *abrogated on other grounds by Venegas v. Mitchell*, 495 U.S. 82 (1990).

In *Cooper*, we explained that while "[c]ourts can open their doors to the public, . . . they must rely on lawyers to guide the litigant through the passageways." 719 F.2d at 1505. Given that some "self-serving lawyer[s] may ignore the best interests of . . . [their] clients," we recognized that courts unmistakably "retain supervisory power over the attorney-client relationship." *Id.* Because "fees"—including "contingent fee arrangements"—"are central to that relationship," our supervisory power extends to such fees and agreements. *Id.* With this background in mind, we confirmed in *Garrick* that "federal court[s] . . . have inherent power to review attorneys' fees." 888 F.2d at 690 (citing *Rosquist v. Soo Line R.R.*, 692 F.2d 1107, 1111 (7th Cir. 1982)).

This basic premise is so uncontroversial that our sister circuits considering the question uniformly agree that the district court retains such inherent power. *See Farmington Dowel Prods. Co. v. Forster Mfg. Co.*, 421 F.2d 61, 87–88 (1st Cir. 1969) (acknowledging that courts have the power to "modify" fee arrangements); *In re Goldstein*, 430 F.3d 106, 110 (2d Cir. 2005) (noting that federal courts have "the right to inquire into fee arrangements . . . to protect the client from excessive fees" and "may order attorneys to return fees the client has paid pursuant to a contract" (omission in

original) (first quoting *In re Michaelson*, 511 F.2d 882, 888 (9th Cir. 1975); and then

quoting *In re Austrian & German Bank Holocaust Litig.*, 317 F.3d 91, 98–99 (2d Cir.

2003))); *Schlesinger v. Teitelbaum*, 475 F.2d 137, 141 (3d Cir. 1973) ("[I]n its

supervisory power over the members of its bar, a court has jurisdiction of certain

activities of such members, including the charges of contingent fees."); *In re Abrams &*

*Abrams, P.A.*, 605 F.3d 238, 243 (4th Cir. 2010) ("[T]he district courts' supervisory

jurisdiction over contingent fee contracts for services rendered in cases before them is

well-established." (quoting *Allen v. United States*, 606 F.2d 432, 435 (4th Cir. 1979)));

*Karim v. Finch Shipping Co. Ltd.*, 374 F.3d 302, 309 (5th Cir. 2004) (noting that the

court's power "to reform contingent fee contracts" is "well-recognized"); *Krause v.*

*Rhodes*, 640 F.2d 214, 218 (6th Cir. 1981) (noting that because a "federal district judge

has broad equity power to supervise the collection of attorneys' fees under contingent fee

contracts. . . . an attorney's right to contract for a contingent fee is not completely beyond

judicial control"); *Kalyawongsa v. Moffett*, 105 F.3d 283, 286 (6th Cir. 1997) (noting that

contingent-fee contracts "are especially deserving of judicial supervision"); *Int'l Travel*

*Arrangers, Inc. v. W. Airlines, Inc.*, 623 F.2d 1255, 1277 (8th Cir. 1980) ("The court has

the power and the responsibility to monitor contingency fee agreements for

reasonableness."); *Boatright ex rel. Boatright v. R.J. Cormon R.R. Co./Material Sales*,

244 F. App'x 312, 316 (11th Cir. 2007) (per curiam) (unpublished) (holding that "[t]he

decision to reduce the contingency-fee percentage was well within the district court's

discretion"); *Hoffert v. Gen. Motors Corp.*, 656 F.2d 161, 165 (5th Cir. Unit A Sept.

1981) ("[T]he district judge has broad equity power to supervise the collection of

attorneys' fees under [contingency] fee arrangements."); *accord* 23 WILLISTON ON CONTRACTS § 62:9 (4th ed.), Westlaw (database updated May 2022) ("While a greater fee may often be justified in contingent fee cases, courts will closely scrutinize these arrangements, due to the special nature of the contract, which gives an attorney an interest in the outcome of the litigation and which is very susceptible to improper influence and duress.").

Indeed, as particularly relevant here, one commentator addressed the matter this way: "Because courts must exercise their independent discretion in making fee awards in common-fund cases, individual contingent-fee agreements that class representatives have entered into are not controlling on the court's determination of fees for the class recovery. Otherwise, the potential for abuse could be great." 1 Alba Conte, ATTORNEY FEE AWARDS § 2:11 (3d ed.), Westlaw (database updated June 2022); *see id.* at n.1 ("In class action fee proceedings, courts may determine reasonable fees and have power to modify contingent-fee contracts when necessary to avoid excessive fees."); *see also* 1 Robert L. Rossi, ATTORNEYS' FEES § 7:9 (3d ed.), Westlaw (database updated June 2022) ( noting that, where the court "use[s] the percentage-of-the-fund method[,] . . . the court should not simply apply the contingent fee percentage . . . since the percentage of a contingent fee in the contract between an attorney and the attorney's client is not controlling in determining a reasonable fee in a common fund case").

To be sure, in *Sears v. Atchison, Topeka & Santa Fe Railway Co.*, 779 F.2d 1450 (10th Cir. 1985), we declined to "consider for the first time contentions challenging the reasonableness of the contingent fees set forth in the contracts," where there was "no

evidence in the record. . . that the contingent fee contracts at issue were entered into other than by arms length, honest dealings" and "freely" and "knowingly" by parties that "agreed that the contingent fees were reasonable." *Id.* at 1452.  But, while Kansas Appellants are keen to emphasize that *Sears* resulted in a remand to the district court, *see id.* at 1452–56, we think their reliance on it is misguided.  In particular, *Sears* does not squarely define the boundaries of the district court's authority to review and modify contingent-fee contracts in a case like this one—that is, a case involving a common fund that was incrementally resolved in 2018 and thereafter.

*Sears* involved fee shifting under 42 U.S.C. § 1988, rather than a fee allocation from a common fund.  *See id.* at 1452.  And, importantly, the *Sears* court noted from the outset that "[t]he sole issue presented by this appeal is whether the district court erred, based on the facts in this record, in applying [a 1983] *en banc* opinion of this court . . . retrospectively so as to abrogate contractual fee agreements entered into between appellant [attorney] and twenty-two (22) clients in 1972 prior to initiation of litigation which ultimately resulted in a class action recovery." *Id.* at 1450.  We assumed that application of the en banc decision "would require the reduction of the award to [counsel] from the agreed-to contingent fee percentages contained in the 22 contracts with his clients to the fees determined to be reasonable and allowable in the class action as found by the district court." *Id.* at 1453.  Notably, we concluded that the en banc case "was a statement of new law in this circuit" and that it "does not apply retrospectively." *Id.*  In other words, the legal regime under which counsel secured a remand in *Sears* to claim the fees prescribed in his contingent-fee contracts was one that existed prior to 1983—the

year of the en banc case. Therefore, Kansas Appellants' reliance on *Sears* in challenging the Kansas district court's ruling in 2018 strikes us as misguided: *Sears* did not involve a common fund, and its holding rested on a legal regime that had been superseded many years before the Kansas district court ruled here. *See id.* at 1453.[37]

In sum, we think the district court rightfully invoked its *inherent power* to review the contingent-fee contracts. However, there are two additional sources of authority that support its decision. This case involves a fee allocation from a common fund created through a class action settlement under Rule 23(h) of the Federal Rules of Civil Procedure. As we explained *supra*, Rule 23(h) provides that "[i]n a certified class action, the court *may* award reasonable attorney's fees . . . that are authorized by law *or* by the parties' agreement." FED. R. CIV. P. 23(h) (emphases added). The committee notes elucidate that "[a]ctive judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process" and instruct district courts to "ensure that the amount and mode of payment of attorney fees are fair and proper

---

[37] Kansas Appellants also rely on a case that we cited in *Sears*—specifically, the Third Circuit's decision in *Dunn v. H.K. Porter Co., Inc.*, 602 F.2d 1105 (3d Cir. 1979). *See Sears*, 779 F.2d at 1453. However, the Third Circuit there "h[e]ld that the district court, both in its supervisory authority over those practicing before it and as part of its duties imposed by [Rule 23(e) of the Federal Rules of Civil Procedure] . . . ha[s] the authority [s]ua sponte to . . . set aside contingent fee agreements when it concludes they would yield unreasonable fees." *Dunn*, 602 F.2d at 1114. Indeed, according to the Third Circuit, a district court's obligation to "review . . . fee arrangement[s]" is greater when "a contingent fee contract is to be satisfied from a settlement fund approved by the [court] pursuant to FED. R. CIV. P. 23(e)"—as is the case here—as Rule 23 "imposes upon [the district court] a responsibility to protect the interests of the class members from abuse." *Id.* at 1109. Plainly, then, insofar as Kansas Appellants argue that the district court simply lacked the authority to review and modify the contingent fee contracts, *Dunn* does not offer the help that they think it does.

whether the fees come from a common fund or are otherwise paid." FED. R. CIV. P. 23(h) advisory committee's notes to 2003 amend. For that reason, the court can "adjust[] . . . the class fee award" to achieve its "objective . . . [of] ensur[ing] an overall fee that is fair for counsel and equitable"—even where "individual fee agreements between class counsel and class members . . . have provisions inconsistent with" that objective. *Id.* Accordingly, Rule 23(h) provided authority for the Kansas district court's action with respect to the contingent-fee contracts here.

Finally, the Settlement itself vested the district court with authority to review and determine the enforceability of the contingent-fee contracts. As the Kansas Special Master observed, the Settlement "recognize[d] that the enforceability of any attorneys' fee contract affecting a Class Member [was] subject to judicial review" and further offered that the judiciary "shall have exclusive jurisdiction to decide the enforceability of any lien," including "any lien for attorneys' fees." Joint App., Vol. 21, at 4795 (quoting Joint App., Vol. 5, at 1105). Moreover, the Settlement expressly "supersede[d] all prior proposals, negotiations, agreements, and understandings relating to [its] subject matter," including issues of attorneys' fees. *Id.* at 4802 (quoting Joint App., Vol. 5 at 1106.) The Kansas district court agreed, concluding that its authority to cap the contingent-fee awards also arose from the Settlement.[38]

---

[38]   Notably, the Kansas district court made clear that individual plaintiffs who wanted to opt out of the class action could do so. *See* Joint App., Vol. 5, at 1214–15. The district court even acknowledged that "economic incentives exist for counsel who are not part of the leadership to procure opt outs . . . to pursue a course in which those counsel might be better situated to earn a fee." *Id.* at 1214. But, because their clients did

This weighty, tripartite authority notwithstanding, Kansas Appellants argue that the Supreme Court's decision in *U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88 (2013) abrogated the district court's ability to cap contingent-fee contracts in the class action settlement context. We are unpersuaded.

*McCutchen*, in relevant part, determined whether certain equitable defenses rooted in the common fund doctrine could be asserted to "override" the express terms of an Employee Retirement Income Security Act (ERISA) contract. 569 U.S. at 94. Respondent James McCutchen participated in a health benefits plan established by his employer, U.S. Airways, under ERISA. *See id.* at 91. The express terms of the plan obliged U.S. Airways to pay any medical expense McCutchen incurred as a result of a third party's actions. *See id.* In turn, the plan entitled U.S. Airways to reimbursement if McCutchen later secured a financial recovery. *See id.* When McCutchen suffered a serious accident at the hands of a third party, his ERISA plan through U.S. Airways paid for certain medical expenses. *See id.* at 92. However, McCutchen also sued the third party responsible for his injuries. *See id.* Limitations in the third party's insurance coverage meant that McCutchen could only recover $110,000 of his accident-related damages, which exceeded $1 million. *See id.* After deducting attorney's fees, McCutchen's take-home award totaled only $66,000. *See id.*

Then came U.S. Airways. Looking to the terms of the ERISA plan, U.S. Airways demanded reimbursement for the money it previously paid for McCutchen's medical

---

not opt out, the Settlement, along with equitable principles, provides the basic framework for their counsel's attorneys' fees.

expenses. *See id.* A subsection of ERISA authorized U.S. Airways to enforce the terms of the plan through an equitable action. *See id.* at 93. McCutchen, then, asked the court whether a plan participant may raise certain equitable defenses based on principles of unjust enrichment—such as, in relevant part, "requiring the party seeking reimbursement to pay a share of the attorney's fees incurred in securing funds from the third party." *Id.* at 91. Such a defense—which stemmed from the common fund doctrine—would have functioned to prevent U.S. Airways from "obtain[ing] [the] full benefit from [McCutchen's] efforts *without* contributing . . . to [his] litigation expenses." *Id.* at 100 (omission in original) (emphasis added) (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 392 (1970)). The Supreme Court held, in relevant part, that the common fund doctrine could not "override the clear terms" of the contract. *McCutchen*, 569 U.S. at 91.

Regarding this holding, the Court explained that "if the agreement governs, the agreement governs." *Id.* at 99. So, because McCutchen and U.S. Airways entered a contract entitling the latter to reimbursement expenses, equitable rules rooted in unjust enrichment, like the common fund doctrine, should not operate to nullify that bargained-for provision. *See id.* at 99–100. That was so, reasoned the Court, because "principles of unjust enrichment give way when a court enforces an *equitable lien* by agreement," as "[t]he agreement itself becomes the measure of the parties' equities." *Id.* at 100 (emphasis added). Put differently, "if a contract abrogates the common-fund doctrine, the insurer is not unjustly enriched by claiming the benefit of its bargain." *Id.*

Kansas Appellants liken their initial contingent-fee contracts to the "equitable lien by agreement" at issue in *McCutchen*. Kan. Aplts.' Opening Br. at 43. Those contracts,

104

Kansas Appellants insist, governed, as "[n]either a court's 'inherent authority,' nor the application of more general common-fund principles can override these contractual liens." *Id.* at 42.  Thus, invoking *McCutchen*, Kansas Appellants urge us to reverse with instructions to award them attorneys' fees consistent with their fee contracts.

We find the comparison to *McCutchen* inapposite.  First, assuming *arguendo* that their contingency-fee contracts make an equitable assignment, Kansas Appellants are not attempting to enforce the lien of the contracts against the contract's other signatories—a key facet of the Supreme Court's analysis in *McCutchen*—because they are obtaining their fee awards as a product of the Syngenta class settlement.  Put otherwise, whereas U.S. Airways sought to enforce a contract McCutchen signed, Kansas Appellants attempt to enforce a contingent-fee contract entered into by their clients *against* other attorneys in the fee award pool who were never party to those contracts.  Kansas Appellants admitted as much during oral argument, stating that they "are not trying to enforce the contingency fee agreements against the[ir] clients," i.e., the actual parties to their fee contracts.[39]  Oral Argument, No. 19-3008, at 3:44–4:27 (10th Cir., dated March 10, 2021).  By instead attempting to "recover their Contract fees from Appellees"—who, it bears repeating, never signed a contingent-fee contract with them—Kansas Appellants turn *McCutchen*'s logic on its head by suspending the equitable considerations animating the common fund doctrine even in the absence of an agreed-to equitable lien.  Toups/Coffman Supp. Br.

---

[39]    As Joint Appellees point out, Kansas Appellants "fail to show that their fee contracts are anything but 'silent on the allocation of attorneys' fees[]' from an aggregate award, which is not surprising because the fee award is being allocated between them and other attorneys who were not parties to those agreements."  Appellees' Br. at 69–70.

105

at 9 n.8. *McCutchen* said exactly the opposite: traditional equitable considerations give way when courts enforce an "agreement" or "contract," because the agreement is the "measure of the parties' equities." 569 U.S. at 100. Where there is no governing contract—and how could there be when the Appellees never signed a contingent-fee agreement with Kansas Appellants—the courts may apply equitable doctrines. *See id.* at 98.

Second, the contract at issue in *McCutchen* is akin to the standard commercial contract that demands judicial respect when freely entered into by the parties. But the Supreme Court, itself, has recognized that contingent-fee agreements trigger different considerations and can be "problematic, particularly when not exposed to court review." *Gisbrecht v. Barnhart*, 535 U.S. 789, 803 (2002). In *Gisbrecht*, for instance, the Court acknowledged that courts test contingent-fee arrangements for "reasonableness" and "have appropriately reduced the attorney's recovery based on the character of the representation and the results the representative achieved." *Id.* at 808. So, even if the contingent-fee contracts at issue in this case paralleled an ERISA contract, we would decline Kansas Appellants' invitation to read *McCutchen*'s language—which did not address attorney contingent-fee contracts—in a way that conflicts with the *Gisbrecht* Court's approval of judicial review.

In sum, we have no trouble concluding that the court possessed the requisite authority to review and modify the contingent-fee contracts. In this case, that authority sprung from the district court's inherent power to review the contingent-fee contracts, Rule 23, and the Settlement. That said, though we think the district court's power to

review and modify the contingent-fee contracts is particularly potent in this case, it is not without limit. Rule 23(h) emphasizes that fees must be reasonable. *See* FED. R. CIV. P. 23(h) ("[T]he court may award *reasonable* attorney's fees . . . ." (emphasis added)). So, if the contingent-fee contract is the best measurement of reasonableness, abrogating the contract would be inconsistent with the district court's duty to award reasonable fees.

### b.     The Effective 10% Cap

Its authority to review and modify having been firmly established, we now ask whether the Kansas district court abused its discretion by imposing a 10% cap on the contingent-fee contracts. Or, more precisely, we ask whether the district court abused its discretion in concluding that the contingent-fee contracts were inappropriate yardsticks for a reasonable fee award. It did not.

Drawing on the Kansas Special Master's careful factual analysis, the district court thoroughly supported its conclusion that modifying the contingent-fee contracts was necessary. The Kansas Special Master explained that the Syngenta class members—mostly farmers—were generally "[in]experienced in the intricacies of class action and mass action litigation," leaving them "potentially vulnerable to overreaching . . . contingent fee agreements committing a substantial portion of any recovery to lawyers who would do limited work and rely on the work of other lawyers who will be compensated out of a common benefit fund." Joint App., Vol. 21, at 4794. Thus, overreaching contingent-fee agreements benefitting counsel who "did not provide service of any material value to the class," *id.*, threatened the Plaintiffs' Settlement Negotiating Committee's goal of ensuring that "similarly situated plaintiffs would receive similar

compensation under the Settlement Agreement, and that individually represented plaintiffs would not receive a lower net recovery due to attorneys' fee obligations," *id.* at 4795–96. Accordingly, the Settlement struck the delicate balance of curbing excessive contingent-fee awards while providing for "fair compensation" to attorneys representing individual clients. *Id.*

To that end, the Kansas Special Master recommended that contingent-fee awards be capped at 10% of a client's recovery. *See id.* at 4810. Though recognizing that this cap represented "a significant reduction from the typical 30–40% contingent fee" agreement, the Kansas Special Master thought the reduction reasonable given that most IRPA counsel "did little more than recruit clients and in some cases fill out PFSs."[40] *Id.* By contrast, leadership lawyers in each jurisdiction performed the "vast majority of the work of litigating legal issues, taking fact and expert discovery, arguing motions, trying cases," and pursuing settlement negotiations. *Id.* After conducting a de novo review, the Kansas district court adopted the Kansas Special Master's factual findings and agreed, in light of the IRPA attorneys' relatively small "contribution to the ultimate recovery," that the 10% cap on contingent fees "appropriately rewarded" counsel. *Id.*, Vol. 23, at 5361. In short, the district court found the 10% cap reasonable. *See id.*

In sum, we hold that the district court's inherent authority, together with both Rule 23(h) of the Federal Rules of Civil Procedure and the Settlement, empowered it to

---

[40] The Kansas Special Master further noted that IRPA counsel provided limited value in preparing claims for their clients "given the simplicity of the Claims Process"—an observation "confirmed by the fact that the majority (52%) of Claims have been filed *pro se*." Joint App., Vol. 21, at 4810.

modify contingent-fee contracts. Furthermore, in view of the district court's careful consideration of the specific facts in this case, we hold that it did not abuse its discretion in imposing a 10% cap on the contingent-fee contracts at issue in this case.

### 3.    The Lodestars and the IRPA Fee Allocation

Kansas Appellants next home in on the disparity between their attorneys' fee recovery and the recovery of the Kansas MDL Leadership. Upon observing that their fee award downwardly departs from their lodestars, Kansas Appellants argue that they should have received their full lodestars. They also claim that the Kansas district court erred in allocating a "paltry" 12% of the aggregate fee award—approximately $60 million—to the IRPA pool. Kan. Aplts.' Opening Br. at 54. On the other end of the disparity, Kansas Appellants aver that the court erred in approving the Kansas MDL Leadership fee award, which reflected a lodestar multiplier of 3. They similarly take issue with the size of the Kansas MDL Leadership's class-counsel fee award, alleging that the sizable award represents an abuse of discretion and asking us to reverse. *See id.* at 57–61. Because these contentions dovetail with Kansas Appellants' third question presented—whether the court arbitrarily allocated fees—we resolve both question two and question three in this section.

At bottom, Kansas Appellants take issue with (1) the secondary status the district court gave their lodestar figures and (2) the factors the district court weighed in allocating fees among and within the pools. By implication, Kansas Appellants reject the district court's use of the percentage-of-the-fund method to allocate fees, effectively arguing that the court was required to employ the lodestar method. Irrespective of which method the

court applied, Kansas Appellants secondarily argue that the court arbitrarily allocated the fees.

Thus, resolution of these complaints turns on two related questions: whether the district court erred in applying a percentage-of-the fund approach and, if not, whether the court otherwise allocated the aggregate fee award arbitrarily and unreasonably among and within the pools.

### a.       The Percentage-of-the-Fund vs. Lodestar Methods in the Class Action Context

Arguing that their lodestar figure is presumptively reasonable, Kansas Appellants contend that they should have "receive[d] their respective lodestars."  Kan. Aplts.' Opening Br. at 52–53.  In that respect, Kansas Appellants backhandedly argue that, as a rule, the district court erred in applying a percentage-of-the-fund method, rather than a lodestar method, in determining their fee award.

We have already asked—and answered—"whether a fee award based on a percentage of a common fund . . . is *per se* unreasonable."  *Brown*, 838 F.2d at 454.  It is not.  *See id.* ("We hold, therefore, that the award of attorneys' fees on a percentage basis in a common fund case is not *per se* an abuse of discretion."); *accord Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) (noting that "under the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class").  That is because the "award of attorneys' fees is based on substantially different underlying purposes in a common fund case" than in other kinds of cases, *Brown*, 838 F.2d at 454— such as those involving fee-shifting statutes, *see Perdue v. Kenny A. ex rel. Winn*, 559

110

U.S. 542, 551 (2010) (explaining that the lodestar method accords with "the aim of fee-shifting statutes").

Ordinarily, under the "American Rule," prevailing litigants are responsible for paying their own attorneys' fees. *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 253 (2010). But the class action context offers an exception to this rule through the "common fund" doctrine. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). In large class actions such as this, a relatively small handful of plaintiffs bear the cost of suit. *See Mills*, 396 U.S. at 392. If those plaintiffs prevail, their success benefits the entire class. *Id.* Were the American Rule to apply in this context, the named class plaintiffs would shoulder the costs of suit—including attorneys' fees—for the entire class, even as the remainder of the class reaps the benefits of their labor. *See Rosenbaum v. MacAllister*, 64 F.3d 1439, 1444 (10th Cir. 1995). The common fund doctrine prevents such unjust enrichment by enabling class action attorneys to extract fees from the collective award, thereby "spread[ing] the costs [of suit] proportionately among" the ascertainable class. *Hall v. Cole*, 412 U.S. 1, 5 (1973) (quoting *Mills*, 396 U.S. at 393–94); *see also Boeing*, 444 U.S. at 478 (noting the Court's "consistent[]" recognition that the common fund entitles an attorney who recovers common, or collective, benefits for persons other than herself or her client to a "reasonable . . . fee from the fund as a whole"); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991) (noting that the common fund doctrine "derives not from a court's power to control litigants, but from its historic equity jurisdiction, . . . and allows a court to award attorney's fees to a party whose litigation efforts directly benefit others").

111

Similar equitable considerations, together with ethical concerns, permit courts to award fees on a percentage-of-the-fund basis, as opposed to the lodestar method. *See Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir. 1994) (recognizing that "[m]any courts have addressed the propriety of utilizing the percentage of the fund instead of the lodestar in calculating attorneys' fees in common fund cases"); *Voulgaris v. Array Biopharma, Inc.*, No. 22-1003, 2023 WL ---, Slip. Op. at 4 (10th Cir. Feb. 27, 2023) (recognizing that "[t]wo methods exist for determining attorneys' fee awards in common-fund class action cases[,]" including "the percentage-of-the fund method"). To be sure, the lodestar method "produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a *comparable case*."[41] *Perdue*, 559 U.S. at 551 (second emphasis added). But some courts have found that using the lodestar approach in common fund cases "encourages significant elements of inefficiency" because the method incentivizes attorneys to "spend as many hours as possible," resulting in fewer settlements. *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1268 (D.C. Cir. 1993). Moreover, unlike in traditional litigation, a common-fund beneficiary is less incentivized to scrutinize her attorney's lodestar-based fee petition because she is one of many receiving a small slice of the collective pie. *Cf.* Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and*

---

[41]     To the extent that Kansas Appellants argue that *Perdue* required the district court to apply the lodestar method, their argument is unavailing in this case, as *Perdue* was a *fee-shifting* case. *See* 559 U.S. at 546.

112

*Recommendations for Reform*, 58 U. CHI. L. REV. 1, 26 n.79 (1991) (discussing

incentives to object).  As well, and as this case illustrates, applying the lodestar method to

a common fund case can fail to account for the productive quality of an attorney's labor,

that is, whether an attorney's time meaningfully contributed to benefits conferred on the

class.  *See generally* Report of the Third Circuit Task Force, *Court Awarded Att'y Fees*,

108 F.R.D. 237, 265 (1986) (noting that an attorney's "contribution to a prompt or a

delayed resolution of the action" is one factor to consider in awarding fees).  In a

common fund case, the fund, itself, is the measure of an attorney's success.  Thus, under

the percentage-of-the-fund method, "inefficiently expended hours only serve to reduce

the per hour compensation of the attorney expending them."  *Swedish Hosp.*, 1 F.3d

at 1269.

Our decision in *Gottlieb* is instructive.  There, multiple shareholders filed suit

against MiniScribe; the district court, however, only certified one case to proceed as a

class action.  *See Gottlieb*, 43 F.3d at 481.  On the eve of a non-class-action suit initiated

by MiniScribe's trustee, the parties reached a global settlement.  *See id.*  The district court

allocated $44 million of the $128 million fund to the one certified shareholder class.  *See

id.*  The district court also awarded attorneys' fees but, in doing so, rejected the

percentage-of-the-fund method in favor of the lodestar method.  *See id.* at 484–85.  In

reversing, we first acknowledged that the settlement "created a 'common fund' from

which the plaintiff class obtained a benefit" and, accordingly, "[a]ttorneys' fees [were]

appropriately awarded from that fund, on the theory 'that persons who obtain the benefit

of a lawsuit without contributing to its costs are unjustly enriched at the successful

litigant's expense.'" *Id.* at 482 (quoting *Boeing*, 444 U.S. at 478). Faced with the question of whether the "proper methodology for awarding attorneys' fees out of a common fund" entailed a percentage-of-the-fund approach or a lodestar analysis, we expressed a preference for the percentage-of-the-fund approach where a special master made detailed factual findings in support of the approach. *Id.* at 482, 487–88; *see also Brown*, 838 F.2d at 454 ("The Supreme Court . . . explicitly described a percentage calculation as a 'reasonable fee' in [common fund] cases." (quoting *Blum*, 465 U.S. at 900 n.16)).

However, because the touchstone of a fee award analysis is reasonableness, we do not require rigid adherence to either the percentage-of-the-fund or lodestar methods in the common fund context. *See Gottlieb*, 43 F.3d at 482–83. To illustrate reasonableness, district courts must "articulate specific reasons for [their] findings." *Uselton v. Com. Lovelace Motor Freight, Inc.*, 9 F.3d 849, 853 (10th Cir. 1993). And, to guide those findings, we further require district courts to consider the factors outlined in *Johnson*, 488 F.2d at 717–19, regardless of which method is used. *See Gottlieb*, 43 F.3d at 483.

Still, in keeping with our longstanding flexible posture, we have acknowledged that the *Johnson* factors' applicability and weight in "common fund situations w[ill] undoubtedly be different" than in statutory fee situations, *Uselton*, 9 F.3d at 853, a point that we expounded on in *Brown*:

> Although the *Johnson* factors are relevant in determining a reasonable fee in a common fund case, the inherent differences between statutory fee and common fund cases could justify a trial judge's decision to assign different relative weights to those factors in the two types of cases. For example, the first factor—time and labor required—is an essential touchstone for recovery

114

in a statutory fee case where reasonableness is measured in part by reference to the lodestar analysis.  In a common fund case, however, although time and labor required are appropriate considerations, the ninth *Johnson* factor—the amount involved and the results obtained—may be given greater weight when . . . the trial judge determines that . . . the efforts of counsel were instrumental in realizing recovery on behalf of the class. . . . [R]arely are all of the *Johnson* factors applicable; this is particularly so in a common fund situation.  We hold here . . . that in awarding attorneys' fees in a common fund case, the "time and labor involved" factor need not be evaluated using the lodestar formulation when, in the judgment of the trial court, a reasonable fee is derived by giving greater weight to other factors, the basis of which is clearly reflected in the record.

*Brown*, 838 F.2d at 456 (citation and footnote omitted).

Thus, we characterize this "percentage plus *Johnson* factors" framework as a "hybrid" approach to attorneys' fees.  *See, e.g.*, *Chieftain Royalty Co. v. Enervest Energy Institutional Fund XIII-A, L.P.*, 888 F.3d 455, 459 (10th Cir. 2017) ("Our approach . . . 'has been called a "hybrid" approach, combining the percentage fee method with the specific factors traditionally used to calculate the lodestar [i.e., the *Johnson* factors].'" (quoting *Gottlieb*, 43 F.3d at 482–83)); *Uselton*, 9 F.3d at 853 (noting that we have "distinguished common fund cases from statutory fee cases and recognized the propriety of awarding attorneys' fees in the former on a percentage of the fund, rather than lodestar, basis"); *accord Fresno Cnty. Emps.' Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*, 925 F.3d 63, 68 (2d Cir. 2019) ("Under the common-fund doctrine, a district court may select 'either the lodestar or percentage of the recovery methods' to calculate fees.  A common-fund-percentage fee must still be evaluated for reasonableness, but may exceed the lodestar—i.e., *it may be less than, equal to, or greater than the lodestar*." (emphasis added) (citations omitted) (quoting *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 45

115

(2d Cir. 2000))).  This hybrid approach, in turn, helps ensure that the percentage-of-the-fund award remains reasonable.

### b.    Ensuring a Reasonable Fee and the *Johnson* Factors

Accordingly, when Kansas Appellants insist that their lodestar figure, as a categorical rule, reflects *the* "reasonable rate," they are wrong.  *See Brown*, 838 F.2d at 454 ("We hold, therefore, that the award of attorneys' fees on a percentage basis in a common fund case is not *per se* an abuse of discretion.").  Still, as the foregoing discussion makes clear, application of a percentage-of-the-fund method does not automatically result in a reasonable fee allocation.  So, with the framework just described in mind, we ask whether the district court misapplied the *Johnson* factors or otherwise unreasonably allocated the aggregate fee award.  We conclude that Kansas Appellants have failed to establish that the district court abused its discretion in allocating the aggregate attorneys' fee award in the way the court did—among and within the four pools—which is all we ask under our deferential abuse-of-discretion standard.  *See Garrett v. McRee*, 201 F.2d 250, 254 (10th Cir. 1953) ("[W]e certainly should not disturb the exercise of [the district court's] discretion as to apportionment [of an attorneys' fee award] in the absence of clear abuse.").  It is readily apparent from the district court's numerous allocation orders that it considered many of the *Johnson* factors—or at least their substance—along the way to the ultimate inquiry of its attorneys' fee analysis: whether the fee is reasonable.

### i.     Allocations Between the Pools

We turn to the allocations between the Kansas and IRPA pools; Kansas Appellants object to the disparity between the two.  In view of the *Johnson* factors, the Kansas Special Master identified "[s]everal points concerning this unique litigation and settlement [that] bear on . . . the . . . allocation considerations," including the considerable experience of lead plaintiffs' counsel; substantively, the novelty of the claims counsel raised and the difficulty of the damages issues; Syngenta's aggressive, first-tier defense; the absence of government involvement and its role in increasing lead plaintiffs' risk; lead plaintiffs' counsels' coordinated, efficient litigation efforts; the "enormous amount of work" demanded by this case and the "hard-fought settlement negotiations"; the "unprecedented" court decisions obtained; and the "extraordinary" results.  Joint App., Vol. 21, at 4783–84.

These factors largely corresponded to the twelve *Johnson* factors, albeit incompletely, and implicitly shaped the Kansas Special Master's recommendation that 90% of the fee award be divided among the three common benefit pools and the remaining 10% be allocated to the IRPA pool.  Of that 90%, the Kansas Special Master recommended that the court assign 50% of the award to the Kansas common benefit pool because the Kansas attorneys led the federal MDL, conducted "massive" discovery against Syngenta, and obtained significant rulings on complex legal issues, including issues that cleared the path for state court litigation.[42]  *Id.* at 4818.  Most significantly, the

---

[42]     As previously mentioned, the Kansas district court ultimately reduced this 50% allocation to 49% to increase the IRPA pool allocation from 10% to 12%.

Kansas group obtained certification of a nationwide class and tried their class litigation to a $217.7 million verdict that brought Syngenta to the settlement table. Moreover, one of the Kansas attorneys devoted significant time and effort to the settlement despite courting many other obligations.

As the Kansas Special Master reasoned, whereas the "vast majority of the work of litigating legal issues, taking fact and expert discovery, arguing motions, trying cases, and settlement negotiation was done by the leadership lawyers in each jurisdiction," *id.* at 4810, the IRPAs conducted "limited work," *id.* at 4809. In fact, the Kansas Special Master found that the IRPAs "did little more than recruit clients and in some cases fill out PFSs." *Id.* at 4810. Certainly, in assessing the IRPAs' time and labor, the difficulty of their work, and the skill required to perform it, the Kansas Special Master's discussion implicitly addressed several of the applicable *Johnson* factors.

The Kansas district court agreed with these factual findings and additionally observed that the time and expense that IRPAs incurred in recruiting and communicating with clients, filling out forms, monitoring the litigation, and the like did not contribute to the ultimate recovery. The district court also specifically found that the claims process with which many IRPAs assisted clients was "quite simple and streamlined, as evidenced by the fact that more than half of the claimants were not represented by individual counsel." *Id.*, Vol. 23, at 5362. As the court saw it, the rub was that other counsel "relieved" the IRPAs from "having to do any work to advance their clients' lawsuits or to add value to their claims." *Id.* Regarding the weight to assign to the IRPAs' contingent-fee contracts, the district court explained, concerning *Johnson*'s sixth factor, that a 10%

cap was appropriate given the "particular facts" of this case. *Id.*; *see also Johnson*, 488 F.2d at 718 (considering the presence of contingent-fee contracts in determining a fee award).

Kansas Appellants insist that the first *Johnson* factor—time and labor—required the court to use their lodestars as a "starting point," and otherwise argue that the district court erred in again discounting their contingent-fee contracts. Kan. Aplts.' Opening Br. at 63–65. However, as we recognized in *Brown*, "the inherent differences between statutory fee and common fund cases could justify a trial judge's decision to assign different relative weights" to certain of the *Johnson* factors. *Brown*, 838 F.2d at 456. Consistent with this observation, the district court's decision to discount time that did not contribute to the ultimate recovery furthered the common fund doctrine's goal of preventing unjust enrichment. *Cf. Swedish Hosp.*, 1 F.3d at 1269 ("[T]he attorney inefficiently expending an excess amount of time . . . stand[s] to gain by that inefficiency if the awarding court does not ultimately recognize the inefficiency . . . ."). In the context of common funds, to otherwise compensate an attorney for time that did not advance a collective benefit would allow that attorney to "obtain full benefit" from a productive party's efforts, thereby "enrich[ing] [her] . . . unjustly" at another's expense. *Mills*, 396 U.S. at 392; *see also McCutchen*, 569 U.S. at 96, 105 (noting that the common fund doctrine is "designed to prevent freeloading" and, in this regard, discussing "[t]he rationale for the common-fund rule").

So, notwithstanding Kansas Appellants' assertion to the contrary, the district court outlined why the IRPA allocation was generally reasonable under *Johnson*. The court's

119

ultimate rejection of the Kansas Special Master's 10% IRPA allocation recommendation

and subsequent decision to increase the IRPA pool allocation by two percentage points to

"achieve a likely effective contingent fee closer to 10 percent," underscores the district

court's considered judgment.[43]  Joint App., Vol. 23, at 5366–67.  We see nothing in the

record to indicate that the district court failed to carefully consider the facts and

applicable law in allocating 49% of the fee award to the Kansas pool and 12% to the

IRPA pool.[44]

---

[43]     Taking issue with the 12% IRPA allocation, which capped their contingent fees to 10%, Kansas Appellants cite a slew of cases where the district court awarded individual plaintiffs' counsel 23–33.3% of their clients' gross recoveries.  But what Kansas Appellants fail to appreciate on appeal is that the district court is best positioned to judge the reasonableness of fee requests in each case.  "We can hardly imagine a more futile and foolhardy endeavor than struggling to review each district court's degree of familiarity with a case to decide how much deference to grant its findings and conclusions." *Swedish Hosp.*, 1 F.3d at 1272.

[44]     It is of no moment that the court's analysis—all of which tracked several of the *Johnson* factors—did not explicitly invoke *Johnson*; there is no talismanic incantation district courts must chant when considering the *Johnson* framework.  *See Law*, 4 F. App'x at 752 ("Although the district court did not expressly address the [*Johnson*] factors, the hearing transcript demonstrates that it considered fully the nature, extent, and value of appellant's contributions to the underlying lawsuits, matters which include and define many of the *Johnson* factors.").  It is similarly inconsequential, in this case, that the Kansas Special Master—and, later, the district court—failed to consider, in substance, *each and every* one of the *Johnson* factors.  *See Gudenkauf v. Stauffer Commc'ns, Inc.*, 158 F.3d 1074, 1083 (10th Cir. 1998) (finding no abuse of discretion where district court failed to specifically address each *Johnson* factor).  The Kansas district court recognized that the Kansas Special Master considered the *Johnson* factors most applicable to this case and, given that consideration, permissibly concluded that her allocation recommendations were reasonable, *see Brown*, 838 F.2d at 456—with the mere exception of her recommended IRPA allocation, which it increased by two percentage points.

### ii.     Allocations within the Pools

Finally, we reject Kansas Appellants' arguments that the district court erred in how it allocated awards *within* the respective pools.  Specifically, Kansas Appellants object to the district court both awarding the Kansas MDL Leadership 98.07% of the Kansas Common Benefit Pool award and applying a lodestar multiplier of 3 to the award.  They additionally object to the district court's application of a 2.5 multiplier to some firms for bellwether discovery work but only a 1.25 multiplier for their own bellwether discovery work.  Such disparate treatment, Kansas Appellants argue, is unreasonable.

First, though they object to the district court's portioning of the Kansas Common Benefit Pool Award to the Kansas MDL Leadership, Kansas Appellants curiously cite to cases and other legal authorities that bear on the propriety of fee percentages vis-à-vis the *entire* settlement award.[45]  This is curious because presumably it is in their interest that the aggregate fee pie be as large as possible—conceivably, allowing for more for them.  However, in the event that their cited authorities actually reflect Kansas Appellants' concern that the Aggregate Fee Order is excessive vis-à-vis the entire settlement award, we agree with our sister circuit that, "while it may be appropriate in some circumstances for fee percentages in large recovery cases to be smaller than those in smaller recovery cases, 'there is no rule that a district court must apply a declining percentage reduction in

---

[45]     *Compare* Kan. Aplts.' Opening Br. at 57 ("The amount of this class counsel fee award is an extraordinary and unjustified outlier in a mega-fund class-action settlement."), *with id.* (approvingly discussing "common fund class fee awards as low as 4.1% where the recovery exceeds $100 million").

every settlement involving a sizable fund.'" *In re AT&T Corp.*, 455 F.3d 160, 174 (3d Cir. 2006) (quoting *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 303 (3d Cir. 2005)).

More fundamentally—and more relevant to Kansas Appellants' salient concern about the portion of the Kanas pool allocated to the Kansas MDL Leadership—reasonableness is the benchmark. As such, as a general matter, we neither require nor embrace overly formulaic approaches that cramp the district court's full appreciation of each case's facts. And that approach also applies to allocations *within* a pool. Thus, because the Kansas Special Master and district court thoughtfully considered the Kansas MDL Leadership's many contributions to the ultimate settlement recovery alongside the *Johnson* factors, we see no occasion to disturb the Kansas MDL Leadership's fee award, let alone the Aggregate Fee Order.

For a similar set of reasons, we cannot conclude that the district court abused its discretion in awarding a multiplier of 3 to the Kansas MDL Leadership. As the district court explained, the leadership multiplier reflected "each firm's contribution to the overall benefit of the settlement class, in accordance with the common benefit guidelines set forth in the Court's initial allocation order." Joint App., Vol. 25, at 5866. Likewise, the district court justified the disparity between multipliers for bellwether discovery work "by reference to the significant work" that some firms—not Kansas Appellants—"performed to advance the litigation." *Id.* at 5873–74. The firms that received a 2.5 multiplier for their pre-trial work "contributed more to the common benefit of the settlement class than the . . . work performed" by Kansas Appellants. *Id.* at 5874. Our precedent allows for the application of multipliers where, as here, "there is evidence of

something extraordinary in the results . . . or if one of the *Johnson* factors appears to demand it." *Rosenbaum*, 64 F.3d at 1448. By all accounts, this is such a case.

\*\*\*

In sum, Kansas Appellants fail to cast doubt on the reasonableness of the Kansas district court's fee allocation decision—be it the court's December 31, 2018, Fee Allocation Order approving the four-pool allocation scheme, or the March 2019 Kansas Pool Allocation Order awarding fees based on each attorney's or law firm's relative contribution to the settlement process and the class settlement fund. While Kansas Appellants may hold their work in higher regard than the Kansas district court, they point to no evidence that the court's specific fee allocation decisions exceeded the bounds of the court's discretion. As is clear from our caselaw, our review of attorneys' fee decisions should not devolve into a full-blown second litigation or, more bluntly, a "re-do" for the disgruntled fee applicant. We find no abuse of discretion.

### E.    The Minnesota Appellants

Minnesota Appellants similarly challenge the Kansas district court's December 31, 2018, Fee Allocation Order. They bring three issues before us, which they describe as follows:

(1)    "Whether, in awarding attorneys' fees, the district court erred in refusing to enforce—or even consider—[the JPAs] entered early in the litigation that allocated fees between mass-action and common-benefit counsel."[46] Minn. Aplts.' Opening Br. at 5.

---

[46]    Per Minnesota Appellants' explanation at oral argument, the JPA at issue here "was entered into very early on" in the litigation between "Minnesota Counsel and Kansas counsel and provided for the division of fees in the event that there was a

(2)     "Whether the district court erred in allocating 12% of fees to retained counsel—a fraction of what the JPAs required—without considering traditional equitable principles." *Id.*

(3)     "Whether the district court erred in allocating 23.5% of available fees to Minnesota, 49% to Kansas, and 15.5% to Illinois—resulting in wildly disparate compensation uncorrelated to each jurisdiction's relative contributions—without any lodestar analysis." *Id.* at 5–6.

Once more, we address each issue in turn and uphold the Kansas district court's judgment.

### 1.     The Joint Prosecution Agreements

On Issue 1, Minnesota Appellants challenge the Kansas district court's effective abrogation of the JPAs when it allocated the attorneys' fees award—an argument we are already familiar with, given that Kansas Appellants have posed a similar question, *supra*, concerning their contingency-fee agreements.  Specifically, Minnesota Appellants explain that "[t]he lead lawyers pursuing claims against Syngenta executed binding contracts—Joint Prosecution Agreements—to coordinate their efforts and ensure a proportional distribution of costs and benefits." *Id.* at 24.  Under these agreements, "Minnesota Mass-Action Counsel agreed to work cooperatively with putative class counsel and surrender a portion of their own fees to compensate class counsel for efforts accruing to mutual benefit." *Id.*  But, "[w]hen th[e] litigation settled, the district court asserted that those JPAs had no bearing on the allocation of fees," which "cannot be

---

settlement with Syngenta."  Oral Argument, No. 19-3008, at 1:02:40–1:03:28 (10th Cir., dated March 10, 2021).

reconciled with the text of the JPAs or the settlement agreement," "defies Supreme Court precedent," is "inequitable," and reflects "bad policy." *Id.*.

Much like Kansas Appellants' arguments, Minnesota Appellants' contentions are unpersuasive. We think that Minnesota Appellants effectively waived their present challenge. But, even if the Minnesota Appellants properly preserved the issue, the abrogated JPAs neither contemplated nor applied to a class recovery. Accordingly, it did not control the Kansas district court's fee allocation. In the absence of a controlling JPA, the district court reasonably applied the *Johnson* factors.

### a.      Effective Waiver

To start, we find that Minnesota Appellants have effectively waived any challenge concerning the Kansas district court's disregard of the JPAs (Issue 1). Recall that the district court rejected a similar argument when it was posed below. As we explained earlier, the Kansas district court concluded the JPAs "do not govern" in this action because: (1) the court is not bound by private agreements among attorneys; (2) the JPAs, per their terms, do not apply to the instant situation involving a nationwide settlement class since it applied to an allocation of fees that may be recovered in multiple, separate litigations; (3) the Settlement entered into by Syngenta and all other relevant parties superseded all other prior agreements, including the JPAs; and (4) the court's Common Benefits Order "addressed the issue of assessments in the event of individual recoveries, and they do not apply to this recovery by a settlement class." Joint App., Vol. 23, at 5360.

125

Critically, the Kansas district court's reasoning was in response to Watts Guerra's objection, *not* to any of the remaining Minnesota Appellants—indeed, it was only Watts Guerra and another law firm (Bassford) that argued that the JPAs should apply, an objection which was first considered and rejected by the Kansas Special Master in her November 2018 Fee Allocation R&R.  At oral argument, Minnesota Appellants accepted the legal premise that they were required to either adopt Watts Guerra's objections explicitly or state those objections to the district court themselves for us to review them here.  Oral Argument, No. 19-3008, at 1:08:00–1:10:00 (10th Cir., dated March 10, 2021).  Reviewing the record before us now, however, we find that neither Byrd nor Shields adequately did so.  *See id.*, Vol. 22, at 4951–57 (making few, if any arguments, and merely "request[ing] the opportunity to speak at the [attorney fee allocation] hearing on December 17, 2018"); *id.* at 5083–86 (making perfunctory arguments without mention of the JPAs, though purporting to join "the legal argument and objections presented by . . . Watts Guerra" "[f]or [the] sake of brevity").

Thus, since Watts Guerra exited this appeal, and the remaining Minnesota Appellants failed to argue the existence of plain error as to Issue 1 here, we conclude that their arguments concerning this issue are effectively waived on appeal.  *See, e.g.*, *In re Rumsey Land Co., LLC*, 944 F.3d 1259, 1271 (10th Cir. 2019) (concluding that an appellant "effectively" waives an argument by failing to argue plain error); *Richison*, 634 F.3d at 1131 ("[T]he failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court."); *McKissick v. Yuen*, 618 F.3d 1177, 1189 (10th Cir. 2010) (identifying

effective waiver when an appellant fails to argue plain error in an opening brief).

Notwithstanding this effective waiver, we think the merits militate against Minnesota

Appellants and see no need to rest our decision on Issue 1 solely on preservation grounds.

### b.    The Joint Prosecution Agreements Do Not Govern

Turning to the merits of the Kansas district court's December 2018 Fee Allocation

Order, we agree that the JPAs themselves do not apply to the class action settlement

context.

At the outset, we acknowledge that we have reservations about—and tend to

disagree with—the Kansas district court's reasoning to the extent that the court concluded

that it possessed inherent authority to override the JPAs. The JPAs are meaningfully

dissimilar to the contingent-fee contracts.[47] While "contingent fee arrangements are . . .

subject to the courts' supervision," *Cooper*, 719 F.2d at 1505, it does not stand to reason

that all contracts are. In particular, not all contracts implicate equitable considerations

---

[47]    As we have explained, the equitable doctrines that empower courts to police against unjust enrichment in common fund cases enable them to review contracts—such as the contingent-fee contracts in this case—that unjustly enrich certain attorneys at the expense of others who contributed to the ultimate recovery. *See* FED. R. CIV. P. 23(h) advisory committee's notes to 2003 amend. (explaining that courts can adjust the fee award to ensure that the overall fee is "fair" and "equitable" where "individual fee agreements *between* class counsel and class members . . . . have provisions inconsistent with those goals" (emphasis added)); *Piambino v. Bailey*, 610 F.2d 1306, 1327–28 (5th Cir. 1980) (recognizing that conflicts between attorneys and clients can result in inequitable, unreasonable fee awards); *see also Boeing*, 444 U.S. at 478 (recognizing the common fund as an equitable doctrine); *Swedish Hosp.*, 1 F.3d at 1268 (recognizing the equitable benefits of applying the percentage-of-the-fund method to common fund cases). That is especially true in this case where IRPA attorneys sought to enforce contracts between themselves and their clients *against* non-signatory counsel.

127

equally.  *Cf. McCutchen*, 569 U.S. at 100 ("The agreement itself becomes the measure of the parties' equities; so if a contract abrogates the common-fund doctrine, [neither party] is . . . unjustly enriched by claiming the benefit of its bargain.").

Where equitable considerations apply less forcefully or clearly—such as when a contract *between attorneys* shifts fees between those same attorneys, and not their clients—courts should, at the very least, explain why equitable principles trump "[t]he principle that contractual limitations provisions ordinarily should be enforced as written." *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 108 (2013); *cf.* 1 Rossi, *supra*, § 4:3 ("Where attorneys jointly representing a client have an agreement as to the method of dividing the overall fee, the agreement should control, at least where there is no breach of the agreement and no violation of the applicable rule on fee splitting." (footnotes omitted)); *id.* (suggesting that there are limited circumstance where, ordinarily, "a court may refuse to recognize such a fee-sharing agreement [that is, an agreement between 'attorneys jointly representing a class of plaintiffs in class action litigation']," specifically, "if [the agreement] does not provide for a division of fees in accordance with disciplinary rules or some other substantive requirement governing conditions of compensation"); *cf. also id.* 7:10 ("It has been said that ideally, the allocation of a fee award among class counsel is a private matter to be handled among the attorneys. . . . However, a court need not be bound by an agreement between counsel as to the allocation of fees." (footnotes omitted)).

After all, courts generally "cannot go outside an . . . agreement" and re-write a contract, let alone nullify its legal effect. *Fru-Con Const. Corp. v. KFX, Inc.*, 153 F.3d

1150, 1156 (10th Cir. 1998) (quoting *Bydalek v. Brines*, 947 S.W.2d 135, 142 (Mo. Ct. App. 1997)); *see also Dunn v. H.K. Porter Co.*, 602 F.2d 1105, 1111 (3d Cir. 1979) (noting that "[t]he strong judicial reluctance to enforce the terms of a judicially fashioned bargain upon the parties" sometimes "presses in favor of honoring the express terms of the fee agreement").  Nevertheless, we need not decide whether the Kansas district court exceeded the scope of its equitable powers because the JPAs, as written, apply only to individual recovery—*not* class recovery.

In other words, the agreements comprised of the JPAs do not "govern[]," *McCutchen*, 569 U.S. at 99, here—in a circumstance they did not contemplate— specifically, one involving a class recovery.  Under the June 2015 Joint Prosecution Agreement, certain IRPA attorneys agreed to cooperate with class counsel and surrender a portion of their fees to compensate class counsel, via a "Common Benefit Assessment," for mutually beneficial efforts.  Joint App., Vol. 13, at 3138–39.  The agreement defined a "Common Benefit Assessment" as a "common benefit fee and expense assessment ordered by a state or federal MDL court in connection with a state or federal MDL."  *Id.* at 3136.  As well, the JPA stated that "the Parties agree that if and as such clients are entitled to any payment from Syngenta in connection with settlement of or judgment on such clients' Syngenta Claims, such clients will be subject to 100% of the then-applicable Benchmark Common Benefit Assessment."  *Id.* at 3138.  The agreement defined the "Benchmark Common Benefit Assessment" as the "benchmark common benefit fee and expense assessment ordered by the Federal MDL Court in connection with the Federal MDL."  *Id.* at 3136.

Yet, the June 2015 Joint Prosecution Agreement did not expressly contemplate a class action settlement, as no court had certified a class. That does not mean that the June 2015 Joint Prosecution Agreement did not anticipate attempts to secure class certification—it did. But the agreement expressly stated that none of the federal MDL co-leads would "propose to certify any litigation or settlement class that include[d]" the relevant Minnesota IRPA clients. *Id.* at 3146. To boot, it provided that "if any of the Federal MDL Co-Leads seek to certify any litigation or *settlement* class, such co-lead(s) will expressly *exclude* from his/their proposed class definition(s), and will advocate for the exclusion and oppose the inclusion of, all Excluded Clients." *Id.* (emphases added). The agreement also obliged class action counsel to abstain from "interfer[ing] with or alter[ing] the terms and conditions of any fee agreement" with the relevant Minnesota IRPA clients. *Id.* In exchange, the relevant Minnesota IRPAs would refrain from opposing class certification. *See id.* Simply, the JPA contained no language tethering an unforeseen class action settlement to the attorneys' fees assessments.

The parties recognized as much, as did the Kansas district court. On June 22, 2015, co-lead counsel submitted to the Kansas district court a final, revised proposed Common Benefit Order incorporating the June 2015 Joint Prosecution Agreement. No party objected to the proposed order. Then, just over one month later, the Kansas district court entered the Common Benefit Order. Tracking co-lead counsel's proposed submission, the Common Benefit Order contained the following language making clear that the JPA's assessment language did not apply to a class settlement:

130

> In the event that there is a class settlement, recovery or judgment in favor of the class, no assessment pursuant to this Section will be made, either for attorneys' fees or for expenses, individually from any class member or his/her/its individual attorney as to the portion of any class recovery distributed to that individual class member if the class member remains in the class (i.e., does not opt-out of the class). Instead, all fees and expenses for that class member will come out of the overall class recovery funds provided by defendants, as approved by the Court, or as otherwise Ordered by the Court. The relationship between class counsel fees and costs obtained through any class settlement or judgment and the Common Benefit Fund will be addressed, if necessary, by later order of the court.

*Id.*, Vol. 21, at 4804.

The January 2016, First Addendum's terms underscore this conclusion that the June 2015 Joint Prosecution Agreement did not reach class recovery. The First Addendum contemplated fee-sharing in the limited context of a Minnesota class. Under its terms, Minnesota counsel agreed to pay a "33 1/3% of the attorneys' fees awarded in all [Minnesota] MDL Class Actions" to the co-lead counsel. *Id.*, Vol. 13, at 3164. But even in that circumstance, the First Addendum did not grant "[Minnesota] MDL Class Action[s]" a national reach, defining that term to mean "any action pursued in the [Minnesota] MDL Court." *Id.* at 3162.

And if a court declined to certify the Minnesota class, the First Addendum expressly stated that only

> [t]o the extent that class certification of a [Minnesota] MDL Class Action is denied and/or Additional Minnesota Counsel have been, are engaged to or otherwise decide to pursue cases for Producers or Non-Producers in one or more individual actions, Additional Minnesota Counsel hereby join in the [JPA] and are subject to all of the same rights and obligations of the Remele/Sieben Group including, but not limited to, the *assessments on individual cases set forth therein.*

131

*Id.* at 3166 (emphasis added). So, essentially, the First Addendum did account for a Minnesota class—in which case, a fee-sharing arrangement would apply. Otherwise, it paralleled the June 2015 Joint Prosecution Agreement and provided assessments only on individual cases. And the First Addendum, like the June 2015 Joint Prosecution Agreement, said nothing of the nationwide class recovery at issue here.

Byrd's own submissions before the Kansas district court reflect this understanding. In its objection to the Kansas Special Master's R&R, Byrd mentions that the case on which the Syngenta litigation was modeled "was not certified as a class." *Id.*, Vol. 22, at 4954. As a result, Byrd complained that it "worked for years with [its] referring lawyers who had *nothing but our contingency fee promise* with our clients as the primary avenue to be compensated for the time and efforts to hold Syngenta accountable." *Id.* at 4954–55 (emphasis added). Continuing, Byrd averred that "[u]ntil it was decided that the settlement claims process was to be worked as a class, our clients had zero intention of being in a class." *Id.* at 4955. Byrd did not represent that the June 2015 Joint Prosecution Agreement guaranteed it payment. To the extent Byrd mentioned the agreement at all, it claimed that it "account[ed] for a commingled world should the Court certify a class, and that agreement was summarily *discarded* after the global settlement was reached." *Id.* at 4957 (emphasis added).

Any doubt about the June 2015 Joint Prosecution Agreement and First Addendum's inapplicability is resolved by the Settlement itself. Of course, the Settlement bound the plaintiffs and Syngenta, not the attorneys. But it was negotiated by leadership firms (in consultation with others) and thus evidences the firms' fee-award

132

expectations going forward.  With that in mind, section 7.2.1 of the Settlement provides that "Settlement Class Counsel and other counsel representing Class Members who performed work for the benefit of Class Members shall make Fee and Expense Applications" to the Kansas district court.  *Id.*, Vol. 5, at 1089.  The Settlement further advised that fee and expense awards "shall be paid from the Settlement Fund," *id.*, not assessed against individual claims, as per the June 2015 Joint Prosecution Agreement.

Therefore, having carefully considered the June 2015 Joint Prosecution Agreement and First Addendum's plain terms and context, and the Settlement, we are satisfied that they simply do not apply to the nationwide class action fee award at issue here.  Moreover, we note as background to our next discussion that Minnesota Appellants do not seek to undo the Settlement that the JPAs did not contemplate.  Indeed, the source of their fee *is* the $503 million apportionment *from* the Settlement.  Fundamentally, their argument is that we should retroactively graft the fee-sharing mechanisms expressed by the JPAs—which contemplated a *pre-class*-settlement world—onto the fee apportionments tailored for a *post-class*-settlement paradigm.  That is, they attempt to transplant what might have been a reasonable apportionment of fees under one scenario into a context radically transformed by the global class settlement.

Beyond trumpeting the JPA's efforts to "promote cooperation and coordination," Minn. Aplts.' Opening Br. at 35, Minnesota Appellants offer no argument as to why the JPAs, even if non-binding, should *govern* the district court's *reasonableness*-driven assessment of the fees.  Nor have they developed a fulsome argument that explains why the JPAs—like the Fee-Sharing Agreement between certain firms—were "critical to the

achievement of a settlement in this litigation," Joint App., Vol. 21, at 4800, an

undoubtedly uphill battle given that the $217,000,000 Kansas class action jury verdict

prompted Syngenta to return to the settlement table.[48]  Where litigants do not advance a

meaningful theory of error, we "will not go hunting" for it.  *Voulgaris*, 2023 WL ---, Slip.

Op. at 9.  In sum, Minnesota Appellants have therefore failed to demonstrate that the

district court abused its discretion in assigning the JPAs little weight.

### c.  The Minnesota State Court Reasonably Allocated the Fees

It seems that Minnesota Appellants' JPA-related arguments are nothing more than

indirect challenges to the Kansas district court's abrogation of their contingent-fee

agreements and its consideration of the *Johnson* factors.  Indeed, Minnesota Appellants

stated at oral argument that their JPA-focused argument is one about the *Johnson* factors

the Kansas district court considered in allocating fees; their argument is similar—though

not identical—to Kansas Appellants' contingent-fee-agreement theory we earlier

disposed of above.  Both of these groups of appellants attempt to secure a fee-award

redux.  *See* Oral Argument, No. 19-3008, at 1:21:00–1:23:27 (10th Cir., dated March 10,

2021) (Minnesota Appellants stating that "[e]ven if the JPA isn't controlling in this case

it should at least provide some guidance to the district court"; referencing the sixth

---

[48]    Minnesota Appellants contend that "[t]he district court never explained
why the *ex-post* [Fee-Sharing Agreement] better reflected an equitable allocation than the
*ex ante* JPAs."  Minn. Aplts.' Opening Br. at 35.  But the Special Master's November
2018 Fee Allocation R&R expressly identified the equitable distinctions between the Fee-
Sharing Agreement and the JPAs.  And, in its December 2018 Fee Allocation Order, the
Kansas district court observed that the Special Master's R&R addressed the issue of
whether the JPAs should govern the awards "at some length" and "agree[d] with [its]
analysis."  Joint App., Vol. 23, at 5360.

*Johnson* factor to argue that the JPA and the Addendum should have been considered by the court; and agreeing that the Addendum by its terms only applied to individual cases and not class settlements).  Thus, to the extent Minnesota Appellants argue that the Kansas district court's disregard of contingent-fee agreements *and* the JPA *and* the Addendum resulted in an erroneous misapplication of the *Johnson* factors, that argument fails for a similar reason that Kansas Appellants' Issue 1 did above: the Minnesota state court's allocation tracked the *Johnson* factors.[49]  And, accordingly, the Kansas district court likewise did not err in its consideration and approval of that allocation.

The Minnesota state court awarded the largest portion of the Minnesota Common Benefit Pool to the Co-Lead Counsel firms because "they made the largest investment in the Minnesota Syngenta litigation."  Joint App., Vol. 29, at 6720–21.  That investment consisted of over 38,000 hours of work and nearly $6 million in litigation funding; the

---

[49]    Notably, neither of the Minnesota Appellants objected to the May 2019 Minnesota allocation order's consideration of the *Johnson* factors.  Byrd did not bother to object at all, which in view of our strong waiver doctrine might explain the circuitous route the Minnesota Appellants charted in ultimately contesting the application of the *Johnson* factors.  For its part, Shields explicitly "d[id] not challenge the judgment of the Minnesota court in making [its] allocation."  Joint App., Vol. 29, at 6870.  Rather, Shields concededly argued that its "objection" was better read as a motion for reconsideration, one challenging the Kansas district court's four-pool allocation structure. *Id.* at 6870–71.  In explaining its tardy motion, Shields suggested that it had to "play the game and see the result" before it could "critique" the order.  *Id.* at 6871.  In other words, Shields tabled its *ex ante* objection so that it could object *ex post*.  The Kansas district court correctly observed that Shields could not "have it both ways" by "go[ing] along with the Court's approach and roll[ing] the dice hoping for a good result," only to "complain about the approach if ultimately dissatisfied with the outcome." *Id.* at 6871–72. *Cf. Jones v. Flowers*, 547 U.S. 220, 231 (2006) (noting that the constitutionality of notice procedures is assessed *ex ante*).  Indeed, Shields's strategy undercuts the orderly and efficient judicial process that objection opportunities are designed to ensure.

Minnesota Co-Lead Counsel "took lead roles in the substantive legal work of developing claims on behalf of all plaintiffs, briefing and arguing many motions, orchestrating discovery, working cases up for trial, and conducting the trial of the Minnesota class action." *Id.* at 6721. Thus, because of their "great legal skill, diligence, . . . willingness to take risks on behalf of their clients," and critical role in the settlement efforts, the Co-Lead Counsel firms comprised Tier One in the state court's allocation order. *Id.* at 6740–41.

Meanwhile, firms like Byrd and Shields, both of whom the Minnesota state court classified as "Tier Five Firms," directed their efforts toward their individual clients, not the class. *Id.* at 6722. Though recognizing that Tier Five work "contributed to the positive outcome," the Minnesota state court noted that it was "not . . . as significant to the ultimate settlement as that performed at the highest tier." *Id.* at 6740. In searching for a way to measure the common benefit value of Tier Five work, the Minnesota state court focused on the number of completed PFSs. *See id.* at 6742. The sheer numerosity of PFSs submitted conferred a common benefit by placing litigation pressure on Syngenta. For this reason, the Minnesota state court concluded that "[t]he common benefit conferred by the total group of completed and submitted PFSs is best measured on a per-PFS basis, not by awarding each firm its claimed lodestar." *Id.* Consistent with the equitable principles we previously described, the Minnesota state court commented that the lodestar method both failed to capture the fact that "some firms were more efficient and cost-effective than others in their approach to completing PFSs" and would have the effect of rewarding firms for "incomplete . . . work that conferred no common benefit."

*Id.* And though Co-Lead Counsel recommended a $250 flat fee for the completion of the relatively simple PFS, the Minnesota state court increased the flat rate to $301.63 to bring the fee award "within $1,000,000 of the collective total lodestar for PFS-related work by Minnesota pool firms." *Id.* at 6743.

As should be abundantly clear, in addition to complying with our "hybrid" model, *see Chieftain Royalty*, 888 F.3d at 458–59, the Minnesota state court considered the firms' (1) time and labor; (2) the novelty and difficulty of their legal work; (3) the requisite skill to perform the work; (4) the customary fee; and (5) the results obtained, *see Johnson*, 488 F.2d at 717–18. Accordingly, we are satisfied that the Minnesota state court implicitly—but thoroughly—considered the *most applicable Johnson* factors. And, to the extent the Kansas district court's limited review of the Minnesota state court's order could concern us, the harmlessness of the Kansas district court's decisions dispels any worries.[50] *See Wright*, 826 F.2d at 943 ("An abuse of discretion[] does not require reversal if that abuse amounted to harmless error.") That is, "other reasoning already contained explicitly or implicitly" in the record upon which the district court's judgment was based, including, of course, the Minnesota state court's thorough and considered review of the issues, "supplied sufficient grounds for affirmance notwithstanding [any such] error." *Groberg v. Astrue*, 505 F. App'x 763, 765 n.1 (10th Cir. 2012) (unpublished) (citing *Fischer-Ross v. Barnhart*, 431 F.3d 729, 734 (10th Cir. 2005)).

---

[50] We elaborate *infra* on our harmless-error rationale—as applied to like circumstances—in addressing the sole challenge of the Illinois Appellants.

In sum, we conclude Minnesota Appellants' Issue 1 challenge is effectively waived. Nevertheless, it also is unavailing for the reasons supplied here. Minnesota Appellants have not met their burden of showing that the fee award amounted to a harmful abuse of discretion.

### 2.     The IRPA Pool Allocation

Next, on Issue 2, Minnesota Appellants contend that the Kansas district court's 12% allocation to the IRPA pool is far too small. They argue that the 12% allocation left them "drastically undercompensated," even as the court acknowledged that retained counsel meaningfully contributed to the settlement. Minn. Aplts.' Opening Br. at 35–36. Minnesota Appellants assert that the court's allocation is especially egregious given that represented plaintiffs "will recover more than 50% of the total recovery by all claimants." *Id.* at 37. Invoking the eighth *Johnson* factor (i.e., the amount involved and the results obtained), Minnesota Appellants argue that "[a]llocating 12% of fees to counsel whose clients recover 50% of the settlement defies the principle that attorney compensation reflect the results obtained for clients." *Id.*

These complaints, however, are unavailing. Considering our deferential standards stated above, Minnesota Appellants fail to demonstrate how the Kansas district court erred in its specific fee allocations to the IRPA pools. Their arguments as to the pool-specific fee allocations are nothing more than invitations to second-guess the district court's discretionary judgments, and we are not inclined to do that. The record shows that the court's decisions were based on a reasonable view of the procedural history of the litigation and the relative contributions of individual firms and regional groupings of

firms and comported with our "hybrid" model. *See Zisumbo*, 801 F.3d at 1207; *McInnis*, 458 F.3d at 1148; *Case*, 157 F.3d at 1249; *see also Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 518 (9th Cir. 2000) ("Given the broad discretion to which attorneys' fees determinations are entitled on appellate review, we decline to second-guess the district court's decision." (citation omitted)); *cf. Highway Equip. Co. v. FECO, Ltd.*, 469 F.3d 1027, 1037 (Fed. Cir. 2006) ("FECO has shown no clear error in the district court's findings and we decline to second-guess the district court's judgment that the defendant is not entitled to attorney fees based on litigation misconduct."); *Kattan by Thomas v. District of Columbia*, 995 F.2d 274, 279 (D.C. Cir. 1993) ("We are in no position to second-guess the district court's judgment as to whether the District of Columbia's tactics were unreasonable enough to warrant the award of extra fees."), as amended (June 30, 1993).

Much like Kansas Appellants, Minnesota Appellants fail to engage with the well-thought-out reasoning of the Kansas district court. Thus, we do not find an abuse of discretion as to the Kansas district court's pool allocations.

### 3.    The Minnesota Common Benefit Allocation

Lastly, on Issue 3, Minnesota Appellants similarly disagree with and complain about the Kansas district court's allocation to the Minnesota common benefit pool, which they argue was unreasonably low. To start, they argue the court erred by giving "significant weight" to the "February 23, 2018 [Fee-Sharing] [A]greement among three groups—Kansas CLC, Minnesota Class Counsel, and Clark/Phipps—[which] purported to allocate 50%, 12.5 %, and 17.5% of fees to each group, respectively." Minn. Aplts.'

139

Opening Br. at 38.  More broadly, Minnesota Appellants argue that the court's failure to "conduct[] a lodestar calculation" in relation to the Minnesota common benefit pool allocation "alone justifies vacating the district court's award here."  *Id.* at 39 (footnote omitted).  Appellants specifically contend that the Minnesota common benefit pool, when cross-checked against the applicable lodestar amounts, ended up imposing so-called punitive fractional multipliers on counsel assigned to this pool.  Indeed, Minnesota Appellants argue that the Kansas district court acknowledged that Minnesota counsels' contributions to the Syngenta litigation outstripped those of Illinois counsels' contributions.  Yet, according to these lodestar-based calculations, Illinois counsel received fee awards closer to their lodestars than Minnesota counsels' fee awards, which is, in their view, an unreasonable and arbitrary result.

At bottom, Minnesota Appellants complain about the Kansas district court's consideration of the February 23, 2018, Fee-Sharing Agreement, including its use of lodestar figures, and the particular allocations among the common benefit pools.  But their arguments never rise above subjective sentiments about the quality or value of their own work.  As we said in *Brown*, a district court need not evaluate an attorney's time and labor "using the lodestar formulation when, in the judgment of the trial court, a reasonable fee is derived by giving greater weight to other factors, the basis of which is clearly reflected in the record."  838 F.2d at 456 (footnote omitted).

In that vein, we reiterate that the record reflects an extensive—and arguably exhaustive—fee allocation process overseen by numerous courts and numerous individuals, judges and experts alike.  And recall that, as part of this process, both the

140

Kansas district court and the Kansas Special Master justified in detail why they viewed Minnesota as the second-most important region in the overall Syngenta litigation—a relative valuation that was supplemented by the Minnesota state court's valuation of individual attorneys' or firms' relative contributions to the Minnesota litigation. Minnesota Appellants are unpersuasive in asserting that this comprehensive process represented an abuse of discretion; they cannot carry their burden by focusing on the purported misuse of or disregard for lodestar figures given—as we have detailed *supra*—those figures' lesser significance in the common fund context and under a percentage-of-the-fund fee allocation approach.  *See Gottlieb*, 43 F.3d at 482–83; *Brown*, 838 F.2d at 453–55; *Uselton*, 9 F.3d at 853; *see also Gudenkauf v. Stauffer Commc'ns, Inc.*, 158 F.3d 1074, 1083 (10th Cir. 1998); *Law*, 4 F. App'x at 751.

More specifically, as to the February 23, 2018, Fee-Sharing Agreement, we see no error as to the Kansas district court's consideration of this agreement when fashioning the fee allocations.  As our sister circuit explained:

> Since lead counsel is typically well-positioned to weigh the relative merit of other counsel's contributions, it is neither unusual nor inappropriate for courts to consider lead counsel's proposed allocation of attorneys fees . . . where the district court retains the ultimate power to review applications and allocations and to adjust them where appropriate.  Suffice it to say that a standard counseling consideration of lead counsels' allocation of fees does not in any way limit the district court's ability to engage in a meaningful review of the fairness of the allocation and the overall reasonableness of fees. Since our review of the record leads us to conclude that such a review occurred here, we see no abuse of discretion.

*Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 90 (2d Cir. 2010); *see also In re Copley Pharm., Inc., Albuterol Prods. Liab. Litig.*, 50 F. Supp. 2d

141

1141, 1149 (D. Wyo. 1999) (noting that, because lead counsel managed the plaintiffs' case, "the Court should and must rely, to a degree, on the voice of Lead Counsel on the responsibilities of class counsel members, quality of their work, and novelty of issues involved"), *aff'd and remanded sub nom. by In re Copley Pharm., Inc.*, 232 F.3d 900, 2000 WL 1508841 (10th Cir. 2000) (unpublished); *cf. In re OCA, Inc. Sec. & Derivative Litig.*, No. CIV.A.05-2165, 2009 WL 512081, at *23 (E.D. La. Mar. 2, 2009) ("In securities cases governed by the PSLRA, courts may give deference to lead counsel and lead plaintiff's allocation of attorneys' fees to non-lead counsel for work done after the appointment of lead counsel at the direction of lead counsel." (citing *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 197–98 (3d Cir. 2005))).

Only when the district court strays from its duty to ensure that the attorneys' fees award is fair and reasonable do we find an abuse of discretion in the court's weighing of lead counsel's proposals. We are not the first court of appeals to consider this issue. In *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220 (5th Cir. 2008), the Fifth Circuit explained that "a district court can in its discretion appoint a committee of plaintiffs' counsel to recommend how to divide up an aggregate fee award." *Id.* at 227. Certainly, reasoned the Fifth Circuit, a district court's appointment of a committee does not give it license to abdicate "its responsibility to closely scrutinize the attorneys' fee allocation, especially when the attorneys recommending the allocation have a financial interest in the resulting awards." *Id.* At all times, our sister circuit instructed, reasonableness must serve as the district court's guiding star. *See id.*

And we have no reason to doubt that reasonableness played that role here.  The

Kansas district court did not uncritically defer to the Fee-Sharing Agreement, which the

Kansas Special Master acknowledged was "not binding."  Joint App., Vol. 21, at 4799.

Rather, in keeping with both the *Johnson* factors *and* the equitable principles animating

the common fund doctrine, the Kansas Special Master concluded that the Fee-Sharing

Agreement merited analytical weight because its signatories "w[ere] critical to the

achievement of a settlement in this litigation."  *Id.* at 4800.

The Kansas district court agreed that the Fee-Sharing Agreement evidenced that

the "Kansas and Minnesota leadership both believed that the Kansas attorneys should

receive a significantly greater award of fees than the Minnesota attorneys."  *Id.*, Vol. 23,

at 5377.  Therefore, given the district court's reasons for weighing the Fee-Sharing

Agreement, we see no reason why it would be error for the Kansas district court to

choose to give weight to that Fee-Sharing Agreement, in light of its broad discretion

when considering attorneys' fees awards.  *See* FED. R. CIV. P. 23(h) advisory committee's

notes to 2003 amend. ("Courts have also given weight to agreements among the parties

regarding the fee motion, and to agreements between class counsel and others about the

fees claimed by the motion.").

Under our deferential standard of review, Minnesota Appellants' arguments are

insufficient—especially when the record reflects that the Kansas district court's myriad

allocation proceedings and orders share one, overriding concern: ensuring all attorneys'

fee awards are reasonable.  Minnesota Appellants have not provided us with any

143

argument that shows otherwise.  Thus, we find its arguments on Issue 3 to be without merit.

### F.     Byrd and Shields

We now turn to Minnesota Appellants' additional challenges, which they bring, not as "Minnesota Appellants," but as "Byrd and Shields."  In this set of challenges, the two law firms disagree with the Kansas district court's July 2019 Expense Order; December 31, 2018, Fee Allocation Order; and July 2019 Minnesota Pool Allocation Order.  Particularly, Byrd and Shields ask us:

(1)     "Did the [Kansas] district court err by awarding expenses to firms for outside, third-party contractors where the court a) had excluded them from the definition of common benefit expenses; and b) denied Appellants reimbursement for temporary in-house workers who performed the same work?"  Byrd & Shields Opening Br. at 2.

(2)     "Did the district court err in its allocation of attorneys' fees within and among the three pools?" *Id.* [51]

---

[51]     In their supplemental briefing, Byrd and Shields raise a third issue, namely that the district court abused its discretion when, on January 2021, it re-allocated the amounts awarded to the four pools "without complying with [Federal Rule of Civil Procedure] 23(h)."  Byrd & Shields Suppl. Br. at 2.  Appellant Hossley-Embry "adopt[ed] and incorporate[d] by reference" Byrd and Shields's supplemental brief.  Hossley-Embry Suppl. Br. at 2.  Consistent with our Supplemental Briefing Order, we confine our review here to how the Kansas district court's IRPA pool allocation order affected "the fee issues already briefed by the parties."  Suppl. Briefing Order at 1.  After reviewing the record, we find Byrd and Shields's Rule 23(h) argument better described as a challenge to the Watts Guerra Settlement and, therefore, outside the scope of our review in the instant appeal.  *See In re Syngenta AG MIR 162 Corn Litig.*, MDL No. 2591, Doc. 4524 at 2 (Mem. and Order, entered Dec. 14, 2020) (discussing Byrd and Shields's challenge to the Watts Guerra Settlement and Article III standing concerns).

Byrd and Shields also contend that the district court flip-flopped its position regarding the enforceability of private agreements entered into between attorneys by reallocating funds *from* the three common benefit pools *to* the IRPA pool for Watts Guerra's sole benefit pursuant to its settlement agreement with other firms. Thus, Byrd and Shields argue that,"[t]o the extent the Watts Guerra settlement agreement was binding on the district court, the JPAs signed by Appellants were no less so." Byrd & Shields Suppl. Br. at 5. After providing additional background on the Kansas district court's Expense Award, we address each issue that we have jurisdiction to consider,[52] and we affirm.

### 1.     The Expense Award

On Issue 1, Byrd and Shields primarily target the Kansas Special Master's alleged expansion of the definition of "common benefit" work. By way of background, in its July 2015 Common Benefits Order, the Kansas district court erected a basic scheme for reimbursing counsel for common benefit litigation expenses. Recall that, under this order, the district court advised that for the purposes of reimbursement it would only consider "reasonable expenses incurred." Joint App., Vol. 3, at 643. The district court instructed counsel to submit expenses to Lead Counsel in accordance with specific guidelines. Those guidelines accounted for expenses related to: (1) travel; (2) telephonic

---

[52]     Reflecting the directions of our Supplemental Briefing Order, we confine our discussion of the Kansas district court's approval of the Watts Guerra Settlement to its implications for the court's alleged disregard of the JPAs.

communications; (3) shipping, postage, courier, and delivery charges; (4) faxing services; (5) copying; and (6) computer research.

Over three years later, in November 2018 and, later, as part of her April 2019 Expense R&R, the Kansas Special Master invited counsel to submit expenses for reimbursement consideration, describing the Kansas district court's July 2015 Common Benefit Order as a "starting point" in her evaluation. *Id.*, Vol. 21, at 4823. At that point, the Kansas Special Master had reviewed the expense materials submitted to date and communicated several important observations. First, she noted that firms had collectively submitted a total of $21,156,330.06 in "miscellaneous" expenses. *Id.* at 4825. The Kansas Special Master thought some of those expenses—such as those related to marketing, overhead, and client acquisition—to be non-reimbursable. Yet, other costs—such as those "related to communications with existing clients regarding ongoing litigation issues, including issues related to the structure, amount, and timing of any potential settlement"—were potentially "reimbursable litigation expenses, because they were necessary for the conduct of the litigation and, ultimately, facilitated the settlement." *Id.* at 4826.

Then, in its December 2018 Fee Allocation Order, the district court announced that it "adopt[ed]" the Kansas Special Master's November 2018 R&R, noting that "no attorney ha[d] objected." *Id.*, Vol. 23, at 5380. The court specifically noted that it found the Kansas Special Master's "recommendations . . . reasonable and appropriate." *Id.* However, the court also stated that it would apply "the standards and limitations" outlined in its July 2015 Common Benefit Order, advising that those terms would

146

"govern" its "determination of reasonable expenses that may be reimbursed from the settlement fund." *Id.* Furthermore, the court relayed that "items not included in the [July 2015 Common Benefit Order] . . . generally constitute firm overhead, and items properly considered overhead will not be reimbursed as reasonable expenses." *Id.* at 5381.

The Kansas Special Master submitted an R&R on Expenses in April 2019. In keeping with her November 2018 R&R and the Kansas district court's December 2018 Fee Allocation Order, the Kansas Special Master recommended approving expenses for "experts" whom the firms described "as assisting in getting information from existing clients and/or the FSA [i.e., the U.S. Department of Agriculture's Farm Services Agency] in order to complete PFSs" and "contract employees," including those who assisted clients with PFSs or discovery. *Id.*, Vol. 26, at 6016–17. The Kansas Special Master did not, however, "recommend acceptance of requests for reimbursement of hourly rates or salaries for law firm employees who performed such tasks," because those "costs are subsumed in attorneys' fee awards." *Id.* at 6017.

In response to these practical modifications, Byrd and Shields accuse the Kansas Special Master and the Kansas district court of impermissibly expanding the definition of "common benefit expenses." Byrd & Shields Opening Br. at 9–10. Relying on the guidelines established by the July 2015 Common Benefit Order, Byrd argues that it hired temporary employees to work exclusively on the Syngenta litigation, tasking them with procuring information from clients and the FSA to complete PFSs and respond to discovery. Shields, too, argues that it initially submitted—but then withdrew—a "PFS expense request for 'in-house' 1099 contractors who worked exclusively on Syngenta,"

147

thinking it was more properly classified as "overhead." *Id.* at 10. On the Kansas Special Master's recommendation, neither firm received reimbursement for these expenses.

In recommending denial of Byrd and Shields's reimbursement request, the Kansas Special Master noted that the Kansas district court's guidance did not "prohibit[] or discourage[]" submission of expenses related to applying for settlement benefits. Joint App., Vol. 29, at 6833. Byrd, who conceded it "d[id] not object to the methodology" governing expense reimbursements, failed to explain why "it could not have submitted these expenses previously," despite having the same guidance as all the other law firms, said the Kansas Special Master. *Id.* As for Shields, the Kansas Special Master found the fact that it initially submitted its temporary workers expenses undermined its subsequent contention that it did not realize it could submit temporary expenses. These issues aside, the Kansas Special Master explained that permitting either firm to revisit its decisions— "long after the exhaustive expense review process . . . ended"—would invite every law firm to submit additional expenses, "causing unnecessary delay" and "unfairly prejudic[ing] the law firms that did not seek a second bite at the apple." *Id.* at 6832.

The Kansas district court largely agreed with the Kansas Special Master's reasoning. With respect to Byrd, the district court effectively reasoned that even if Byrd could bite the apple a second time (but it could not), it would not come away with a greater expense award. That is because Byrd issued W-2s for its temporary workers, instead of the 1099s used for independent contractors—a meaningful distinction because, as the court put it, its "primary consideration in considering [expenses for employees] is whether the work is more properly considered as attorney fee work or an expense." *Id.* at

6897. So, if, as with Byrd, the "firm did the work in-house, with its own employees," and "exert[ed] a level of control [over the workers] sufficient to demand treat[ing] [them] as employees for tax purposes," then the "reimbursement for this time should have come through the attorney fee award process." *Id.* at 6897–98.

Turning to Shields, the court offered the following reasoning: Shields "voluntarily chose to submit this incurred cost [i.e., for contract workers who worked on Syngenta matters] in its fee application instead of in its expense application," though "there was no reason to believe that such charges for contract workers could not support an award of expenses." *Id.* at 6900. And Shields "may not try the other route simply because it is unhappy with the result of the route that it did choose." *Id.* The court also found that awarding Shields for its contract workers would potentially create a "double-dipping" scenario, because Shields already received $643,980.05 for its work completing PFSs. *Id.*

### a.    The Kansas District Court Provided Reasonable Notice That It Expanded the Definition of "Common Benefit Expenses"

Byrd and Shields first contend that the July 2015 Common Benefit Order "should be considered akin to the law of the case."[53] Byrd & Shields Opening Br. at 8. The law

---

[53]    Joint Appellees rightly note that Byrd and Shields did not raise an argument regarding the applicability of the law of the case doctrine as to the July 2015 Common Benefit Order before the Kansas district court and, therefore, have effectively waived it and any related arguments through this forfeiture and their subsequent failure to argue plain error on appeal. *See Richison*, 634 F.3d at 1131. Specifically, before the Kansas district court, Shields "averred that it had been mistaken and pleaded for an opportunity to claim its labor costs as expenses"—yet now Shields "insist[s] that the CBO [i.e., the July 2015 Common Benefit Order] did not permit such recoupment and accuse[s] the

of the case doctrine posits that a court *may* "decline the invitation to reconsider issues already resolved earlier in the life of a litigation." *Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1240 (10th Cir. 2016). The doctrine advances the laudable goal of "maintain[ing] consistency . . . during the course of a single continuing lawsuit." *Kennedy v. Lubar*, 273 F.3d 1293, 1298 (10th Cir. 2001) (quoting 18 Charles Alan Wright et al., FEDERAL PRACTICE & PROCEDURE: Jurisdiction § 4478 (1981)). But the doctrine functions less as a mandate and more as a guiding norm: generally, "when a court decides upon a rule of law, that decision *should* continue to govern the same issues in subsequent stages in the same case." *United States v. Monsisvais*, 946 F.2d 114, 115 (10th Cir. 1991) (emphasis added) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)); *accord Wilson v. Meeks*, 98 F.3d 1247, 1250 (10th Cir. 1996) ("The doctrine is considered only a rule of practice and is not a limit on a court's power or authority.").

Thus, the law of the case doctrine is fundamentally permissive, affording courts, for example, "the discretion to entertain relitigation of settled issues when the failure to do so would work 'a manifest injustice.'" *Entek*, 840 F.3d at 1242 (quoting *White v. Murtha*, 377 F.2d 428, 431–32 (5th Cir. 1967)). And, to the extent the law of the case doctrine constrains a district court's discretion at all, it certainly does not operate to calcify the legal force of non-final orders like the July 2015 Common Benefit Order. *See Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1251 (10th Cir. 2011) (noting that we have "declined to apply [the law of the case doctrine] to rulings revisited prior to entry of a

---

district court of contravening its own order." Joint Aplees.' Resp. Br. at 123–24 (emphasis omitted). Nevertheless, we exercise our discretion to review their argument.

final judgment, concluding that 'district courts generally remain free to reconsider their earlier interlocutory orders'" (quoting *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1225 (10th Cir. 2007))); *id.* at 1252 (confirming that the "law of the case doctrine [is] inapplicable to reconsideration of interlocutory orders in the district court without regard to the basis for reconsideration" and "reaffirm[ing] that . . . [the] doctrine has no bearing on the revisiting of interlocutory orders"); *cf. Elephant Butte Irrigation Dist. v. U.S. Dep't of Interior*, 538 F.3d 1299, 1306 (10th Cir. 2008) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge." (quoting *Price v. Philpot*, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005))).

In any case, we do not understand the district court's decision-making to be arbitrary as Byrd and Shields paint it. The Kansas Special Master observed that guidelines established in the July 2015 Common Benefit Order were underinclusive because they failed to account for all the expenses that furthered the settlement. Thus, the Kansas Special Master recommended reimbursing expenses that advanced this goal— in effect, recommending that the Kansas district court enlarge the definition of "common benefit expenses" so as to not undercompensate attorneys. No attorney objected to the Kansas Special Master's recommendations, which the Kansas district court "adopt[ed]." Joint App., Vol. 23, at 5380. So, even though the Kansas district court noted that the "standards and limitations" contained in the July 2015 Common Benefit Order would apply, *id.*, its December 2018 Fee Allocation Order is reasonably clear that those guidelines are not exhaustive. Other firms got the point and made submissions accordingly. That Shields withdrew its initial request does not mean that either the

Kansas Special Master or the Kansas district court acted arbitrarily.  Sometimes, when you play your cards wrong, you lose.

### b.    The District Court's Expense Awards Were Reasonable

Byrd and Shields also contend that the Kansas district court erroneously differentiated between "permanent salaried worker[s] . . . [who were] 'shopped out' and not designated a[s] employee[s] for tax purposes"—who could be considered "expenses"—and "temporary hourly worker[s] hired in-house"—who could not be considered "expenses."  Byrd & Shields Opening Br. at 12.  Byrd and Shields essentially argue that the "court arbitrarily [granted and denied] expenses without *any* governing methodologies."  Byrd & Shields Reply Br. at 5 (emphasis added).

We see it differently.  According to Byrd and Shields's own briefing, the Kansas district court "relied on Byrd's level of control over workers to deny [its] expense reimbursement."  Byrd & Shields Opening Br. at 12.  Thus, even Byrd and Shields effectively recognize that the district court employed *some* kind of standard.  For them, the issue is not actually that the district court's fee assessment was rudderless, it is that it did not extend deeply enough into the facts.  Thus, Byrd and Shields argue that "it was incumbent on the court to consider the level of control other firms exerted over their workers to determine whether they were 'independent contractors' (an expense) or 'temporary employees' (not an expense)."  *Id.*  They say that, instead of engaging in a fact-intensive analysis, the Kansas district court "improperly accepted at face value the labels firms attached to workers when labels are not dispositive."  *Id.*  As a result, they

152

claim that the district court ended up granting expenses to some firms but denying expenses to others for substantively the same work.

These arguments are unavailing. To start, Byrd and Shields fail to rebut the Kansas district court's critical "double-dipping" rationale for denying their objections to the Kansas Special Master's R&R on expenses. Recall that, as we have narrated above, in both Byrd's and Shields's cases, the Kansas district court noted that, regardless of the timeliness of their expense applications or their characterizations of the work for which they sought compensation, the firms *already should have been allocated* compensation for that work through the attorneys' fee process—and to allow these firms to additionally obtain some kind of expense-related compensation would constitute, in effect, a double recovery. Specifically, with respect to Byrd, the district court noted that the attorneys' fee award process was designed to compensate it for the work done by its employees. Likewise, regarding Shields, the district court concluded that Shields voluntarily looked to the fee award process for compensation for the contract labor that contributed to its PFS work and, to allow it to shift direction now and seek compensation for the same work as reimbursement for expenses would (at the very least) generate "the specter of double-dipping." Joint App., Vol. 29, at 6900. Byrd and Shields leave the Kansas district court's findings completely unaddressed in this appeal, which, we note, proves to be fatal to their challenge. *See Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015) ("The first task of an appellant is to explain to us why the district court's decision was wrong," which involves challenging "the reasons that were given by the district court . . . .").

153

More substantively, "[a] request for attorney's fees should not result in a second major litigation." *Hensley*, 461 U.S. at 437. The Kansas Special Master scrutinized each firm's petition and supporting materials. Notwithstanding this thorough review process, we reiterate that reasonableness is the touchstone of our analysis. For that reason, a district court does not abuse its discretion when awarding attorneys' fees and expenses unless it "renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Derma Pen, LLC v. 4EverYoung Ltd.*, 999 F.3d 1240, 1244 (10th Cir. 2021) (quoting *Burke v. Regalado*, 935 F.3d 960, 1011 (10th Cir. 2019) (citation omitted)). That the district court did not spearhead a fact-finding mission to determine the precise nature of each firm's relationship with its employees (or independent contractors) is not the product of a "manifestly unreasonable judgment." *See id.* We have no trouble concluding that the district court reasonably exercised its discretion when it, together with the Kansas Special Master's intensive review, engaged in both a *de jure* and *de facto* analysis of the expenses. Thus, for all these reasons, we find Byrd and Shields's arguments as to Issue 1 unavailing.

## 2.      The Lodestar Figures

We now turn to Byrd and Shields's penultimate challenge. In their view, they are the victims of group work gone bad. Before the Kansas district court even allocated a percentage of the fee award to the Minnesota pool, Byrd and Shields contend that Minnesota CLC recommended a common benefit fee based on a lodestar computation reflecting the work of the Minnesota attorneys, including Shields's "time and lodestar ($5,240.683.25 in PFS work) and some of Byrd's PFS time and lodestar." Byrd and

154

Shields Opening Br. at 13. Accordingly, in the sequence of events, Byrd and Shields supplied Minnesota CLC their proposed fee allocations based on their lodestar figures and then—not coincidentally, as they see it—the Kansas district court allocated approximately $118 million to the Minnesota pool.

Thus, in the view of Byrd and Shields, the $118 million pool allocation included their lodestars. But by the time the Minnesota state court disbursed the funds to individual firms, Byrd and Shields contend that Minnesota CLC reversed course, specifically by arguing that their PFS work—which contributed to the lodestar computation resulting in the $118 million pool allocation—should be *excluded* from their fee award. By their lights, the effect—if not the intent—of this shift in course was to reduce the fee claim of Byrd and Shields to the pool funds and to increase the amount available for others—notably, the Minnesota CLC. In ultimately approving "these shenanigans," Byrd and Shields contend that the district court abused its discretion. *Id.* at 14. As further evidence of the unreasonable allocation, Byrd and Shields complain that the Kansas district court's allocation scheme awarded certain Illinois firms—which did not significantly contribute to the common recovery—a higher PFS award than Byrd and Shields could claim given the $301 flat fee.

We need not spend much time on this issue as Byrd and Shields's premise—that the lodestars were determinative in the district court's December 2018 Fee Allocation Order—is wrong. When the Kansas Special Master initially recommended the district court allocate 24% of the fee award to the Minnesota pool, she assessed the litigation's history, the Fee-Sharing Agreement, her own and the Illinois Special Master's experience

155

in connection with the settlement negotiations and implementations, and "the available data regarding attorney hours incurred." Joint App., Vol. 21, at 4815. The Kansas Special Master specifically noted that "[t]here is some inconsistency and dispute among firms as to what hours are properly considered 'Common Benefit Hours.'" *Id.* at 4815 n.7. In keeping with the equitable principles undergirding the common-fund doctrine, the Kansas Special Master explained that "[w]hat is most relevant in assessing contributions that benefitted the Class is *not the characterization of the time*, but the actual *tasks* performed." *Id.* (emphases added). Unsurprisingly, the Kansas district court did not so much as mention a lodestar calculation in connection with the initial Minnesota allocation. So, contrary to Byrd and Shields's contentions, the lodestars did not shape the initial Minnesota allocation.

Moreover, Byrd and Shields crucially "ignore that the basis for awarding fees for PFS work from the common-benefit allocations was merely that it kept the 'litigation moving' and 'helped to push Syngenta toward settlement.'" Joint Aplees.' Resp. Br. at 114 (quoting Joint App., Vol. 21, at 4817). And, as the Minnesota state court explained, it largely agreed with Minnesota CLC's "general approach" with respect to the PFS-related work and its recommendation to compensate such work through a flat fee. Joint App., Vol. 29, at 6738. Minnesota CLC justified the flat-fee approach through explaining, among other rationales, that a flat-fee payment of $250 "for each completed PFS . . . represents the best solution to recognize the common benefit value of all firms' PFS efforts through a consistent payment methodology, *while avoiding overpayment for*

156

*inefficient work.*" *Id.* at 6731 (emphasis added). As described by the Minnesota state

court, in substance, Minnesota CLC reasoned as follows:

> [C]ompleting thousands of PFSs would serve the common benefit by
> showing Syngenta that defeating class certification would not end the
> litigation[;] [o]nce critical mass was reached (that is, by completion and
> delivery of a sufficiently large number of PFSs to place pressure on
> Syngenta), the effect of any single additional PFS became of diminishing
> benefit to the entire group of plaintiffs.

*Id.* at 6725.

Minnesota CLC did not stop there, as it further reasoned, in deciding to

recommend a flat fee for each PFS filed, that:

> [D]ifferent firms performed PFS-related work in different ways, with some
> using senior lawyers, others using junior lawyers, paralegals, or staff, and
> still others hiring outside contractors. As a result, widely disparate hours,
> hourly rates, and lodestars, were claimed for doing essentially the same work.
> As an example, two objecting firms' PFS lodestar amounts averaged to
> $2,000 per PFS or higher, while other firms completed their PFSs at a much
> lower average cost. [Minnesota CLC] also learned that some firms recorded
> all of their PFS-related time contemporaneously, while others recreated it
> later based upon estimates, giving rise to differing levels of accuracy in the
> record-keeping supporting the claimed PFS lodestar amounts. Furthermore,
> some firms did not differentiate between time spent entering completing
> PFSs and time spent entering data for other litigation purposes.

*Id.* at 6726. Certainly, Minnesota CLC's discussion illustrates precisely why, in a

common fund context, the lodestar can serve as a dubious benchmark.

The Minnesota state court itself, while largely adopting Minnesota CLC's

approach and, to an extent, its reasoning for a flat fee, found that $250 was too low and

increased the flat fee to $301.63, explaining that:

> The [a]mount of the Court's flat fee is driven, in part, *by the arithmetic of
> dividing a large sum of money among many claimants*. The Court's
> considered judgment is that the per-PFS flat fee . . . should be increased by

157

approximately 20% from the proposed amount. A flat fee of $300 would be exactly 20% higher than the proposed $250, but would leave a small percentage of the Minnesota pool attorney fees unallocated. The remaining small amount to be allocated after adjusting the multipliers and increasing the flat fee is most fairly accounted for, in the Court's view, by slightly raising the per-PFS flat fee to $301.63.

*Id.* at 6743 n.6 (emphasis added). And, perhaps more crucially, the Minnesota state court—following, in effect and in salient part, the diminishing returns and work inefficiency reasoning of the Minnesota CLC, which is also embraced in our caselaw— stated that:

In the Court's view, a flat fee of $301.63 for each completed PFS submitted to Syngenta will provide fair compensation for the common benefit conferred by PFS-related work, *without over-compensating for such work. To pay a much higher fee for PFS-related work, well in excess of the claimed lodestar amounts as advocated by many of the objectors, would overemphasize the value of the PFS work, as compared to the substantive legal work performed by the firms in the higher tiers.* As Judge Lungstrum [of the Kansas district court] noted in his March 20, 2019 order, the preparation of PFSs contributed to the favorable outcome to a relatively small extent, and it is appropriate to compensate firms for their completed PFSs at a rate that reasonably approximates the lodestar amount for performing that task efficiently.

*Id.* at 6744 (emphasis added).

As we have already explained—and as our discussion here illustrates—the Minnesota state court's allocation order was not out-of-step with our precedent: it reasonably, albeit implicitly, considered the common fund doctrine's equitable principles and the *most relevant Johnson* factors. Here, we find that the overall record, along with Joint Appellees' arguments before us and in the courts below, show the Minnesota state court's flat-fee award of $301.63 per PFS to be reasonable. Thus, we do not see any

significant issues surrounding the discrepancy between the flat-fee rates between Minnesota and Kansas such that a reversal or remand is warranted as to this issue.[54]

Equally unavailing, Byrd and Shields's claims about PFS compensation from the Illinois common benefit pool add nothing to their argument, as these claims are wholly speculative and unsupported by the record. Thus, to the extent that Byrd and Shields argue in their initial and supplemental briefing that fee awards were unreasonable, we disagree.[55]

### 3. The District Court Did Not Arbitrarily Disregard the Joint Prosecution Agreements

We now resolve Byrd and Shields's final challenge by highlighting the critical distinctions between the Joint Prosecution Agreements and the Watts Guerra Settlement. Byrd and Shields argue that the Kansas district court's approval of the Watts Guerra Settlement illustrates its arbitrary disregard for the JPAs. This argument is unavailing.

---

[54] The differential rates between the PFS-related fees of Kansas and Minnesota track the relative common benefit pool allocations. That is, the Kansas pool accounted for roughly 50% of the aggregate attorneys' fee award, while the Minnesota pool accounted for just shy of 25%. That is, the Minnesota pool was half the size of the Kansas pool. So, logically, Minnesota PFS work was compensated at half the rate of Kansas PFS work, thereby reflecting the Kansas district court's judgment as to the relative contributions of each litigation site to the overall settlement process. Byrd and Shields's related contention that some Illinois firms benefitted from a PFS flat-fee windfall is unavailing; no firm asked the Illinois district court to award PFS work on a flat-fee basis and, in any case, the Illinois court gave "little weight" to the hours firms reportedly spent on PFS work. Joint App., Vol. 29, at 6941.

[55] To the extent that Byrd and Shields argue that the Kansas district court erred in allocating only 12% of the aggregate fee award funds to the IRPA pool, we direct them to our discussion of Kansas Appellants' argument regarding that same issue.

As we have discussed, the JPAs did not govern and merited little weight because they did not anticipate a nationwide class action settlement. By contrast, the nationwide class action settlement context is baked into the Watts Guerra Settlement. Hence, Minnesota Appellants' argument that the district court arbitrarily enforced one agreement but not the other rests on an inapposite comparison, one tantamount to comparing apples to oranges. *See Derma Pen, LLC*, 999 F.3d at 1244 (noting that a district court does not abuse its discretion when awarding attorneys' fees and expenses unless it "renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment" (quoting *Burke*, 935 F.3d at 1011 (citation omitted))).

***

In sum, the Kansas district court acted well within its discretion in denying Byrd and Shields's belated expense applications and motions for reconsideration, and Byrd and Shields fail to show how these denials constituted an abuse of discretion. Likewise, they, like their fellow Appellants, fail to establish an abuse of discretion as to any facet of the attorneys' fee allocation process in the Kansas district court. We thus reject their challenges and affirm the Kansas district court's orders concerning the fee allocation as to the Minnesota common benefit pool.

### G.    Illinois Appellants

We now turn to Illinois Appellants, who target the Kansas district court's November 2019 Illinois Pool Allocation Order, while also invoking the Kansas district court's April 2019 Clarification Order. Their sole issue is framed as follows: "Whether the district court erred by refusing to review the attorneys' fees allocations recommended

160

by [the Illinois Special Master] and [the Illinois district court] and instead adopting [the

Illinois district court's] recommended allocations without reviewing them under the

*Johnson* factors." Ill. Aplts.' Opening Br. at 6.

Consisting of Demerath and Eiland, Illinois Appellants pursue a narrow challenge.

They argue that the Kansas district court erred by reviewing the Illinois district court's

allocation order too deferentially. Illinois Appellants contend that the Kansas district

court, because it had "exclusive jurisdiction over the allocation of the attorneys' fees and

expenses," "was required to meaningfully review the recommendations regarding the

allocation by applying the *Johnson* factors." *Id.* at 10. However, in their view, because

the Kansas district court limited its review of the August 2019 Illinois Pool Allocation

Order to structural and procedural issues, it did not specifically assess the Illinois fee

award's reasonableness against the *Johnson* factors. Accordingly, Illinois Appellants

request that we reverse the Kansas district court's November 2019 Illinois Pool

Allocation Order "so that the district court can perform this review."[56] *Id.*

---

[56] Illinois Appellants concede that the Kansas district court "had discretion to consider (and even defer to) the recommendations of [Illinois Special Master] Stack and [Illinois District] Judge Rosenstengel," but nonetheless assert that the court "had no discretion to simply adopt Judge Rosenstengel's recommendations without at least analyzing the allocation under the *Johnson* factors." Ill. Aplts.' Opening Br. at 12. At bottom, the implicit foundation of Illinois Appellants' argument seems to be that the Kansas district court erred by not adopting the Illinois Special Master's R&R, which provided them a higher attorneys' fee award compared to the Illinois district court's August 2019 Illinois Pool Allocation Order. Illinois Appellants specifically note that, in its Fee Allocation Order, the Kansas district court justified deferring to the Illinois district court's August 2019 Illinois Pool Allocation Order because of that court's "familiarity with the lawsuit." *Id.* at 13. They assert, however, that though such "logic certainly applies to [Illinois Special Master] Stack's Report and Recommendation," "it does not support unquestioned deference to Judge Rosenstengel's determination because she was

First, we find that, in failing to object to the Kansas district court's pronouncements regarding the scope of its review, Illinois Appellants forfeited their arguments. And, because they failed to argue plain error before us, we deem those arguments effectively waived. Nevertheless, with our highly deferential—and prejudice-sensitive—standard in mind, we are ultimately not persuaded as to the merits of their claim. A federal court, albeit one based in Illinois, assessed Illinois Appellants their fees in full view of the *Johnson* factors. To the extent the Kansas district court erred—an issue we need not decide—the error was harmless.

## 1.     Effective Waiver

Illinois Appellants lodged no objections to the Kansas district court's December 31, 2018, Fee Allocation Order—which anticipated that the Illinois district court alone would allocate the Illinois common benefit pool—and, likewise, voiced no contemporaneous objection to the court's April 2019 Clarification Order when it was entered.

Illinois Appellants' failure to file objections as to the scope of the Kansas district court's review of the Illinois district court's allocation order constitutes forfeiture. *See Leffler*, 942 F.3d at 1196 ("When a party fails to raise an argument below, we typically treat the argument as forfeited."). Furthermore, because Illinois Appellants failed to

---

not the judge who presided over the Illinois Syngenta litigation." *Id.* Yet it is not altogether clear how Illinois Appellants would practically reconcile, on the one hand, their insistence that any allegedly unquestioned deference by the Kansas district court to the Illinois district court is improper with, on the other hand, their contention that deference to the Illinois Special Master's R&R—but not Judge Rosenstengel's August 2019 Illinois Pool Allocation Order—is permissible.

argue plain error before us, we deem their argument effectively waived. *See Richison*, 634 F.3d at 1131. However, as we have said, "whether issues should be deemed waived is a matter of discretion." *Walker*, 918 F.3d at 1153. With that, we elect to turn to the merits.

### 2.    The Kansas District Court's Limited Review Did Not Prejudice Illinois Appellants

#### a.    The Illinois District Court Adequately Applied the *Johnson* Factors

To start, we note that the Illinois district court's August 2019 Illinois Pool Allocation Order expressly acknowledged that common benefit principles and the *Johnson* factors shaped its determination of the fee award. With respect to Demerath, the Illinois district court observed that the firm claimed "9,505.5 hours of common benefit work, consisting of 6,060 attorney hours and 3,445.5 non-attorney hours." Joint App., Vol. 29, at 6944. Of that, Demerath claimed 321.5 attorney hours and 91.5 non-attorney hours for drafting complaints, 5,375.5 attorney hours and 3,237 non-attorney hours for pre-settlement communications with clients, 345 attorney hours and 105 non-attorney hours for assisting clients in perfecting claims, and 18 attorney hours and 12 non-attorney hours in preparing fee petitions. The court afforded "significantly less weight to the non-attorney hours and little weight to hours recorded as pre-settlement communications with clients and assisting clients in perfect claims," *id.*, because "time spent shepherding clients through the claims process and substantial post-retention communications with clients are not especially valuable to the common benefit of the plaintiffs," *id.* at 6938. Moreover, the court found that Demerath's contributions to the overall settlement were

limited to it "filing some of the first cases in Nebraska." *Id.* at 6944. Accordingly, the court awarded Demerath $780,166.67, or 1% of the Illinois pool.

Turning to Eiland's award, the court observed that Eiland claimed 13,254 hours of "common benefit work," consisting of 7,268 attorney hours and 5,986 non-attorney hours. *Id.* at 6945. While Eiland devoted 468 attorney hours to complaint drafting, motion briefing and argument, paper discovery, expert witness work, and other pretrial motion practice, they committed the bulk of their attorney hours—4,015, to be exact—to pre-settlement communications with clients. In addition, Eiland spent 815 attorney hours preparing and reviewing PFSs, which the court already explained contributed little to the plaintiffs' common benefit. However, the court recognized that Eiland filed several cases in Illinois, assisted with document review and briefing, worked with experts, and conducted discovery. For this, the court awarded Eiland $2,340,500, or 3% of the Illinois pool.

As we noted earlier, "[w]e have *never held* that a district court abuses its discretion by failing to specifically address each *Johnson* factor"—and, in fact, "we have stated that not all of [these factors] need be considered." *Gudenkauf*, 158 F.3d at 1083 (emphasis added). We are satisfied that the *Illinois* district court applied the *Johnson* factors, albeit implicitly. The Illinois district court expressly found that the bulk of both firms' time and labor did not contribute to the plaintiffs' common benefit, and accordingly discounted much of that time. *See Johnson*, 488 F.2d at 717 (Factor 1). Because walking clients through the claims process and preparing fact sheets was exceptionally easy, neither Demerath nor Eiland had to apply their talents to particularly

novel or difficult legal questions; successfully accomplishing those tasks required little skill. *See id.* at 718 (Factors 2 and 3). The "results" both firms obtained were relatively miniscule compared to the time they invested, but the Illinois district court nevertheless compensated each firm for its contribution to the common benefit. *See id.* (Factor 8).

b.       **To the Extent the Kansas District Court Erred, the Error Was Harmless**

Though it nominally restricted its review of the Illinois district court's order to structural and procedural defects, the Kansas district court opined that the Illinois district court "properly considered the type of work for which Demerath claimed common benefit fees, and [it] applied this Court's guidance in affording less weight to non-attorney hours, claims work, and client communications." Joint App., Vol. 32, at 7448. And, as it did with Demerath's objections, the Kansas district court remarked that the Illinois district court "acknowledged Eiland's contributions" but assigned less value to the firm's work "relating to fact sheets, client communications, claims, and administration." *Id.* at 7449. Notably, the Kansas district court assured the parties that it would not "merely . . . sign off on the allocations . . . without any consideration whatsoever." *Id.*, Vol. 26, at 5926. So, any insinuation that the court did a blanket, blind adoption of the Illinois district court's fee allocation order would be plainly inaccurate. Framed more accurately, what Illinois Appellants object to is the Kansas district court's decision to not explicitly analyze the fee allocations against the *Johnson* factors after another federal court did exactly that.

Of course, our precedent establishes that courts are obliged to ensure the reasonableness and fairness of attorneys' fees awards and to state the reasons for its

findings. *See Uselton*, 9 F.3d at 853 (reconfirming, again, "the existing requirement that the district court determine the reasonableness of the fee and articulate specific reasons for its findings"); *Brown*, 838 F.2d at 454 (noting that "the district court must 'articulate specific reasons for fee awards to give us an adequate basis' to review the reasonableness of the percentage and thus the reasonableness of the fee award" (citation omitted) (quoting *Ramos v. Lamm*, 713 F.2d 546, 552 (10th Cir. 1983))).

Even so, reviewing Illinois Appellants' challenge on the merits still affords them no relief because they completely fail to explain how they were prejudiced by the Kansas district court's circumscribed review. That is, they fail to explain how a *Johnson* factor analysis—or, indeed, the "hybrid" analysis we have explained is appropriate in common fund allocations, *see Chieftain Royalty*, 888 F.3d at 458–59—would change the Kansas district court's decisions regarding the attorneys' fees awarded to them. Effective waiver aside, we are especially disinclined to consider reversing a district court's fee award where, as here, appellants have made no attempt to show how they were harmed or prejudiced by the alleged error. *See Nixon*, 784 F.3d at 1366. This is especially so given that the Illinois district court considered the *Johnson* factors and common fund equitable principles when devising the fee award. So, bearing in mind Illinois Appellants' failure to explain how exactly they were prejudiced by the Kansas district court's adoption of the Illinois district court's pool allocation order, we do not see a reason to disturb the Kansas district court's decision. In short, "[w]e see nothing in the record to indicate [either the Kansas or Illinois] district court[s] failed to carefully and adequately familiarize

166

[themselves] with this litigation before rendering the fee award." *Uselton*, 9 F.3d at 854. We affirm.

### H.    Johnson Becker

The last of the Appellants, Johnson Becker challenges discrete portions of the Kansas district court's December 31, 2018, Fee Allocation Order and July 2019 Minnesota Pool Allocation Order.  Specifically, Johnson Becker questions whether the Kansas district court's "refusal to allow [the firm] . . . the opportunity to seek attorneys' fees before those Courts where it actually performed work—while allowing every other similarly situated firm to make multiple fee applications—[constituted] a due process violation[.]"  Johnson Becker Opening Br. at 1.

Specifically, Johnson Becker argues that the Kansas district court violated its constitutional due process rights when it assigned it solely to the Minnesota common benefit pool, rather than assigning it to the Illinois common benefit pool or to both the Illinois and Minnesota pools.  Johnson Becker complains that it "was the only Firm in the entire litigation who performed common benefit work in two jurisdictions but was evaluated by only one court." *Id.* at 2–3 (emphases omitted).  Thus, as Johnson Becker reasons, the Kansas district court's "decision to place [Johnson Becker] in one Court versus the Courts where the work occurred," then, "was wholly arbitrary and adversely impacted its fee award." *Id.* at 3.

According to Johnson Becker, that adverse impact took form as follows: It "filed 1,352 cases . . . in Minnesota and 510 cases in Illinois," and it performed "511.8 hours of 'traditional' common benefit work in Minnesota and 400.9 hours in Illinois." *Id.* at 2.  It

167

is not that the Minnesota state court made no effort to compensate Johnson Becker for its Illinois work—it did. The issue, as Johnson Becker sees it, is that the Illinois district court's "methodology allowed firms to seek reimbursement for 'broader' common benefit work—i.e., work that advanced the litigation but was not subsumed within traditional litigation activity." *Id.* Johnson Becker claims it performed 6,000 such "broader" common benefit hours in Illinois. *Id.* Though Johnson Becker would like to collect, it cannot as long as it is assigned to the Minnesota pool. Thus, Johnson Becker argues that the Kansas district court's *initial* assignment to the Minnesota pool violated its right to due process under the Fifth and Fourteenth Amendments. We decline to reach Johnson Becker's constitutional claims because the firm abandoned (i.e., waived) its sole appellate issue in the district court.

Johnson Becker does not contest the relevant procedural history. When the Kansas Special Master initially placed Johnson Becker within the Minnesota common benefit pool, Johnson Becker filed a paper seeking clarification concerning how its Illinois legal work would be evaluated and compensated by the Minnesota state court. Furthermore, Johnson Becker affirmed that it was "not objecting to its inclusion in the Minnesota grouping, or to any other aspects of the Special Master's Report." Joint App., Vol. 22, at 5080 (Johnson Becker's Req. for Clarification Regarding the November 2018 Fee Allocation R&R, filed Dec. 5, 2018).

At the subsequent hearing on the November 2018 Fee Allocation R&R held on December 17, 2018, the Kansas Special Master clarified that she expected the Minnesota state court to compensate Johnson Becker for its Illinois legal work as part of its overall

168

attorneys' fee award.  Later in the same hearing, counsel for Johnson Becker characterized the firm's "objection" as "technically a request for clarification," *id.*, Vol. 23, at 5314, which makes sense given that Johnson Becker titled its filing "Johnson Becker's *Request for Clarification*" and explicitly did *not* object to its inclusion in the Minnesota pool, *id.*, Vol. 22 at 5076 (emphasis added).  Johnson Becker stated at the hearing that the Kansas Special Master "for the most part clarified [its] question" and further relayed that it "kn[ew]" it would be "treated fairly" by both the Minnesota state court and Minnesota CLC as to the allocation and valuation of its Illinois time.  *Id.*, Vol. 23, at 5314–15.  Concluding, Johnson Becker said, "So, . . . what we really came for today was to get that clarification.  *I think we've received it*."  *Id.* at 5315–16 (emphasis added).[57]

Johnson Becker's filing of a paper requesting clarification and then its explicit decision not to object—upon receiving the Kansas Special Master's clarifying explanation—suggests that it knew it had the right to object "and intentionally chose[] to relinquish it."  *Vreeland v. Zupan*, 906 F.3d 866, 876 (10th Cir. 2018); *see also United States v. Cruz-Rodriguez*, 570 F.3d 1179, 1183 (10th Cir. 2009) ("Waiver occurs when a party deliberately considers an issue and makes an intentional decision to forgo it.").  Stated otherwise, even if we were to characterize Johnson Becker's "request for clarification" as an "objection"—as it initially did during the hearing before the Kansas

---

[57]    The Kansas district court similarly observed that Johnson Becker had "abandoned" the argument during the December 17, 2018, hearing, among other instances in which the firm failed to explicitly raise its objection.  Joint App., Vol. 29, at 6876.

Special Master—Johnson Becker's agreement with, and its acceptance of, the clarification offered and decision not to object further to its placement in the Minnesota common benefit pool constituted abandonment. *See Richison*, 634 F.3d at 1127 (noting that when a litigant has "intentionally relinquished or abandoned [a theory or argument] in the district court, we . . . deem it waived and refuse to consider it"); *see also United States v. Martinez*, 974 F.2d 589, 591 (5th Cir. 1992) (noting that "the critical factor in deciding whether the silence of counsel constitutes a waiver is whether there was a *meaningful opportunity* for counsel to request argument or to object, considering all the attendant circumstances" (emphasis added) (footnote omitted)). And, even if we were to charitably look at Johnson Becker's conduct before the district court as indicative of general litigation negligence and review its claim through the framework of our forfeiture doctrine, Johnson Becker failed to argue for plain error in either its opening or reply briefs. So, we would deem Johnson Becker's present objection to the district court's placement effectively waived. *See Richison*, 634 F.3d at 1131.

Furthermore, we note the additional fact that Johnson Becker utterly failed to object or submit a motion for reconsideration *after* the Kansas district court entered an order on January 9, 2019, which "noted that . . . six additional firms had been assigned by the [Kansas] [S]pecial [M]aster to both the Kansas and Minnesota pools because they had performed audited common benefit work in both jurisdictions." Joint App., Vol. 29, at 6875.[58] As to that January 9, 2019, order, the Kansas district court further recounted that,

---

58      As the Kansas district court itself pointed out, Johnson Becker repeatedly declined to object to any differential treatment of similarly situated law firms throughout

"with the consent of the Kansas and Minnesota leadership (which were designated by this Court and the Minnesota [state] court to undertake initial allocations from their respective pools), the Court ordered that those firms would remain in both pools," but "Johnson Becker did not renew its request to be placed in two pools in light of this order." *Id.*

Johnson Becker's failure to file anything opposing the Kansas district court's decision to place six other firms, but not it, in multiple pools perhaps most crucially proves fatal in terms of Johnson Becker's claim for preservation. In other words, when the Kansas district court issued its January 9, 2019, order—which placed those six other firms in multiple pools—Johnson Becker was explicitly on notice that such a placement was possible and that the court did *not* provide Johnson Becker with such a placement. Yet, even with explicit notice, Johnson Becker was silent and did not challenge its placement, despite knowing that *other* firms were successfully placed in multiple pools.

To frame it a bit differently, only after it received its fee award from the Minnesota common benefit pool did Johnson Becker complain its rights had been violated and argue that the Kansas district court needed to unwind the allocation

---

the fee allocation process, even though it was aware that roughly six other firms like it— i.e., firms that had performed work in two litigation sites—had been assigned to multiple common benefit pools. Moreover, even after the Kansas district court largely adopted the Kansas Special Master's November 2018 Fee Allocation R&R and "clarifie[d] that each applicant will eventually receive an award of fees based on its common benefit work anywhere, performed with respect to cases in any jurisdiction, regardless of the particular pool into which the applicant is placed," Johnson Becker "did not seek reconsideration of the Court's decision to assign it only to the Minnesota pool." Joint App., Vol. 29, at 6875.

framework and reassign it.  But, for the reasons discussed above, Johnson Becker had (at least) forfeited or (much more likely) abandoned and waived this complaint *months* before the Minnesota common benefit pool had been allocated.

Accordingly, we need not consider Johnson Becker's constitutional challenges here.  *See Richison*, 634 F.3d at 1127, 1131; *Carrasco-Salazar*, 494 F.3d at 1272–73.  After all, "[i]t is a well-established principle governing the prudent exercise of th[e] [c]ourt's jurisdiction that normally the [c]ourt will not decide a constitutional question"— here, Johnson Becker's constitutional due process claim—"if there is some other ground upon which to dispose of the case."  *Holder*, 557 U.S. at 205 (first alteration in original) (quoting *Escambia Cnty.*, 466 U.S. at 51).  So, we conclude that Johnson Becker has failed to preserve its sole appellate issue.

## I.    Pending Motions

Before concluding our merits discussion, we briefly turn to and dispose of three requests related to the merits of this action: (1) Kansas CLC's Contingent Cross-Appeal; (2) Byrd's, Shields's, and Hossley-Embry's October 13, 2020, Motion for Leave to File Additional Briefing; and (3) Toups/Coffman's July 26, 2021, Motion to Supplement the Record.  We dismiss these as either moot or unavailing.[59]

---

[59]    Because we have not considered in resolving this appeal the portions of Byrd and Shields's supplemental briefing related to the Watts Guerra Settlement, in summary fashion, we also **deny as moot** Joint Appellee's motion to strike, which was filed on August 5, 2021.

### 1.    Kansas CLC's Contingent Cross-Appeal

We turn first to Kansas CLC's Contingent Cross-Appeal.  Kansas CLC brings its cross-appeal "to preserve and show that even if one or more Appellants . . . demonstrate they were undercompensated, the Kansas allocation was not the reason for any under-compensation," and "any [potential] increase in fees to the Appellants should be based on reducing the Illinois or Minnesota allocations."  Kan. CLC's Contingent Cross-Appeal Br. at i.  In the alternative, Kansas CLC also requests that, "[i]f [we] accept[] any of [Appellants'] arguments," we should remand this matter "for the district court to make [an allocation] determination in the first instance because it is most acquainted with the facts."  *Id.* at i–ii.  Nevertheless, Kansas CLC itself further states that it "strongly urge[s] *full affirmance* of the district court's fee-allocation orders, *which would render moot th[e] contingent cross-appeal*."  *Id.* at i (second emphasis added).

Because a federal court can only exercise jurisdiction over "[c]ases" and "[c]ontroversies," U.S. Const. art. III, § 2, cl. 1, "an actual controversy must be extant at all stages of review."  *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1121 (10th Cir. 2010) (alteration in original) (quoting *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997)); *see also Equal Emp. Opportunity Comm'n v. CollegeAmerica Denver, Inc.*, 869 F.3d 1171, 1173 (10th Cir. 2017) ("A case or controversy does not exist when a claim is moot.  Thus, moot claims must be dismissed." (footnote omitted)).  Since we fully affirm the Kansas district court's orders challenged in these appeals, we **deny** the related Contingent Cross-Appeal filed by Kansas CLC as moot.

173

### 2.      Byrd, Shields, and Hossley-Embry's Motion to File Additional Briefing

On October 13, 2020, Byrd, Shields, and Hossley-Embry (hereinafter, "Movants") moved this court for an order permitting additional briefing. We conclude that Byrd, Shields, and Hossley-Embry effectively waived their arguments.

The motion for leave primarily concerns the motions for reconsideration Movants filed before the Kansas district court in September 2020. Those motions for reconsideration, in turn, challenge the Kansas district court's December 2018 and January 2019 orders, including the December 31, 2018, Fee Allocation Order as well as the Kansas Special Master's December 2018 R&R. In brief, those motions sought an additional fee allocation to the IRPA pool given allegedly unforeseen complexities in the settlement claims process. To wit, Movants argue the "district court prematurely discounted [their] contingent fee recoveries with their clients and awarded these firms a lesser common benefit fee while shifting millions of dollars in fees paid by their clients to the various common benefit pools" because "it lacked information as to the scope of work required by the attorneys during the settlement claims process." Joint Aplts.' Mot. for Leave to File Additional Briefing, Doc. 010110422119, at 4 (filed Oct. 13, 2020). Therefore, in Movants' view, additional briefing is necessary to illuminate "the lack of a 'simple and streamlined' settlement claims process which is the underpinning of the district court's orders." *Id.*

Since Movants filed their motion for leave in October 2020, the Kansas district court denied their motions for reconsideration. *See In re Syngenta AG MIR 162 Corn Litig.*, MDL No. 2591, Doc. 4499 (Mem. and Order, entered Dec. 2, 2020)

174

("Reconsideration Order").[60]  While the district court ostensibly found it lacked jurisdiction to consider the reconsideration motions at all, it nonetheless indicated that, had it enjoyed jurisdiction, it would still deny the motions because they were untimely and, in any case, did not disturb the common benefits logic undergirding the court's prior orders.  *See id.* at 7–12; *id.* at 6 (noting that "the Tenth Circuit has stated that even if a district court lacks jurisdiction to grant a Rule 60 motion because of a pending appeal, it may still consider and *deny* the motion" (citing *Allison v. Bank One-Denver*, 289 F.3d 1223, 1243 (10th Cir. 2002))).

We see no reason to exercise our discretion to grant Movants' request to effectively augment their opening briefs.  Movants have been on notice of the issues they raise in their reconsideration filings for quite some time—and, for our purposes, *months* before they filed their opening briefs in these appeals.  They offer nary a word as to why they were unable to include the substance of their reconsideration arguments as part of their initial appellate briefing.  So, here, we do not allow Movants to effectively "amend" their opening briefs and add new issues through supplemental briefing.  *Cf. Becker v. Kroll*, 494 F.3d 904, 913 n.6 (10th Cir. 2007) ("An issue or argument insufficiently raised in the opening brief is deemed waived.").

---

[60]    In an exercise of our discretion, we take judicial notice of the Kansas district court's order.  *See, e.g.*, *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007) ("Although we are not obliged to do so, we may exercise our discretion to take judicial notice of publicly-filed records in our court and certain other courts concerning matters that bear directly upon the disposition of the case at hand.").

175

Finally, we note that Movants' complaints about the district court's purported failure to account for the extra hours individually retained private attorneys would need to expend are irrelevant to the overall fee allocation framework. As the district court made clear on numerous occasions, and as we have elucidated here in parts of this opinion, the overall fee allocation framework, including the specific fee allocation to the IRPA pool, was predicated on the contributions specific attorneys or groups of attorneys made *toward the Settlement*. This was a central facet of the court's overarching "reasonableness" inquiry. Movants have not explained, either before the district court or before us, how these alleged hours more recently expended relate *at all* to "reasonableness" and why the Kansas district court's failure to anticipate such hours— even if that were true—would undermine its allocation decisions.

At bottom, Movants could have and should have included these arguments in their opening briefs. They cannot do so now by inaccurately claiming they pertain to "unanticipated" developments. And beyond their tardiness, these arguments are meritless and irrelevant to our review, and they do nothing to cast doubt on the Kansas district court's fee allocation decisions. Thus, we **deny** Movants' motion for leave to file supplemental briefs concerning their motions for reconsideration.

### 3.    Toups/Coffman's Motion to Supplement the Record

Lastly, Toups/Coffman filed a motion to supplement the record with documents concerning their contingent-fee agreements. Specifically, Toups/Coffman attempts to bring forth certain spreadsheets that apparently "combin[e] the source data pertaining to Toups/Coffman's contingent-fee client contracts . . . that [were] filed [before the Kansas

176

district court]." Toups/Coffman's Mot. to Supplement the Record, Doc. 010110553968, at 2 (filed Jul. 27, 2021). Toups/Coffman believe that the spreadsheets are relevant, first, "because they will conclusively show the Court the fees Toups/Coffman, at the very least, are due under the binding Contracts reviewed, approved, and accepted by the [Kansas] Special Master, but whose fee provisions were abrogated by the district court," and, second, because we apparently "noted several times during the oral argument that [we] could not determine what would be a fair fee allocation until all the information is before the Court." *Id*. at 2.

We do not generally review documents that were not before the district court. *See Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1549 n.1 (10th Cir. 1992) ("We will not review this complaint, however, because it was not before the district court when the various rulings at issue were made."); *see also Castner v. Colo. Springs Cablevision*, 979 F.2d 1417, 1423 (10th Cir. 1992) ("[The party's] motion to supplement the record is granted insofar as it relates to documents that were before the district court, and denied as to those documents that were not presented to the district court."). Supplementing the record on appeal is a "rare exception" only available through the exercise of our "inherent equitable power." *United States v. Pickard*, 396 F. App'x 568, 572 (10th Cir. 2010) (unpublished) (citing *United States v. Kennedy*, 225 F.3d 1187, 1192 (10th Cir. 2000)); *see Kennedy*, 225 F.3d at 1192 ("[U]nder some circumstances, we have an inherent equitable power to supplement the record on appeal."); 16A Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 3956.4 (5th ed.), Westlaw (database updated Apr. 2022) ("In special circumstances, a court of appeals may supplement the record to add

177

material not presented to the district court, though this is rare enough that many of the decisions noting the court's power to do so go on to say that the power will not be exercised under the circumstances of the case.").

Here, we find Toups/Coffman's motion to be meritless. First—and very simply— the spreadsheets were *not* filed before the district court. And, following our ordinary practice, that fact, standing alone, provides a sufficient reason to justify our denial of the motion. Second, even if we read our caselaw with an eye toward providing Toups/Coffman leeway and assume that the spreadsheets were "before" the court since they contain information from contingent-fee agreements that the Kansas district court reviewed—a reading of the caselaw that we explicitly note to be somewhat of a stretch bordering on the unreasonable—we still find the motion unavailing in light of the spreadsheets' irrelevance to our analysis here. *See CSX Transp., Inc. v. City of Garden City*, 235 F.3d 1325, 1330 (11th Cir. 2000) ("A primary factor which we consider in deciding a motion to supplement the record is whether acceptance of the proffered material into the record would establish beyond any doubt the proper resolution of the pending issues."); *accord Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1013 (6th Cir. 2003) ("[W]e need not consider this new information because the point [the plaintiff] is trying to establish with this material . . . is ultimately not material to our legal analysis."). As Joint Appellees rightly note, "no one asked Toups about the fees they *might* have received under their contingent fee contracts because that sum is irrelevant to the Court's disposition of these appeals." Aplees.' Resp. to

Toups/Coffman's Mot. to Supplement the Record at 3.  We agree with that observation and find the spreadsheets irrelevant to our review.

Third, we take issue with Toups/Coffman's insinuation that we requested the spreadsheets or the information therein.  We direct Toups/Coffman to the oral argument recording that they themselves cite; there, we did *not* inquire—and we expressed *no* concern—about the possible attorneys' fees award Toups/Coffman or any other firm would receive under contingent-fee contracts.  *See* Oral Argument, No. 19-3008, at 12:57–13:14; 13:31–13:41; 27:35–27:41 (10th Cir., dated March 10, 2021).  Instead, we asked certain questions as to what effect, if any, the then-pendency of the IRPA allocation had on the case.  *See id.*

Thus, for all these reasons, the motion to supplement the record is meritless and we **deny** the motion.

### III. Conclusion

For the reasons provided above, we **AFFIRM** the district court's post-judgment attorneys' fees orders.